Daniel J. Kaiser, Esq.
Kaiser Saurborn & Mair, P.C.
111 Broadway, 18th Floor
New York, New York 10006
Tel: (212) 338-9100

Attorneys for [under seal]


## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------------

|  |  |
|---|---|
| UNITED STATES OF AMERICA and NEW YORK STATE, ex rel. [UNDER SEAL],<br><br>Plaintiffs,<br><br>vs.<br><br>[UNDER SEAL],<br><br>Defendants. | Civil Action No.<br><br>12-CV-4425 (MKB/RML)<br><br>THIRD AMENDED COMPLAINT<br><br>**(FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2))** |

------------------------------------------------------

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

UNITED STATES OF AMERICA and NEW YORK STATE, ex rel. MICHAEL QUARTARARO,

                 Plaintiffs,

vs.

CATHOLIC HEALTH SYSTEM OF LONG ISLAND, INC. d/b/a CATHOLIC HEALTH SERVICES OF LONG ISLAND, ST. CATHERINE OF SIENA MEDICAL CENTER, ST. CATHERINE OF SIENA NURSING HOME,

                 Defendants.

---------------------------------------------------------x

Civil Action No.

12-CV-4425 (MKB/RML)

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL CIVIL FALSE CLAIMS ACT [31 U.S.C §§ 3729 *et seq.*] and NEW YORK FALSE CLAIMS ACT [N.Y. Finance Law §§ 187 *et seq.*]

JURY TRIAL DEMANDED

**(FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2))**

Plaintiff-Relator Michael Quartararo, through his attorneys of record, on behalf of the United States of America and New York State, for his Complaint against Defendants Catholic Health System, Inc. d/b/a Catholic Health Services of Long Island ("CHS"), St. Catherine of Siena Medical Center ("SCSMC") and St. Catherine of Siena Nursing Home ("SCSNH") (collectively, "the CHS Defendants"), alleges based upon personal knowledge, relevant documents and, where indicated, on information and belief, as follows:

2

## I.    **NATURE OF THE ACTION**

1.    This is an action to recover damages and civil penalties on behalf of the United States of America and New York State arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants and/or their agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*

2.    As set forth in detail below, the CHS Defendants knowingly engaged in complementary fraudulent schemes designed to misappropriate and enhance the reimbursement proceeds they received from the Medicaid and Medicare programs.

3.    The principal fraudulent scheme, which started in or about 2000 and lasted for more than a decade, began after CHS acquired the former Bishop Jonathan G. Sherman Episcopal Nursing Home ("BSENH") in Smithtown, New York.  After that transaction closed in late 1999, the nursing home was renamed St. Catherine of Siena Nursing Home and assigned a new Operating Certificate ("Opcert") identification number by New York State.  As discussed in further detail below, CHS and SCSNH knew that they were no longer entitled to the BSENH Medicaid reimbursement rate, and that they should be assigned a new rate (commonly referred to as "re-basing").  Rather than securing a new reimbursement rate from the New York Department of Health ("DOH"), however, they decided to continue submitting false and fraudulent claims to the New York Medicaid program for more than a decade, in which they claimed a BSENH rate that they knew was not associated with or assigned to SCSNH, and that they also knew was significantly higher than the rate to which they were legally entitled.  As a result of this scheme, Medicaid suffered losses of not less than $13 million.

3

4. Not satisfied with fraudulently claiming a Medicaid rate to which they were not entitled, CHS and SCSNH found a way to compound that initial fraud by fraudulently accepting a one-time $4.5 million "remediation" payment from the Medicaid program that was intended to compensate SCSNH for the huge drop-off in the Medicaid reimbursement rate that occurred in 2011, when the DOH re-based SCSNH to its true and far lower reimbursement rate. That $4.5 million payment, which was based on the drop-off from the inflated BSENH rate previously claimed by SCSNH to SCSNH's new rate, was artificially high. Had SCSNH claimed its true Medicaid rate in the years after acquiring BSENH, the "remediation" payment offered by DOH in 2011 would have been far less than $4.5 million. CHS then promptly misappropriated the payment for its own use by transferring a substantial portion of the money from SCSNH and preventing its use for the care of SCSNH residents. By accepting and converting this payment, to which CHS and SCSNH knew they were not entitled, these defendants effectively leveraged the first fraud to commit a second, related fraud against the Medicaid program. As a result of this scheme, Medicaid suffered losses of not less than $3 million.

5. Another fraudulent scheme involved the systematic and illegal diversion and misappropriation by CHS and SCSMC of Medicaid and Medicare funding required by law to be used by SCSNH for the treatment and care of its residents. This was done by charging SCSNH for fictitious expenses or expenses that were grossly inflated and then diverting Medicaid and Medicare proceeds to bolster the operational budgets of other CHS affiliates. For example, SCSNH was required to pay SCSMC for a range of charges, including certain utility expenses, payroll expenses and other ancillary medical and laboratory services that either were not incurred at all or that were grossly inflated. In this way, millions of Medicaid and Medicare dollars were fraudulently siphoned from the account and budget of SCSNH.

6.    The fraudulent practices described above constituted "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.* and the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.* Such claims cheated the government and unlawfully enriched the CHS Defendants.    Therefore, Plaintiff/Relator, Michael Quartararo, seeks to recover all available damages, civil penalties, and other relief for violations alleged herein.

## II.    PARTIES

7.    Plaintiff/Relator Michael Quartararo ("Relator") resides in Long Island, New York. Over a 38 year career, Relator rose through the ranks of CHS to become the licensed Administrator of SCSNH.    The nursing home Administrator has broad responsibility for the general administration of the nursing home, including but not limited to managing, supervising and coordinating all departments to ensure a proper environment and standards of care, maintaining and developing legally compliant operating protocols, developing and managing budgets, developing financial policies and monitoring financial performance to ensure sufficient revenue, supervising all human resource issues and reporting to the nursing home's governing body as needed.    In or about April 2007, Relator was asked to become the Administrator at SCSNH, a 240 bed nursing home, while still maintaining his oversight responsibilities at Good Samaritan Nursing Home ("GSNH"), another CHS nursing home located in Sayville, New York. At the time Relator assumed the position of Administrator, SCSNH was experiencing a range of operational efficiency problems.    During his tenure as Administrator, Relator was successful in making numerous improvements at SCSNH that enhanced operational efficiency and increased revenues.    Relator's leadership and innovative management techniques drew praise from staff, residents, families of residents, the communities, local politicians, as well as CHS executives,

and he was rewarded with salary bonuses, large monetary grants, community awards, regulatory and private nursing training programs, as well as multiple nominations for CHS leadership awards. Although Relator was not directly involved in billing or financial accounting activities at CHS, as Administrator, Relator regularly interacted with many of the top executives of the CHS Defendants, and participated in conversations and attended meetings during which he gradually became aware of various compliance issues, including the fraudulent schemes alleged in this complaint. After Relator began voicing his objections to CHS executives, CHS orchestrated his dismissal, telling Relator that he was no longer "the right fit" at SCSNH.

8. Catholic Health System of Long Island, Inc. ("CHS, Inc.") is a New York corporation doing business as Catholic Health Services of Long Island, and is headquartered in Rockville Centre. CHS, Inc. is an enterprise of more than 17,500 staff and 4,600 health care professionals engaged in the operation of hospitals, nursing homes and/or the care of the sick, and is a healthcare consortium. CHS, Inc. describes itself as an integrated healthcare system that includes six hospitals, three nursing homes, a regional home care and hospice group and a community-based agency for persons with special needs. One of the hospitals is SCSMC, located in Smithtown, NY. One of the nursing homes is SCSNH, also located in Smithtown, right next to SCSMC. Collectively, the CHS Defendants are related organizations through, for example, common ownership, governing bodies, trustees and/or officers. The CHS Defendants comprise a single, integrated enterprise, as they perform related activities through common control for a common business purpose and also engage in a joint venture of operational control for providing healthcare services through an agreement, as established through their conduct in sharing profits and losses.

6

## III.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator is the original source of the facts and information alleged in this Complaint.

10.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the Defendants can be found in this District and transact business in this District.

11.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendants can be found in and transact business in this District. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

## IV.    APPLICABLE LAW

### A.    Federal False Claims Act

12.    The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to

7

disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

13.    The FCA prohibits knowingly presenting or causing to be presented to the federal government or any contractor, grantee or other recipient of federal funds, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).[1] Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B), (G).

14.    The FCA does not require direct contact between a defendant and the government. By its terms, the FCA imposes liability on any person who presents or *causes* to be presented a false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). *See* 31 U.S.C. § 3729(a).

15.    To "cause" an FCA violation, it is not necessary that a defendant's fraudulent conduct be the last in the series of events that results in financial loss to the government. As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a defendant's actions. Under this standard, a defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the defendant need not be the recipient or beneficiary of the false claim. All that is required is that the defendant, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

---

[1] Citations are to the renumbered liability provisions of the FCA, as effected by the Fraud Enforcement and Recovery Act of 2009 (Publ. L. No. 111-21, [May 20, 2009]).

16.   The FCA also prohibits two or more parties from conspiring to violate any of the liability provisions of the statute. 31 U.S.C. § 3729(a)(1)(C).   Any person who violates, or conspires to violate, the FCA is liable for a civil penalty of up to $11,000 per claim for claims made on or after September 29, 1999, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

17.   The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

18.   The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

19.   The New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.,* is modeled after the FCA, and its liability provisions are virtually identical.  Similarly to the FCA, any person who violates, or conspires to violate, the New York False Claims Act is liable for three times the amount of the damages sustained by New York State or any local government.  In addition, a violator faces a civil penalty of up to $12,000 per claim.

## B.        The Medicare Program

20.   The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et*

*seq.* ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue. Entitlement to Medicare is based on age, disability or affliction with certain diseases. The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries. Payment under Medicare is contingent upon, among other things, the claimed item or service "being reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

21. Claims submitted to Medicare for payment, whether submitted on a paper UB-04 (CMS-1450) Claim Form, or electronically, carry certifications of truth and accuracy. The paper Claim Form carries a certification that the billing information on the form is true, accurate and complete, and that the provider submitting the form did not knowingly or recklessly disregard or misrepresent or conceal material facts. *See* UB-04 (CMS-1450) Claim Form. The Claim Form further states that the person or entity submitting the form "understands that misrepresentation or falsification of essential information as requested" by the form "may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment . . . ." *Id.* Those who submit claims electronically are likewise required to certify that the claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare

10

Claims Processing Manual, Chapter 24, 30.2. In general, CMS defines Medicare fraud as "making false statements or representations of material facts to obtain some benefit or payment for which no entitlement would otherwise exist." CMS Fact Sheet, Medicare Learning Network, "Medicare Billing: 8371 and Form CMS-1450" (August 2014).

### C.    **The New York Medicaid Program**

22.    The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid") is a health insurance program administered by the United States and individual states and is funded by federal and state taxpayer revenue. The Medicaid Program is overseen by the United States Department of Health and Human Services. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.

23.    New York maintains a federally-approved Medicaid program to reimburse health care charges made by physicians and other health care providers for the treatment of many low-income New York citizens not covered by Medicare or private insurance. Claims submitted to the New York Medicaid Program cause payments to be made by both the United States and New York State. The United States and New York each contribute approximately one-half the cost of each claim submitted through the New York Medicaid Program. The funding supplied to medical providers through the New York Medicaid Program must be used for Medicaid services to benefit Medicaid-eligible beneficiaries. Medicaid funding cannot lawfully be diverted by a provider to non-Medicaid purposes such as filling budget deficits in other areas.

24.    Providers apply to participate in the New York Medicaid Program and agree as a condition of participation and payment to comply with all the policies and procedures of DOH, which administers the Medicaid Program in New York State. All claims submitted to the

Medicaid Program carry a Claim Certification Statement that certifies the provider's agreement to these conditions. The Certification Statement further states that all information included on the claim form is "true, accurate and complete" and that "no material fact has been omitted."

25.    DOH policies and procedures include an explicit exclusion from Medicaid coverage for medical care and services that are "fraudulently claimed" or "represent abuse or overuse," and define as an "unacceptable practice" when a provider "knowingly [makes] a claim for an improper amount or for unfurnished, inappropriate or excessive care, services or supplies." DOH also defines Medicaid fraud to include a provider who "submits false information for the purpose of obtaining greater compensation than that to which he/she is legally entitled." DOH further reserves the right to recover any overpayments, including "any amount not authorized to be paid under the Medicaid Program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake."

### 1.  Calculation of the Medicaid Reimbursement Rate

26.    The New York Medicaid program reimburses a nursing home a set amount for each day of care based on a reimbursement formula established by regulation, and which has evolved over time. (NY PHL § 2808; 10 NYCRR 86-2 *et seq.*). A unique rate is calculated for each nursing home on a per-patient, per-day basis.

27.    The New York Medicaid rate is comprised of four cost components: (1) direct; (2) indirect; (3) non-comparable; and (4) capital. The first three components collectively make up the "operating portion" of the rate. Costs included within a nursing home's annual cost report are considered in calculating each of these rate components. 10 NYCRR 86-2.10.

28.    The cost categories making up the direct component of the rate are:

  (i)    nursing administration;

(ii)     activities;

(iii)    social service;

(iv)     transportation;

(v)      physical therapy;

(vi)     occupational therapy;

(vii)    speech and hearing therapy--(speech therapy portion only);

(viii)   pharmacy;

(ix)     central service supply; and

(x)      residential health care facility.

29.   The cost categories making up the indirect component of the rate are:

(i)      fiscal services;

(ii)     administrative services;

(iii)    plant operations and maintenance (with the exception of utilities and real estate and occupancy taxes);

(iv)     grounds;

(v)      security;

(vi)     laundry and linen;

(vii)    housekeeping;

(viii)   patient food services;

(ix)     cafeteria;

(x)      nonphysician education;

(xi)     medical education;

(xii)    housing; and

(xiii)   medical records.

30. The cost categories making up the non-comparable component of the rate are:

    (i)     laboratory services;

    (ii)    ECG;

    (iii)   EEG;

    (iv)   radiology;

    (v)    inhalation therapy;

    (vi)   podiatry;

    (vii)   dental;

    (viii)  psychiatric;

    (ix)   speech and hearing therapy--(hearing therapy only);

    (x)    medical director office;

    (xi)   medical staff services;

    (xii)   utilization review;

    (xiii)  other ancillary; and

    (xiv)  plant operations and maintenance--(cost for utilities and real estate and occupancy taxes only).

31. The cost categories making up the capital component of the rate are:

    (i)    Reported depreciation based on approved historical cost of buildings, fixed equipment and capital improvements;

    (ii)   Necessary interest on both current and capital indebtedness;

    (iii)   Capital cost reimbursement; and

    (iv)   Expense related to movable equipment.

32. In computing the reimbursement amount assigned to the "direct" cost component, each nursing home resident is assigned to a resource utilization group ("RUG") that reflects the

severity of the resident's illness and associated level of care. A statewide price is established for each RUG for three facility peer groups, adjusted for regional variations in nursing home wage and fringe benefit levels. The peer groups are free-standing facilities with less than 300 beds, free-standing facilities with 300 or more beds and hospital-based facilities. The more complex the care that is required, the higher the direct cost component of the rate will be. A ceiling price is established for each RUG group within the peer group. A ceiling price is also established for the indirect component. Costs that exceed the ceiling will contribute to a nursing home's operating deficit. Non-comparable costs are added on a facility-specific basis without calculating a ceiling price. All three components are added together in determining the operating cost component of the Medicaid rate.

33.    Under the regulations, the costs of goods and services furnished to a nursing home by a related organization are includable in computing the basic rate, and any costs incurred by the nursing home in connection with a related organization are included in the final payment rate. (10 NYCRR 86-2.26(b) and (c)). A "related organization" is defined to include any entity that controls the nursing home, either directly or indirectly, or that the nursing home has the power, directly or indirectly, to influence or direct, or where an "association of material interest exists in an entity which supplies goods and/or services to the" nursing home. (10 NYCRR 86-2.26(a)). Under this definition, SCSMC is "related" to SCSNH, and CHS is "related" to both SCSMC and SCSNH, as well as its other affiliates.

34.    The "base year" is the year that is used to establish the initial cost experience for a specific provider. That cost experience forms the basis for the Medicaid allowable costs used to determine the Medicaid rate. The operating portion of each facility's rate is calculated using a base year that is fixed in time, whereas the capital component of the rate is "re-based" each year

15

to reflect capital costs that apply to the rate year. To compensate for the fixed base year, the operating portion of the rate is supposed to be adjusted each year by an inflationary trend factor. The trend factor is intended to account for inflationary increases in operating costs, although this factor is currently set to zero through at least March 2013.

35. For many years, the New York Medicaid program used a base year of 1983 for calculating the operating cost component of the rate. For rate years 2009 through 2011, New York began using 2002 cost reports, but then suspended full implementation of that change after concluding that the increased costs to the Medicaid program would be prohibitive. In 2012, New York moved to a new system known as "statewide pricing," which implemented a revised methodology for calculating the operating portion of the Medicaid rate described above and based such calculations on 2007 cost report data.

36. "Re-basing" refers to the changing or updating of a nursing home's base year costs. Re-basing, when it occurs, offers a facility an opportunity to have its current operating costs considered in the rate setting process, instead of operating costs from an antiquated base year and several years of inadequate trending adjustments. One circumstance in which re-basing is permitted is when ownership of a facility changes hands.

37. When there is a change of ownership in respect to a nursing home, such as occurred when CHS purchased BSENH, the new operator must perform a full patient assessment within four months and must file a cost report for the first 12-month period during which the nursing home has an average occupancy rate of 90% or higher. (10 NYCRR 86-2.10(k)). That cost report becomes the new base year cost reference for the nursing home and must be certified and filed with DOH as a rate appeal within 60 days of the end of the 12-month period. The patient assessment and cost report are then used to re-base the nursing home by adjusting the direct,

16

indirect, non-comparable and capital components of the rate. Those adjustments are effective as of the first day of the patient assessment and cost report periods, respectively. Pending those adjustments, DOH assigns an initial rate to the facility that is based on "the rate in effect on the date . . .of transfer of ownership." (10 NYCRR 86-2.10(k)(2)(i)) Through this process, the new operator requests a new rate, knows that one will be assigned and further knows that the facility's assigned rate at the time of change of ownership is temporary and will be adjusted retroactively. A new operator's failure to submit the required documentation causes an automatic rate reduction. (10 NYCRR 86-2.2(c)).

38. Claims submitted by nursing homes to the Medicaid program are submitted either electronically or on paper UB-04 forms. Among the information that is included in the claim is the appropriate reimbursement rate, as assigned to the nursing home by DOH. The assigned Medicaid reimbursement rates are reflected on a "rate computation sheet" that is sent to the nursing home's Administrator by DOH's Bureau of Long Term Care Reimbursement ("BLTCR"). DOH also forwards the applicable rates reflected on the rate sheet to DOH's Office of Health Insurance Programs ("OHIP") for payment purposes. The rate sheet lists the name of the nursing home for which the rates apply along with the Opcert number assigned to that nursing home. The rate sheet lists different Medicaid rates depending on whether the nursing home resident on whose behalf the reimbursement is being made is also eligible for coverage under Medicare Parts B and D. The cover letter accompanying the rate sheet states that the rates listed are "all-inclusive rates for services" provided by the nursing home and directs the nursing home to direct "any questions" concerning the rates to BLTCR and "request the analyst that handles your facility." The letter also notifies the nursing home of the correct procedure to follow if it wishes to appeal the assigned rates.

## V.   FACTS UNDERLYING THE FRAUD SCHEMES

### A.   The Fraudulent Scheme to Claim the BSENH Reimbursement Rate

39.   In or about November 1999, the Bishop Jonathan G. Sherman Episcopal Nursing Home was sold, together with St. John's Episcopal Hospital and a home health agency, to CHS by Episcopal Health Services for $94 million.  After that transaction closed, the nursing home was renamed St. Catherine of Siena Nursing Home and it was assigned a new Opcert number by New York State.  The old Opcert number for BSENH was "5157309N"; the new Opcert number for SCSNH was "5157312N".

40.   Notwithstanding this change of ownership and new Operating Certificate number provided to SCSNH, DOH through an administrative oversight never assigned either an initial or an adjusted reimbursement rate to SCSNH as the new operator of the nursing facility.  Instead, DOH continued to send rate sheets to the same address in the name of the old facility BSENH which listed BSENH's Opcert number and authorized reimbursement rates assigned specifically to BSENH.  Exploiting this oversight to enrich itself, CHS and SCSNH continued to claim for more than a decade a Medicaid reimbursement rate assigned by DOH to BSENH without disclosing to DOH that it was doing so, or pressing DOH to assign SCSNH its own rate, or appealing or questioning the rates on the rate sheets, or suspending SCSNH's claim submissions while CHS sought permission from DOH to claim a different rate on a temporary basis.

41.   On the basis of internal CHS records, conversations with senior executives and as evidenced by the steep decline in the Medicaid daily reimbursement rate assigned to SCSNH when the nursing home was eventually re-based in or about June 2011 (discussed in further detail below), Relator knows that the BSENH reimbursement rate claimed by SCSNH from in or about 2000 through at least in or about 2011, was significantly higher than the rate that would

18

have been assigned by DOH to SCSNH over that same period had the nursing home been "re-based" and a new rate been assigned to SCSNH back in 2000, after the nursing home's ownership changed hands and CHS assumed control of the facility. The rebasing, in or about June 2011, caused SCSNH's reimbursement rate to plummet from approximately $270 per day to a far lower rate. On information and belief, based on conversations between Relator and various executives at SCSNH and CHS, the reason for the much higher BSENH rate was due, at least in part, to certain capital costs associated with the original construction of the nursing home that could not be properly claimed by SCSNH as the new operator of the nursing home.

42.    Soon after Relator was appointed the on-site Administrator of SCSNH, in or about April 2007, Relator discovered that SCSNH was continuing to claim a Medicaid reimbursement rate that had been assigned to BSENH, rather than a rate specific to SCSNH. Relator approached Phil Bruno (the Chief Operating Officer of SCSMC), Sharon Kennish (the Chief Administrative Officer of SCSMC) and John Pohlman (the VP for Finance at SCSMC) and inquired as to the reason that SCSNH was still claiming a BSENH rate. These executives told Relator that DOH had never changed the name of the nursing home on the rate sheets that the agency regularly sent to SCSNH, that DOH had allegedly been "notified" of the issue and that Relator should let the executives know if and when DOH sent a rate sheet for SCSNH.

43.    On information and belief, the only "notification" DOH had ever received was the original cost report filed by SCSNH pursuant to 10 NYCRR 86-2.10(k) at some point after CHS assumed control of the former BSENH nursing facility approximately seven years earlier. However, on information and belief, CHS and SCSNH had never notified DOH prior to that time that an initial Medicaid reimbursement rate had never been assigned by DOH to SCSNH as required, nor did CHS or SCSNH ever make any inquiry or otherwise notify DOH after that time

19

that DOH had never assigned an adjusted rate to SCSNH based on the original cost report that was filed. Further, even if such an inquiry or notification had occurred at some point after the original cost report was filed, that could never have justified the massive fraud perpetrated by CHS and SCSNH in knowingly and secretly claiming the wrong rates for a decade and reaping a reimbursement windfall to which it was not entitled and never repaid.

44. CHS and SCSNH had many options that did not involve committing fraud on the Medicaid program by knowingly submitting false reimbursement requests that claimed rates assigned to BSENH and not to SCSNH. Although CHS and SCSNH could have chosen to suspend the submission of claims for a period while it pressed DOH to assign SCSNH a new rate, or to seek permission to claim the BSENH rate on a temporary basis, or to disclose to DOH at or about the time of SCSNH's weekly claim submissions that the rate it was claiming belonged to BSENH and not to SCSNH, or to follow the directions in the "Dear Administrator" letters that accompanied the rate sheets by appealing or questioning the rates in the manner instructed, it did none of these things. Instead, CHS and SCSNH allowed DOH to unwittingly continue to send BSENH rate sheets to SCSNH so that CHS and SCSNH could fraudulently claim those rates as their own on every reimbursement claim they filed on behalf of SCSNH. They did so knowing full well that each and every such reimbursement claim being submitted was false and fraudulent because each claim fraudulently misrepresented SCSNH's entitlement to the BSENH rate and fraudulently failed to disclose that SCSNH was improperly claiming another facility's rate and that SCSNH had never been assigned a reimbursement rate of its own. CHS and SCSNH dared not tell DOH the truth for fear of instigating precisely the type of rate adjustment contemplated by the regulations, which they knew would – and eventually, in or about June 2011, did – result in a sharp rate reduction. Examples of the "Dear Administrator"

20

letters and accompanying rate sheets containing the much higher daily rates assigned to BSENH that were fraudulently exploited by CHS and SCSNH to their own advantage for more than a decade, are attached as Exhibit 1.

45. The inflated Medicaid reimbursement rates that were fraudulently claimed by CHS and SCSNH on a weekly basis resulted in millions of dollars of inflated Medicaid payments by DOH to SCSNH over more than a decade. Examples of these inflated Medicaid payments are included within the amounts actually paid to SCSNH that are reflected in the spreadsheets attached as Exhibits 2, 3 and 4. These spreadsheets were produced by DOH and contain paid amounts for three sample months in March 2008, June 2008 and September 2008. The service code 3839 represents the Medicaid rate reimbursed to SCSNH for residents who also had coverage though Medicare Parts B & D; the service code 3838 represents the Medicaid rate reimbursed to SCSNH for residents who either had coverage through Medicare Part D or who were not eligible for coverage under either Medicare Part B or D. The dollar amounts listed next to these service codes, on information and belief, incorporate inflated Medicaid reimbursement amounts paid to SCSNH during these months on the basis of claims submitted to DOH that fraudulently claimed BSENH's higher daily reimbursement rate. Definitions for the each of the columns reflected in the spreadsheets are provided in Exhibit 5.

46. In addition, SCSNH falsely and fraudulently claimed the BSENH reimbursement rate as its own in annual cost reports submitted by SCSNH to DOH. Attached as Exhibit 6 are excerpts from SCSNH's 2007 and 2008 filed cost reports that purport to list minimum and maximum daily Medicaid reimbursement rates for SCSNH of between $274.51 and $371.14 as of the last day of fiscal year 2007 and between $282.51 and $288.06 as of the last day of fiscal year 2008. These representations, however, are false because SCSNH had not yet been assigned

a daily reimbursement rate at the time these cost reports were filed and the rates listed by the CHS Defendants had actually been assigned to BSENH, and not to SCSNH.

47.    In or about May 2008, Relator had follow-up meetings with Dennis Verzi (Executive Vice President of the Continuing Care Division of CHS), John Haight (Director of Finance for SCSNH, GSNH and Our Lady of Consolation Nursing Home ("OLCNH")) and Bill Mead (Chief Financial Officer of the Continuing Care Committee).   During those meetings, it was disclosed to Relator that CHS "Finance" was booking significant reserves against the BSENH Medicaid rate to which SCSNH was not entitled and that SCSNH never received its own initial or re-based rate after CHS purchased the facility.   They further assured Relator that everything had been approved by CHS's auditors and that it would all be reconciled when DOH released an official SCSNH Medicaid rate.   Relator questioned why SCSNH did not apply for a higher hospital-based Medicaid reimbursement rate, which SCSNH could easily have done given its close connection to SCSMC, the hospital right next door to SCSNH.   Although doing so would have increased the Medicaid rate for the nursing home, Relator was told that DOH would likely not approve a hospital-based rate for SCSNH, but that if it were determined that CHS had to pay back funds as a result of improperly claiming the BSENH rate for all these years, CHS would try to mitigate that amount by contending that SCSNH was entitled to a hospital-based rate retroactive to 2000.

48.    In or about July 2008, Relator was warned, first in a breakfast meeting with Bill Allison (CEO of the Eastern Division, encompassing SCSMC, Good Samaritan Hospital Medical Center and St. Charles Hospital) and subsequently in a meeting with Allison, Frank Fox (Chief Financial Officer of the Eastern Division), Sharon Kennish, John Pohlman and Phil Bruno, to stop questioning financial allocations and financial strategies at SCSNH and GSNH.   Relator was

22

simultaneously criticized during these meetings for losses incurred at SCSNH during the first part of 2008.

49.     In 2009, DOH conducted an audit of SCSNH's Medicaid rates for the rate period January 1, 2003 through December 31, 2007.  The audit, however, did not address the legitimacy of the underlying reimbursement rate being claimed by SCSNH, or whether SCSNH had falsified or inflated operating costs over that rate period, but rather focused very narrowly on a few capital cost components claimed by SCSNH that were either inconsistent with governing regulations or unsupported by documentation maintained by the facility.  The audit also found that SCSNH had understated Medicaid patient days by a certain amount during rate years 2004-2007.  As a result, DOH adjusted the rate slightly downward during the rate period and asked that SCSNH return a Medicaid overpayment of $281,242.  Although the audit report invited SCSNH to provide a written response to DOH's findings, SCSNH did not do so.  Nor did SCSNH or CHS use the opportunity of the audit to alert DOH to the fact that SCSNH had claimed an illegitimate rate assigned to a different nursing home during the entire audited rate period.

50.     In or about March 2011, a meeting was held in the offices of Horan Martello and Marrone ("HMM"), a health care accounting firm servicing CHS.  Relator attended this meeting, as did Bill Mead, John Haight, Joseph Tomaino (Executive Vice President of Continuing Care) and the Administrators from GSNH and OLONH.  During the meeting, two principals of HMM openly discussed the overpayment to SCSNH that had resulted from claiming the BSENH rate. They referenced the "statute of limitations" as affecting DOH's ability to collect the overpayment, and they expressed the opinion that it would be better for SCSNH not to request a hospital-based rate and to instead "let sleeping dogs lie" because all the personnel in the rate appeal department at DOH who were responsible for assigning the SCSNH Medicaid rate had

23

retired and the paperwork had probably been forgotten in a file with nobody at DOH knowing that follow-up was needed.  HMM recommended that CHS wait until SCSNH was officially issued a re-based rate before assessing its options.  A financial presentation prepared by Tomaino and HMM, dated March 21, 2011, and titled "The Future of CHS Skilled Nursing Facilities," contained the below inculpatory chart  at page 8 titled "Medicaid Rates" that concedes a "$13 million liability for Bishop Sherman" for SCSNH "On the Balance Sheet" as a result of having fraudulently claimed the BSENH daily reimbursement rate (emphasis added):



**Medicaid Rates**

|  | Consolation | Siena | Good Sam |
|---|---|---|---|
| Paid Rate | $259 | $270 | $199 |
| Rebased Rate | $271 | $212 | $219 |
| Statewide Pricing Estimate – July 2011 | $242 | $242 | $242 |
| On the Balance Sheet | $700k receivable for rebasing | $13 million liability for Bishop Sherman<br><br>$3 million liability for rebasing | $1 million receivable for rebasing |

51.    As noted, in or about June 2011, SCSNH received its own re-based rate, an event prompted by a general re-basing of all nursing homes being implemented in New York State at that time, for the period April 2009 through June 2011.  As a result of this re-basing, SCSNH's reimbursement rate dropped drastically, from approximately $270 per Medicaid patient day to a rate below $250 per Medicaid day, and as low as $212 per Medicaid patient day.

52.   In an email dated June 14, 2011 from John Haight to Relator, Joseph Tomaino, Dennis Verzi and Bill Mead, with a subject line titled "SCSNH Financials," Haight referenced the fact that "Medicaid [for the month] was better than budget because we reserved $149k instead of the $250[k] which we had been reserving thanks to the mitigation portion of the rebasing rate which we will be receiving." On information and belief, the reference to "$250" was to CHS's long-standing practice of setting aside reserves of $250,000 per month to reflect, for accounting purposes, the amount of overpayments received by SCSNH on a monthly basis as a result of improperly claiming the BSENH rate since 2000. Further, on information and belief, the email's reference to the "mitigation portion of the rebasing rate" relates to a one-time $4.5 million Medicaid remediation payment made by DOH to compensate for the severe drop-off in reimbursement represented by the new re-based rate. The separate fraud involved in CHS's acceptance of this remediation payment is discussed in further detail below.

53.   In a subsequent email dated June 23, 2011, from John Haight to Relator, Joseph Tomaino, Dennis Verzi and Bill Mead, with a subject line titled "Nursing Home Rates – SCSNH," Haight states:

> The rates for SCSNH show that we are over reserved by $465,000 prior to the mitigation rates. The mitigation rates then add an additional $4.5 million of revenue for a net increase through May 2011 of $4.965 million. Even with the additional revenue, SCSNH will still experience a cash hit of $1.185 million which will be taken back over a period of time from our Medicaid remittances. I will send the file out to you in the AM. Let me know if you have any questions.

On information and belief, Haight's reference to SCSNH taking a "cash hit" of $1.185 million relates to the fact that, even after receiving a $4.5 million mitigation payment and despite the fact that SCSNH was already over-reserved by $465,000 before receiving that payment, the impact of

SCSNH improperly claiming the BSENH rate over the re-based period meant that SCSNH had received an extra $1.185 million above and beyond the $4.965 million sum of those amounts.

54.    In or about June 2012, Relator had another discussion with John Haight in which he again raised the prospect of SCSNH applying for a hospital-based rate as part of an effort to off-set, by adding as much as $15 to $20 per day, the steep decline in reimbursement represented by the nursing home's new and much lower re-based rate.  Haight responded that the possibility of seeking a hospital-based rate had been discussed with Joseph Tomaino and CHS Corporate Finance, and that CHS had decided not to call any attention to the SCSNH rate for fear that Medicaid would ask CHS to return at least $13 million in overpayments received as a result of claiming the BSENH rate for the past decade.  When Relator stated his understanding that the overpayment had been reserved by accounting, and that CHS would be repaying the money to Medicaid anyway now that SCSNH had been issued a re-based rate, Haight replied, in words or substance:

> Are you out of your fucking mind? The Hospital borrowed the additional reimbursement and it's long gone.  They know that the whole department in Albany that was responsible for the reimbursement calculation of that rate had retired because one of the retirees worked for Horan Martello and Marrone.

When Relator stated his understanding that once CHS reserved the overpayment funds, the funds had to be placed into an escrow account, Haight responded, in words or substance:

> Nope.  They just document the reserves and the money can come from any source.  They are just responsible to pay it back from some source of funds.

When Relator then inquired whether that was the reason CHS had not taken some of the reserves "off the books" even after concluding that collection by DOH could be barred by the statute of limitations, Haight replied, in words or substance:

> CHS Senior leadership had contemplated taking some of the early reserves in off the books because the statute of limitations had expired, however they were advised against it because they had researched that Medicaid did not give a damn about the statute of limitations and they apparently had made other facilities pay back owed reimbursement funds even after the statute of limitations period had expired.

Relator then became angry and informed Haight that it was his understanding that the reserved funds would be paid back to Medicaid when SCSNH was re-based, which had happened in June 2011, and that he was uncomfortable with CHS's decision not to return the overpayment. Haight seemed amused by Relator's reaction, told him "not to get his panties all twisted" and assured Relator that it was not Relator's responsibility and that it was solely a CHS corporate decision.

55. Relator attempted to follow-up on this issue (as well as Relator's request that SCSNH apply for a hospital-based rate) with Joseph Tomaino after a CHS Board of Trustees meeting held in or about June 2012. At that time, Tomaino dismissed Relator's concerns, telling him that it was a CHS corporate decision and not Relator's concern.

56. On information and belief, SCSNH and CHS submitted claims to the Medicaid program on at least a weekly basis from in or about 2000 through in or about 2011. Each of those claims falsely recorded reimbursement rates that were taken from rate sheets issued by DOH and received by SCSNH, but clearly addressed to BSENH with BSENH's Opcert number and listing rates assigned to BSENH, and not SCSNH. Furthermore, neither CHS nor SCSNH provided any notification or made any inquiry to DOH, either at the time of each claim submission or at the times that the rate sheets were issued, related to the fact that the rates listed and claimed were not assigned to SCSNH, but instead had been assigned to a different nursing home with a different Operating Certificate number, and that SCSNH needed its own re-based rate. Defendants failed to so notify DOH notwithstanding that they fully understood that

27

SCSNH was not entitled to the rates listed on the rate sheets and claimed by SCSNH in seeking reimbursement, and despite the fact that numerous communications from DOH that accompanied the rate sheets instructed SCSNH to contact DOH with "any questions" relating to DOH's calculation of the rates. Even when SCSNH's Medicaid rates were audited by DOH in 2009 for rate years 2003-2007 concerning relatively minor matters unrelated to the fundamental issue of re-basing and the need to retroactively assign SCSNH an entirely new rate based on cost report data going back to 2000, CHS and SCSNH did not so much as respond to the audit findings, much less alert DOH to the real issue. Instead, they were content to repay DOH a modest sum based on small rate adjustments turned up by the audit.

57. DOH, unaware that SCSNH was claiming the BSENH rate, paid SCSNH an inflated reimbursement rate week after week, year after year, for more than a decade. Through repeated fraudulent acts of misrepresentation and concealment, SCSNH and CHS embarked on a deliberate campaign to transform what was supposed to be a temporary rate condition attendant CHS's acquisition of BSENH – in which the existing BSENH rate would first be assigned to SCSNH as an initial rate and then be adjusted retroactively based on 2000 cost report data – into a permanent entitlement. CHS and SCSNH fraudulently exploited DOH's failure to assign either an initial or an adjusted rate to SCSNH by secretly claiming BSENH rates for more than a decade, without disclosing their own perfidy or the unlawful windfall they were reaping.

58. Each and every claim submission made by CHS and SCSNH that knowingly claimed an inflated Medicaid reimbursement rate belonging to BSENH and not to SCSNH was both a legally and factually false and fraudulent claim under the FCA. Each claim was factually false because it falsely claimed a rate that was never assigned to SCSNH in the first place. Each claim was also legally false because the express and implied certifications of truth and accuracy

28

accompanying each claim were false and because the legal entitlement to the rate claimed, to which CHS and SCSNH were expressly and impliedly certifying, was false. Moreover, all amounts received and converted by CHS and SCSNH as a result of those fraudulent claim submissions after the effective date of the Patient Protection and Affordable Care Act ("PPACA") on March 23, 2010, represented "overpayments" that were never repaid and that therefore became "false claims" by operation of law within the meaning of the FCA and PPACA. 31 U.S.C. § 3729(b)(3); 42 U.S.C. § 1320a-7k(d).

**B.    The Fraudulent Scheme Leading to a $4.5 Million Remediation Payment**

59.    In or about June 2011, as a consequence of statewide re-basing of nursing homes performed by DOH at that time, SCSNH officially received a new re-based rate for rate years 2009, 2010 and 2011. As a result of that re-basing, SCSNH's Medicaid per diem rate dropped precipitously, from approximately $270 per day to a far lower rate, well below $250 and as low as $212. SCSNH, however, received a one-time retroactive remediation payment of approximately $4.5 million to mitigate the impact of these severe revenue losses. The remediation payment was paid to SCSNH in the form of large Medicaid per diem rate increases in May 2011.

60.    CHS and SCSNH accepted the $4.5 million remediation payment from DOH with the knowledge that the payment was inflated because it had been calculated based on the difference between the higher BSENH rate that SCSNH had fraudulently claimed since 2000 and the far lower SCSNH rate that DOH issued in June 2011. That discrepancy – and the resulting remediation payment -- would have been much smaller, if not non-existent, had SCSNH been claiming the lower reimbursement rate to which it was legally entitled.

61. After accepting the remediation payment, which had been allocated by DOH to SCSNH to compensate the nursing home for the severe decline in Medicaid reimbursement resulting from SCSNH's new re-based rate, CHS, under the pretext of taking "reserves" against the remediation payment for at least $1.1 million in purported workers compensation costs and to compensate for approximately $600,000 in excess Medicaid revenue, misappropriated approximately 40% of the remediation amount. This was done by removing the funds from SCSNH's budget allocations. By the end of 2011, only approximately $2,694,000 of the mitigation payment remained at SCSNH. Relator does not know whether additional reserves were taken against the remediation funding in 2012.

62. By fraudulently accepting an inflated $4.5 million remediation payment and then misappropriating the proceeds for its own purposes, CHS and SCSNH essentially leveraged their initial fraud of knowingly claiming an inflated BSENH reimbursement rate for more than a decade in order to commit a second multi-million dollar fraud against the Medicaid program. The loss resulting from the second fraud was not less than $3 million, a loss amount that is reflected in the chart appearing in paragraph 50 above and was a part of the internal financial presentation at HMM that occurred in or about March 2011. That chart, in addition to listing a $13 million liability as a result of the BSENH rate fraud previously discussed, also lists a $3 million liability "for rebasing." That reference represents the admitted liability arising from SCSNH's acceptance of an inflated remediation payment as described above.

63. Significantly, the chart lists large discrepancies between the rate actually "paid" to SCSNH of "$270," its "rebased" rate of "$212" and a "statewide pricing estimate" of "$242." CHS and SCSNH cynically exploited these discrepancies in the manner described above, initially by fraudulently claiming BSENH's much higher rate as their own since in or about

2000, and then by fraudulently accepting an inflated remediation payment that was calculated on the basis of the discrepancy between the rebased rate and the BSENH rate they had wrongfully claimed for all those years.

64. Not less than $3 million of the $4.5 million remediation payment that was accepted and wrongfully retained and converted by CHS and SCSNH represented an "overpayment" that was never repaid and that therefore became a "false claim" by operation of law within the meaning of the FCA and PPACA. 31 U.S.C. § 3729(b)(3); 42 U.S.C. § 1320a-7k(d).

### C. The Fraudulent Scheme to Illegally Generate and Divert Medicaid and Medicare Funding

65. Providers are not free to misrepresent their costs and their assigned rates in order to fraudulently generate Medicaid funding that can be diverted to non-Medicaid purposes. Nor may they apply for and receive Medicare funding allocated for the physical rehabilitation of nursing home residents and divert that funding to non-Medicare purposes. Indeed, pursuant to 42 U.S.C. § 1320a-7b(a)(4), any person who applies to receive payment for the use and benefit of a Medicaid or Medicare beneficiary and then converts that payment for a different use not related to the care of that beneficiary is guilty of a crime. Yet, that is exactly what CHS and SCSMC did by systematically siphoning away the Medicaid and Medicare funds obtained by SCSNH in this case.

66. Starting no later than in or about 2007 at SCSNH, CHS and SCSMC engaged in a deliberate effort to require SCSNH to pay SCSMC for medical, administrative, utility and other costs that were either not incurred or that had been vastly inflated. CHS and SCSMC systematically siphoned those payments from Medicaid and Medicare funding being paid to SCSNH as reimbursement for the claims SCSNH submitted on behalf of its patients in residence.

31

67. In or about 2008, Relator noted that SCSNH had been charged by SCSMC for excessive laboratory costs. John Haight advised Relator that SCSMC charged a fixed, all-inclusive amount for those services each year whether or not SCSNH was under or over the actual amount incurred. In a follow-up conversation with Haight, Haight advised Relator that the SCSMC laboratory had been charging SCSNH residents 300% to 400% of the Medicare Rate, which was far in excess of fair market value and far above the rate charged to other CHS nursing facilities. John Haight, John Pohlman and Dennis Verzi all would have possessed knowledge of the proper fair market value charges by virtue of their experience in conducting financial oversight of CHS nursing and medical facilities.

68. In or about November 2009, in the face of financial performance at SCSNH that had yielded a profit of $1.8 million, Relator learned that approximately $2 million was taken from SCSNH's budget under the pretext that CHS "Finance" had to take reserves for purported workers compensation costs, notwithstanding that the actual number of workers compensation cases did not support such an action and despite the fact that John Haight and Bill Mead acknowledged that the alleged compensation charges against SCSNH's budget were "ridiculous" and "outrageous." In or about November 2011, Relator was informed by John Haight and Bill Mead that an additional $1.1 million had to be reserved for workers compensation costs at SCSNH. When Relator challenged this decision because there were no significant workers compensation costs noted in a quarterly review of cases performed by SCSNH's insurance carrier, Relator was advised that old cases from 2005 that were unknown to the present carrier required more reserves. Relator subsequently received an e-mail from Haight and Mead indicating that a review of workers compensation costs at 19 other nursing homes showed that SCSNH was being charged up to 20 times more for its workers compensation costs. In

32

compensation review meetings held in 2009, Relator brought to the attention of CHS Continuing Care and SCSMC officials that workers compensation cases for SCSNH were being co-mingled with SCSMC workers compensation cases. Relator's comments were ignored.

69.   Laboratory and radiology charges were the subject of an email dated February 24, 2012 from John Haight to Relator and others, including Joseph Tomaino and Karen Estrada (CFO of Continuing Care). The email attached the comparative chart of "Ancillary Service Chargebacks" appearing below showing that SCSNH was being charged far in excess of the other CHS nursing homes for these costs, in one instance more than 500% more:

**Ancillary Service Chargebacks to Nursing Facilities**
**SCSMC vs GSH**

| HCPCS Code | Description | SCSNH Charge | 20% | GSNH/OLC Charge | Variance | % Variance |
|---|---|---|---|---|---|---|
| **LABORATORY** | | | | | | |
| 36415 | Venipuncture | 53.00 | 10.60 | 3.00 | 7.60 | 253% |
| 80048 | Basic Metabolic | 139.00 | 27.80 | 9.33 | 18.47 | 198% |
| 80053 | Comp Metabolic | 288.00 | 57.60 | 13.96 | 43.64 | 313% |
| 84134 | Prealbumin | 183.00 | 36.60 | 8.15 | 28.45 | 349% |
| 85014 | Hematocrit | 72.00 | 14.40 | 3.46 | 10.94 | 316% |
| 85018 | Hemoglobin | 72.00 | 14.40 | 3.46 | 10.94 | 316% |
| 85025 | CBC PLT | 102.00 | 20.40 | 11.35 | 9.05 | 80% |
| 80162 | Digoxin levels | 149.00 | 29.80 | 19.39 | 10.41 | 54% |
| 81001 | Unrinalysis | 142.00 | 28.40 | 4.63 | 23.77 | 513% |
| **RADIOLOGY \*** | | | | | | |
| 73510 | Xray hip | 415.00 | 83.00 | 64.70 | 18.30 | 28% |
| 71010 | Chest xray | 415.00 | 83.00 | 56.46 | 26.54 | 47% |
| 71020 | Chest xray 2x | 415.00 | 83.00 | 56.95 | 26.05 | 46% |
| 73060 | Xray humerus | 415.00 | 83.00 | 44.69 | 38.31 | 86% |
| 73080 | Xray elbow | 415.00 | 83.00 | 50.23 | 32.77 | 65% |

70.   A follow-up email dated February 21, 2012 from Joseph Tomaino to John Haight, and copying Relator and Karen Estrada, acknowledged that the charge discrepancies posed a

33

compliance problem for CHS since they were in excess of fair market value ("FMV"). In that email, Tomaino instructed Haight as follows:

> John . . . in prep for the meeting with eastern division finance, can you break down what we pay for lab, x-ray and EKG and how it is paid (lump sum, individual billing, etc.) From what both Michael [i.e., Relator] and you have been telling me I am afraid that we may be overpaying for Part A services. Compliance tells me that those services when contracted between related parties need to be paid at FMV.

In his response, Haight advised Tomaino that while the lab and radiology charges at GSNH and OLCNH are maintained at the Medicare fee schedule rates, SCSNH is charged at a discount off the "gross rates from the charge master" that leave those charges "substantially higher than the Medicare fee schedule."

71.     In or about March 2012, a meeting was scheduled by James Degloria (SCSMC Compliance Officer) at which Dennis Verzi attempted to argue that it was appropriate to charge SCSNH 300% to 400% of the Medicare rate for laboratory charges. However, after Relator argued that the money for the excessive charges should be used for the care of the residents at SCSNH and questioned whether Verzie would have thought such a charge was fair and appropriate when he was the CEO of OLCNH, Verzie started laughing and stated that he was "ripping us off." However, Verzi still refused to reverse the excessive charges.

72.     Another follow-up meeting on this issue was held in or about March 2012 with Joseph Tomaino, John Haight and Karen Estrada . At this meeting, Relator not only discussed the inflated laboratory charges and compliance implications, but also complained about the inflated charges for radiology and EKG services being charged by SCSMC to SCSNH. Relator stated that he believed the inflated charges should be decreased to fair market value immediately and retroactively to whenever the improper practice began. Tomaino decided that he was going to honor SCSMC's request not to adjust the rate, either retroactively or on a going forward basis,

34

and he stated that the issue could be addressed in next year's budget. Tomaino also joked that we could run the issue by CHS's in-house attorneys and we would not get an answer for at least a year. Tomaino's decision was later confirmed in an email sent to John Haight on July 17, 2012, which referenced the "decision to defer the corrections of allocations from the hospital to the nursing home that exceed fair market value to next year . . . ."

73.     In or about May 2012, Relator, who was uncomfortable with how the matter had been addressed, followed up with compliance officer Marianna Harris. Relator complained to Harris that the excessive laboratory and other charges were improper. Harris reluctantly promised to follow up with Pegeen Mcgowan, Vice President for Compliance at CHS, and get back to Relator. At a later meeting with Ms. Harris, Relator inquired about the status of his complaint and she stated that she was still waiting for a response. Neither Harris nor anyone else at CHS ever responded to Relator's concerns about excessive laboratory, radiology and EKG costs charged to the Medicaid program.

74.     Relator subsequently complained to John Tomaino, Karen Estrada and John Haight on multiple occasions regarding the fact that SCSNH was forced to pay a significant amount of executive salary expense (15 hours per pay period) for SCSMC's Hospital Medical Director, who did not participate in operations of SCSNH. Relator also brought numerous other complaints of inappropriate SCSMC and CHS cost allocations for numerous SCSMC and CHS employees, including completely unjustifiable salary costs for a CHS Human Resources executive who had no role at SCSNH, an SCSMC Director of Engineering who spent less than an hour a month at SCSNH, an SCSMC Director of Housekeeping who spent less than an hour a month at the SCSNH, and a Chaplin who also spent very little time at SCSNH. SCSNH was also required to bear the cost of additional salary expense for two SCSNH Medical Directors to

perform utilization review services for SCSMC. Tomaino, Estrada and Haight acknowledged that these cost allocations were improper and the general issue was raised to the CHS Board of Trustees, but no affirmative action was taken to stop the practice or remedy the situation.

75. During the ensuing development of the SCSNH budget during the summer of 2012, Relator questioned both Haight and Tomaino as to why 70% of the salary of Darlene Dasch, who was Supervisor of billing for SCSNH (240 beds), GSNH (100 beds) and OLCNH (450 beds) was being charged back to SCSNH, and OLOC was only required to pay 20% with GSNH paying 10%. Haight responded "because I can" and told Relator that he should be happy he was allocating any of Dasch's salary to the other nursing homes. Relator also questioned why SCSNH had to pay a percentage of the salary of the Head Chef at OLOC, who had no role at SCSNH. In addition, Relator learned in or about July 2012 that SCSMC had been improperly charging SCSNH for the entire cost of SCSMC's natural gas utility bills at a cost of $26,000 per month.

76. CHS likewise diverted Medicare funding that was provided for the benefit of Medicare-eligible residents of SCSNH to other purposes not related to the care of residents at the nursing home. As the Administrator of SCSNH, Relator was acutely aware that a significant percentage of the reimbursement revenues flowing to the nursing home were derived from Medicare reimbursements related to rehabilitation beds for residents receiving rehabilitation services. Relator knows this because, upon becoming Administrator and learning of the financial challenges confronting SCSNH, Relator spearheaded an effort to increase the number of "rehab" beds at the nursing home that could be reimbursed under Medicare at a much higher daily rate than would otherwise be available under Medicaid. However, those revenues were not allowed to be applied by the nursing home for the care of Medicare-eligible residents as intended.

36

Instead, just as it did with the Medicaid funding, CHS diverted those Medicare proceeds to other purposes by charging SCSNH inflated and fabricated costs as described above and then siphoning revenues from the nursing home's budget to cover those costs.

77. The CHS Defendants were not entitled to create additional Medicaid funding through misrepresentations and then use Medicaid as a piggy bank to fill operational needs unrelated to the purpose of such funding. Nor were they entitled to ravage the operating account of SCSNH and prevent it from using Medicaid and Medicare funds to benefit its residents in whose names the funding had been obtained. CHS's and SCSMC's relentless raiding of SCSNH's budget by charging the nursing home inflated and fictitious costs was a constant source of anxiety to Relator and a continual basis of disagreement between Relator and CHS executives.

78. Where, as here, Medicare and Medicaid funding is systematically converted and diverted from its lawful purpose, and is thus unavailable for the care of the beneficiaries in whose names and on whose behalf the funding was purportedly obtained, then all of the underlying reimbursement requests are necessarily both legally and factually false and fraudulent under the FCA. Such claims are factually false because the reimbursement amounts are not being used for the purposes or the beneficiaries represented in the claim submissions. The claims are also legally false because the express and implied certifications accompanying the claims – including certifications that the claims are completely truthful, seek payment for medically necessary services rendered to the beneficiaries named in the claims and that the funds sought will not be criminally converted for purposes unrelated to the care of the beneficiaries in whose names the funds are being requested – are false.

37

79.     Moreover, all such fraudulent reimbursement amounts represent "overpayments" by the Medicaid and Medicare programs that were never repaid by CHS and SCSNH. Any such overpayments that were improperly converted after the effective date of PPACA on March 23, 2010 and were never repaid became "false claims" by operation of law within the meaning of the FCA and PPACA. 31 U.S.C. § 3729(b)(3); 42 U.S.C. § 1320a-7k(d). All Medicaid and Medicare funding that was fraudulently diverted from the account of SCSNH and improperly converted thus must be returned.

**D.     An Orchestrated Strategy to Terminate Relator's Employment**

80.     In or about July 2012, following Relator's multiple encounters with John Haight, Joseph Tomaino, Dennis Verzi, John Pohlman, Marianna Harris, James Degloia and other senior CHS management, including CHS's Chief Financial Officer Colleen Blye and Acting Chief Executive Office and Chairman of the CHS Board Richard Sullivan, in which he raised various compliance concerns relating to all of the fraudulent and abusive Medicaid reimbursement and cost allocation practices described above, Relator was gradually frozen out of key meetings and relieved of his job responsibilities at SCSNH. While Relator was on vacation, a key SCSNH staffing and finances meeting that had been scheduled for when he returned was suddenly moved up by Joseph Tomaino and held in Relator's absence. Following that meeting, Joseph Tomaino unilaterally directed reduced staffing levels at SCSNH without consulting Relator. Also at this time, Relator suddenly found himself the subject of intense and factually unsupported criticisms of his job performance as SCSNH Administrator.

81.     On July 23, 2012, while Relator was still on vacation, Relator learned from Joseph Tomaino that he was the subject of a compliance investigation, supposedly sourced to a call to the compliance hotline, relating to the purported submission of inaccurate staffing numbers in

order to improve SCSNH's staffing rating. Later that day, Relator received a follow-up call on the same issue from the SCSNH compliance officer, Marianna Harris. When Relator inquired of Harris whether such a hotline call had occurred, Harris said "No" but that she had to conduct an investigation if directed to do so by "her boss," Joseph Tomaino. Relator informed Harris that he believed he was being subjected to a retaliatory attack by CSH for raising various compliance concerns. Relator then proceeded to detail all of the compliance concerns set forth in this Complaint, including the scheme to claim an improper and inflated Medicaid reimbursement rate belonging to BSENH. Relator further commented that Joseph Tomaino's actions in directing reduced staffing levels at SCSNH, without Relator's knowledge or approval and without having the requisite Administrator license, training or authority, had resulted in unsafe staffing levels and jeopardized the safety and care of the residents that were under Relator's care as the duly licensed Administrator. Harris became nervous on the phone, inquiring whether Relator really wanted to raise all these concerns, and commenting that his staffing numbers were probably accurate after all and that is was "no big deal." Relator stated that his compliance concerns were serious, affected reimbursement to the Nursing Home and impacted the care and safety of the residents, and that they needed to be raised either with CHS's Vice President for Compliance Pegeen McGowan, or the Chairman of the CHS Board of Trustees, Richard Sullivan.

82.    On July 24, 2012, again while Relator was still on vacation, Relator learned through his assistant that Marianna Harris and another person from compliance had been rifling through the files in his office, reviewing his staffing sheets and communicating with Joseph Tomaino. The next day, Relator received a call from Tomaino informing him that the investigation was going well but that Relator should continue to take vacation days until the investigation was completed. Two days later, Relator received a call from the SCSNH Medical Director, Jay

Schneider, who was concerned that Relator had not yet returned to work. Relator explained that he was being retaliated against for raising compliance concerns, which he detailed to Schneider, who agreed with Relator that it was suspicious and unusual that nobody from Compliance had contacted Relator to investigate his complaints.

83. On July 27, 2012, Relator received a call from Pegeen McGowan, who stated that Marianna Harris had informed her that Relator had compliance concerns, but did not specify what they were, which Relator found curious in light of the fact that Harris had assured Relator that she had documented all of his complaints. When Relator told McGowan that he wanted to explain his concerns in person and preferably in the presence of Richard Sullivan or another member of the CHS Board of Trustees so that there would be no misunderstanding, McGowan responded that she had known Relator for a long time and was "sorry" this was happening. Relator never heard back from McGowan or anyone else regarding his complaints.

84. On July 30, 2012, Relator received a phone call from Lori Spina (Vice President of Human Resources) and Joseph Tomaino. On the call, Tomaino stated that the staffing compliance investigation had been completed, that they had not found any errors and that Relator's staffing numbers were accurate. He went on to state that, although Relator was "a great administrator," Tomaino did not believe Relator was "the right fit" for SCSNH at that time. Tomaino further indicated that there were no other openings or opportunities available to Relator within CHS, and urged Relator to accept a "nice cushy buy-out and move on." The same day, after speaking with Relator, Tomaino announced that he was making a leadership change at SCSNH, allegedly due to losses of a million dollars suffered in the first half of the year.

85. On July 31, 2012, Relator met with Joseph Tomaino and Lori Spina at a diner in Smithtown. During the meeting, Spina mentioned that they had received only wonderful

feedback from the staff regarding Relator's leadership, which prompted Relator to ask Tomaino why he was being fired. When Tomaino mentioned the first half losses at SCSNH and that the Administrator from OLCNH would be a "better fit," Relator replied that if OLCNH had SCSNH's Medicaid rate, it would be losing $7 million and if SCSNH had OLCNH's Medicaid rate, it would be making a $3 million profit. Spina stated that CHS wanted Relator to have the respect and dignity he deserved after 38 years of faithful service and asked Relator how he wanted CHS to announce his departure. Relator replied that Tomaino had already made an announcement and damaged Relator's reputation because the staff knows that he was under some type of investigation and, based on feedback from friends in the community and former employees, many of them now apparently believed that Relator had been terminated for stealing a million dollars. At hearing this, Tomaino apologized and stated that he did not realize how the announcement might be perceived. Before the meeting ended, Tomaino stated that Relator also had to inform him of any compliance concerns that he had, to which Relator responded that his concerns had already been reported to the compliance officer and that it was supposed to be a confidential process. When Tomaino stated that the compliance officer reports to him, Relator responded that it was a clear conflict of interest. When Tomaino insisted on knowing of any compliance concerns, Relator stated that he had already discussed his concerns directly with Tomaino on other occasions.

86. As set forth above, Relator was subjected to adverse employment actions, including termination, because he complained of compliance violations constituting Medicaid fraud. The CHS Defendants had no legitimate, non-retaliatory reason for terminating Relator's employment. Defendant's stated explanation for Relator's termination was a pretext for retaliation. Defendants' retaliatory actions taken against plaintiff were malicious and/or or in reckless

41

disregard of his civil rights.  At all times relevant to this action, Relator's job performance was exemplary and he would not have been fired but for his complaints concerning compliance violations constituting Medicaid and Medicare fraud.

## VI.   CAUSES OF ACTION

### COUNT ONE
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

87.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

88.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

89.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees, grantees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

90.   The United States, unaware of the falsity of the claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

91.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

92.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT TWO
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

93.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

94.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted  facts, material to false or fraudulent claims  within the meaning of 31 U.S.C. § 3729(a)(1)(B).

95.   The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

96.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

97.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT THREE
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

98.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

99.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the

44

meaning of 31 U.S.C. § 3729(a)(1)(G) and (b)(3), pursuant to which "obligation" includes a duty arising from the retention of any overpayment.

100.    The United States, unaware of the falsity of the records and statements and of the Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

101.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

102.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

**COUNT FOUR**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

103.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

104.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

105.    By virtue of the acts described above, Defendants conspired with each other and with others known and unknown to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of 31 U.S.C. § 3729(a)(1)(C). Defendants, moreover, took substantial steps in furtherance of the conspiracy, *inter alia*, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

45

106.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

107.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT FIVE
### (Federal False Claims Act – Retaliation Violation)
### 31 U.S.C. § 3730(h)

108.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

109.    Defendants had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act.   Such discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

110.    As set forth above, Relator engaged in numerous activities that are protected under the False Claims Act. This included investigation and inquiries to CHS executives regarding various fraudulent activities to enhance Medicaid reimbursement; bringing this fraudulent and illegal activity to the attention of CHS senior management and compliance personnel; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the FCA violations described above.

111.    The CHS Defendants – including senior executives and compliance personnel working at the various Defendant entities -- were well aware that Relator had engaged in these

46

protected activities, and they discriminated and retaliated against Relator for engaging in such protected conduct by terminating his employment.

112. The CHS Defendants' actions damaged and continue to damage Relator in violation of 31 U.S.C. § 3730(h). As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing to harm his career. In connection with this claim, Relator seeks all damages and other appropriate relief authorized by the False Claims Act, as well as litigation costs and reasonable attorneys' fees.

**COUNT SIX**
**(New York False Claims Act)**
**N.Y. Finance Law § 189(1)(a)**

113. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

114. This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 et seq., as amended.

115. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to New York State for payment or approval, within the meaning of N.Y. Finance Law § 189(1)(a).

116. New York State, unaware of the falsity of the claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

117. By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

118.    Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

**COUNT SEVEN**
**(New York False Claims Act)**
**N.Y. Finance Law § 189(1)(b)**

119.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

120.    This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 et seq., as amended.

121.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted  facts, material to false or fraudulent claims, within the meaning of N.Y. Finance Law § 189(1)(b).

122.    New York State, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

123.    By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

124.    Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT EIGHT
## (New York False Claims Act)
## N.Y. Finance Law § 189(1)(g)

125.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

126.    This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 et seq., as amended.

127.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of N.Y. Finance Law § 188(4) and 189(1)(g), pursuant to which "obligation" includes a duty arising from the retention of any overpayment.

128.    New York State, unaware of the falsity of the records and statements and of the Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

129.    By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

130.    Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

**COUNT NINE**
**(New York False Claims Act)**
**N.Y. Finance Law § 189(1)(c)**

131.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

132.    This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 et seq., as amended.

133.    By virtue of the acts described above, Defendants conspired with each other and with others known and unknown to defraud New York State by inducing New York State to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of NY Finance Law § 189(1)(c). Defendants, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

134.    By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

135.    Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT TEN
### (New York False Claims Act – Retaliation Violation)
### N.Y. Finance Law § 191

136.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

137.   Defendants had a duty under the New York False Claims Act, N.Y. Finance Law § 191, to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act.   Such discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

138.   As set forth above, Relator engaged in numerous activities that are protected under the New York False Claims Act.   This included investigation and inquiries to CHS executives regarding various fraudulent activities to enhance Medicaid reimbursement; bringing this fraudulent and illegal activity to the attention of CHS senior management and compliance personnel; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the violations described above.

139.   The CHS Defendants – including senior executives and compliance personnel working at the various Defendant entities -- were well aware that Relator had engaged in these protected activities, and they discriminated and retaliated against Relator for engaging in such protected conduct by terminating his employment.

140.   The CHS Defendants' actions damaged and continue to damage Relator in violation of N.Y. Finance Law § 191.   As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment and has suffered additional economic and non-

51

economic damages, including severe emotional anguish and irreparable, continuing to harm his career. In connection with this claim, Relator seeks all damages and other appropriate relief authorized by the False Claims Act, as well as litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Relator, acting on behalf and in the name of the United States of America and New York State, demands and prays that judgment be entered against Defendants under the Federal False Claims Act and New York False Claims Act as follows:

(1)    That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* and N.Y. Finance Law §§ 187 *et seq.* as set forth above;

(2)    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(3)    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of defendants' actions, plus a civil penalty of not less than $6,000 and not more than $12,000 for each violation of N.Y. Finance Law §§ 187 *et seq.*

(4)    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and N.Y. Finance Law § 190;

(5)    That by reason of Defendants' retaliatory and discriminatory actions and wrongful discharge of Relator in violation of 31 U.S.C. § 3730(h) and N.Y. Finance Law § 191, judgment be entered in favor of Relator and against Defendants, that Relator be awarded double his back-pay losses, plus front pay, interest, costs, attorneys' fees and special damages for emotional

distress and harm to his reputation, that Relator be re-instated to his former position as Administrator of SCSNH, with all applicable raises, and that Defendants should be enjoined from engaging in continued retaliatory and discriminatory actions; and

(6)    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

(7)    That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.


Dated: December 21, 2015

By: _____

Daniel J. Kaiser, Esq.
Kaiser Saurborn & Mair, P.C.
111 Broadway, 18th Floor
New York, New York 10006
Tel: (212) 338-9100

Attorneys for Relator
Michael Quartararo