UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

UNITED STATES OF AMERICA and THE STATE
OF NEW YORK *ex rel.* MICHAEL
QUARTARARO,

                      Plaintiff,

              v.

CATHOLIC HEALTH SYSTEM OF LONG
ISLAND INC. *d/b/a/* CATHOLIC HEALTH
SERVICES OF LONG ISLAND, ST. CATHERINE
OF SIENA MEDICAL CENTER, ST. CATHERINE
OF SIENA NURSING HOME, GOOD
SAMARITAN HOSPITAL MEDICAL CENTER
and GOOD SAMARITAN NURSING HOME,

                      Defendants.

--------------------------------------------------------------

<u>**MEMORANDUM & ORDER**</u>
12-CV-4425 (MKB)

MARGO K. BRODIE, United States District Judge:

On September 5, 2012, Plaintiff-Relator Michael Quartararo brought this *qui tam* action,

under seal, on behalf of the United States of America and the State of New York against

Defendants Catholic Health System of Long Island Inc., doing business as Catholic Health

Services of Long Island ("CHS"), St. Catherine of Siena Medical Center (the "Medical Center"),

St. Catherine of Siena Nursing Home (the "Nursing Home"), Good Samaritan Hospital Medical

Center, and Good Samaritan Nursing Home.  (Compl., ¶ 1, Docket Entry No. 1.)  Relator alleges

violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the New York State

False Claims Act, N.Y. State Fin. Law § 187 *et seq.* ("NYFCA"), based on the alleged filing of

false Medicare and Medicaid reimbursement claims.[1]  (*Id.* ¶¶ 2–10.)  While the United States and

---

[1]  *Qui Tam* actions are sealed until the government parties decide or decline to intervene.
*See* 31 U.S.C. §§ 3730(b),(c) (2006).

New York State investigated the allegations to determine whether to intervene, Relator filed an Amended Complaint on September 10, 2012, (Docket Entry No. 3), a Second Amendment Complaint on August 2, 2013, (Docket Entry No. 6), and a Third Amended Complaint ("TAC") with attachments on February 21, 2015, (Docket Entry Nos. 15, 16). The United States and the State of New York declined to intervene on January 27, 2016, (Docket Entry Nos. 18, 19), and the Court unsealed the TAC the same day. (Order dated Jan. 27, 2016, Docket Entry No. 20.)

Defendants move to dismiss the action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and also move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Defs. Mot. for Partial Summ. J., Failure to State a Claim, and Lack of Jurisdiction ("Defs. Mot."), Docket Entry No. 29.) For the reasons discussed below, the Court (1) denies Defendants' motion to dismiss the action for lack of subject matter jurisdiction, (2) grants Defendants' motion to dismiss for failure to state a claim and (3) grants Defendants' motion for summary judgment. The Court grants Relator thirty (30) days to file an amended complaint.

## I. Background

### a. Overview of Medicare and Medicaid reimbursement programs

Medicare and Medicaid are taxpayer-funded health insurance programs offered to individuals based on age or disability.[2] (TAC ¶¶ 9, 20, 22.) Medicare is provided by the federal government and Medicaid is provided by the federal, state and local governments and operated through the states. (*Id.*) The United States Department of Health and Human Services, through its Centers for Medicare and Medicaid Services, runs both programs in conjunction with the state

---

[2] For the purposes of deciding Defendants' motion to dismiss, the Court assumes the truth of the allegations in the Complaint.

agencies that oversee Medicaid.  (*Id.*)  Individuals may be covered under Medicare, Medicaid, or

both.  (*Id.*)  New York State maintains a Medicaid program for its citizens.  (*Id.* ¶ 23.)  If health

care providers[3] choose to provide state-based Medicaid services, they must enroll with the New

York State Department of Health ("DOH"), which requires health care providers to certify that

they will comply with DOH rules and regulations.[4]  (*Id.* ¶ 24.)  Health care providers that treat

patients covered by Medicare or Medicaid may submit claims for reimbursement of the costs

expended to treat the covered patients.  (*Id.* ¶¶ 21, 38.)  Reimbursement claims are submitted to

the DOH on CMS-1450/UB-04 Forms.[5]  (*Id.* ¶ 21.)  The reimbursement claim forms contain

general compliance certifications specifying that false, misleading, incomplete or inaccurate

claims may subject the claimant to civil and criminal penalties.  (*Id.* ¶¶ 21, 24, 25.)  The

reimbursement claim forms also require a health care provider to include its reimbursement rate.

(*Id.*)  In states that provide Medicaid coverage, the reimbursement rate for Medicaid and

Medicare claims is calculated and assigned by the state agency that oversees the Medicaid

program, (*id.* at ¶ 26); in New York State, the DOH, (*id.* ¶ 38).

---

[3]  Under Medicare and Medicaid, health care providers are "patient care institutions such as hospitals, critical access hospitals, hospices, nursing homes, and home health agencies." Centers for Medicaid and Medicare Services, Publication 100-07, State Operations Manual § 1000A, (Oct. 3, 2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c01.pdf.

[4]  *See* New York State Medicaid Enrollment Form, at 8, https://www.emedny.org/info/ProviderEnrollment/ProviderMaintForms/436601_INST_FORM_InstRateBasedEnrlForm.pdf (last visited Mar. 31, 2017).

[5]  CMS-1450/UB-04 Form, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1104CP.pdf (last visited Mar. 31, 2017).

As health care providers, nursing homes are reimbursed for every day they provide care to a Medicaid or Medicare beneficiary.[6]  (*Id.* ¶ 27 (first citing N.Y. Pub. Health Law § 2808; and then citing 10 N.Y. Comp. Codes R. & Regs. § 86-2 *et seq*.) (McKinney 2017).)  The reimbursement rates are calculated by a complex formula that considers four components related to a nursing home's costs and expenditures: (1) direct costs; (2) indirect costs; (3) non-comparable costs; and (4) capital expenditures.  (*Id.* ¶ 27 (citing 10 N.Y. Comp. Codes R. & Regs. § 86-2.10).)  The first three components are known as the "operating portion" of the reimbursement rate.  (TAC ¶ 27.)  The operating portion is calculated based on a nursing home's costs from a "base year," a particular fiscal year selected by the DOH.  (*Id.* ¶ 35.)  After the DOH selects a base year, it continues to use that base year to calculate a nursing home's operating costs until it decides to select a new base year.  (*Id.*)  The DOH obtains the base-year operating costs through annual cost reports that must be submitted by any nursing home intending to seek Medicaid reimbursement.  (*Id.* ¶¶ 34–35.)  From 1983 to 2009, the DOH used a base year of 1983, and cost reports from 1983, to calculate the operating-costs portion of the reimbursement rates.  (*Id.* ¶ 35.)  In 2011, the DOH selected a new base year of 2002, which selection applied retroactively to years 2009 to 2011.  (*Id.*)  Accordingly, from 2009 to 2011, the DOH used 2002 as the base year and used 2002 cost reports to calculate the operating-costs portion of the reimbursement rates.  (*Id.*)  In 2012, the DOH selected a new base year of 2007 and changed its reimbursement rate calculation methodology.  (*Id.*)

---

[6]  While the Court focuses on how the reimbursement procedures operate with respect to nursing homes, the reimbursement procedures are similar for any health care provider seeking Medicaid and Medicare reimbursement in New York State.  *See, e.g.*, 10 N.Y. Comp. Codes R. & Regs. § 86-1 *et seq.* (McKinney 2017) (governing reimbursement for "medical facilities"); *id.* § 86-3 *et seq.* (government reimbursement for "health maintenance organizations"); *id.* § 86-4 *et seq.* (governing reimbursement for "free-standing ambulatory care facilities"); *id.* § 86-5 *et seq.* (governing reimbursement for "long-term health care programs").

The DOH also has the option to change, or "re-base," the base year for a nursing home's reimbursement rate calculation when a nursing home changes ownership. (*Id.* ¶¶ 36–37.) In order to get an accurate reimbursement rate, the new operator of the nursing home is required to submit a rate appeal and an annual cost report to the DOH once the nursing home has operated at a capacity of ninety-percent or higher for a continuous twelve-month period. (*Id.* ¶ 37 (citing 10 N.Y. Comp. Codes R. & Regs § 86-2.10(k)).) The annual cost report submitted by the new nursing home operator must be certified by an independent accountant, and the new reimbursement rate applies retroactively and prospectively. (TAC ¶ 37.) Until the DOH calculates and assigns the new reimbursement rate, the new operator must use the reimbursement rate that was assigned to the old operator of the nursing home. (*Id.* (citing 10 N.Y. Comp. Codes R. & Regs. § 86-2.10(k)(2)(i)).) Once the new operator receives its reimbursement rate, it must pay back any overpayment received while using the old operator's reimbursement rate. *See* 10 N.Y. Comp. Codes R. & Regs. § 86-2.7.

**b. Factual background**

CHS is a healthcare consortium that operates hospitals and nursing homes. (TAC ¶ 8.) In November of 1999, CHS purchased the Nursing Home and the Medical Center from Episcopal Health Services, who had operated the facilities under the names Bishop Jonathan G. Sherman Episcopal Nursing Home ("Episcopal Nursing Home") and St. John's Episcopal Hospital. (*Id.* ¶ 39.) CHS officially assumed ownership and control of Episcopal Nursing Home in early 2000. (*Id.* ¶ 41.)

As the new operator, the Nursing Home used the reimbursement rate that the DOH assigned to Episcopal Nursing Home, and was authorized to do so until the Nursing Home maintained ninety-percent capacity over a twelve-month period, at which point the Nursing Home was required to submit its rate appeal and annual cost report to allow the DOH to assign

the Nursing Home its own reimbursement rate.  (Decl. of David DeCerbo ("DeCerbo Decl.")

¶¶ 36–37, Docket Entry No. 29-1.)

In 2001, the Nursing Home submitted its rate appeal and annual cost report to the DOH.

(TAC ¶ 43; DeCerbo Decl. ¶¶ 36–38; Nursing Home 2001 Cost Report, annexed to DeCerbo

Decl. as Ex. C; Nursing Home Rate Appeal, annexed to DeCerbo Decl. as Ex. D; DOH

Acknowledged Rate Appeal, annexed to DeCerbo Decl. as Ex. E.)  The DOH, however, never

assigned the Nursing Home its own reimbursement rate.  (DeCerbo Decl. ¶ 39–40; DOH Record

of Open Rate Appeals as of Aug., 2014, annexed to DeCerbo Decl. as Ex. F.)  Thus, from 2000 to

2011, the Nursing Home used the reimbursement rate that the DOH had assigned to the prior

operator, Episcopal Nursing Home.  (TAC ¶ 41.)

> i. **New York State investigations into the Nursing Home's Medicare and Medicaid reimbursement claims**

In August of 2005, the New York State Attorney General's Medicaid Fraud Control Unit

(the "Fraud Unit"), investigated the Nursing Home's Medicaid reimbursement claims spanning

from 2000 to 2004.  (Fraud Unit Letter, annexed to DeCerbo Decl. as Ex. Z.)  The Fraud Unit

requested that the Nursing Home provide any information regarding overpayments and any

information about its reserve accounts related to overpayments.  (*Id.*)  The Nursing Home

responded to the request on October 5, 2005, detailing that it had kept a reserve for

overpayments that it believed may be due to the DOH and stating that:

> the NYS DOH . . . has not issued [the Nursing Home] rates using
> the base year cost report submitted for the period of February 29,
> 2000 through February 28, 2001.  Currently and since 2000, [the
> Nursing Home] is being paid a Medicaid rate issued to Bishop
> Sherman Nursing Home (the former operator) . . . .

(Nursing Home Letter Replying to Fraud Unit, annexed to DeCerbo Decl. as Ex. AA.)  The

Nursing Home also stated in the letter that it had submitted a rate appeal that the DOH had yet to

resolve.  (*Id.*)  The Nursing Home further requested that the DOH decline any requests from the public to release any information provided by the Nursing Home pursuant to New York's Public Officer's Law.  (*Id.*)

In April of 2007, Relator, who had been working for CHS for about thirty-eight years, was elevated to the position of Licensed Administrator of the Nursing Home.  (TAC ¶ 7.)  As the Licensed Administrator, Relator was responsible for the general administration of the Nursing Home, which included "managing, supervising, and coordinating" the various departments at the Nursing Home, as well as "maintaining and developing legally compliant operating protocols, developing and managing budgets, developing financial policies[,] . . . monitoring financial performance . . . , supervising all human resource issues and reporting to the [N]ursing [H]ome's governing body as needed."  (*Id.*)

Soon after starting in his new position, Relator discovered that the Nursing Home was using the reimbursement rate assigned to Episcopal Nursing Home.  (*Id.* ¶ 42.)  Relator informed several of the executives at the Medical Center that the Nursing Home was not using the correct reimbursement rate and they assured Relator that the DOH had been notified of the issue.  (*Id.* ¶ 43.)

In May of 2008, Relator met with several CHS executives and restated his concerns regarding the Nursing Home's use of the Episcopal Nursing Home reimbursement rate.  (*Id.* ¶ 47.)  During the meeting, the CHS executives told Relator that CHS was aware of the issue and had created a reserve account for the funds that they believed the Nursing Home would owe once the Nursing Home received its reimbursement rate.  (*Id.*)  Relator told the executives that the Nursing Home may be eligible for the higher reimbursement rate applicable to hospital-based facilities, given the proximity and interrelatedness of the Nursing Home and the Medical Center.

(*Id.*)  The executives told Relator that the DOH likely would not approve a hospital rate for the Nursing Home, but that they may seek to get a hospital rate in the future to set off any overpayments they may have to return to the DOH.  (*Id.*)

In 2009, the DOH audited the Nursing Home's Medicaid reimbursement rates for the years 2003 to 2007.  (*Id.* ¶ 49.)  The audit focused on "a few" claims by the Nursing Home for "capital costs components" that were "inconsistent with governing regulations or unsupported by documentation . . . ."  (*Id.*)  The DOH discovered that the Nursing Home had understated the number of reimbursable patient-days in its cost reports.  (*Id.*)  As a result, the DOH adjusted the Nursing Home's reimbursement rate "slightly downward" based on the correct number and requested that the Nursing Home return to the DOH $281,242 in overpayments received as a result of the inflated rate.  (*Id.*)

In March of 2011, Relator attended a meeting between CHS executives and representatives from Horan Martello and Marrone, a health care accounting firm.  (*Id.* ¶ 50.) Representatives from the accounting firm discussed the overpayments the Nursing Home had been receiving due to the continuing application of Episcopal Nursing Home's reimbursement rate.  (*Id.*)  The attendees discussed a chart, which illustrated that, as of 2011, the Nursing Home may have owed the DOH $13 million in Medicaid overpayments.  (*Id.*)  The accounting representatives told the CHS executives that it may be best not to follow up with the DOH regarding the overpayments because the statute of limitations on repayment may soon expire, and the individuals at the DOH who were responsible for the Nursing Home's rate appeal likely had retired and forgotten to inform someone else to complete the rate appeal.  (*Id.*)

### ii.    The DOH retroactively re-bases the reimbursement rates in 2011 and the Nursing Home receives a mitigation payment as a result

In June of 2011, the DOH retroactively changed the base year used to calculate Medicaid reimbursement rates for health care providers from 1983 to 2002 for the reimbursement period covering 2009 through 2011.  (*Id.* ¶¶ 35, 51.)  The re-basing caused the Nursing Home's reimbursement rate to drop from "approximately $270 per Medicaid patient day to . . . $250 per Medicaid [patient] day."  (*Id.* ¶ 51.)  The DOH sought to minimize the impact of the re-basing by providing one-time mitigation payments to affected health care providers that could be used to off-set any potential losses caused by the retroactive application of the lower reimbursement rates.  (*Id.* ¶ 59.)  Under this program, the Nursing Home received a $4.5 million mitigation payment.[7]  (*Id.*)  CHS accepted the mitigation payment and subsequently "misappropriated" approximately $1.7 million of the mitigation payment by charging the Nursing Home for "workers['] compensation" and "excess Medicaid costs."  (*Id.* ¶ 61.)

In June of 2012, Relator again discussed his concerns regarding the Nursing Home's reimbursement rate with John Haight, a CHS executive.  (*Id.* ¶ 54.)  Relator told Haight that he believed that the Nursing Home should apply for a hospital-based rate to off-set any losses incurred as a result of the 2011 re-basing.  (*Id.*)  Haight told Relator that CHS did not want to draw the DOH's attention to its reimbursement rates because the DOH may realize that the Nursing Home owes at least $13 million in overpayments as a result of using the Episcopal Nursing Home reimbursement rate for such a long period of time.  (*Id.*)  Relator told Haight that returning the overpayments was not an issue since the Nursing Home had placed the funds in a

---

[7]  The accounting firm had anticipated that the re-basing may occur and that a mitigation payment would be issued as a result of the re-basing.  (Compl. ¶¶ 50, 62.)  Therefore, the accounting firm estimated that because the mitigation payment would be based on the difference between the Episcopal Nursing Home rate used by the Nursing Home and the newly issued rate, the Nursing Home may have had to repay approximately $3 million.

reserve account. (*Id.*) Haight told Relator that the Medical Center had borrowed all of the reserve account funds and that the reserve account was empty. (*Id.*) Haight also told Relator that CHS believed that it would not be responsible for the overpayments due to the statute of limitations and a lack of continuity in the DOH office, but that CHS kept the reserve account on the books in the event that DOH disregarded the statute of limitations and sought repayment. (*Id.*) When Relator expressed that he was uncomfortable with the Nursing Home's decision not to return the overpayments, Haight told him "not to get his panties all twisted." (*Id.*) Relator made one final attempt to follow up on the issue later that month, but to no avail. (*Id.* ¶ 55.)

### iii. CHS's alleged use of the Nursing Home's Medicaid and Medicare funds for non-Medicaid and non-Medicare purposes

During the course of Relator's employment as the Nursing Home's Licensed Administrator, Relator also discovered that CHS had been improperly diverting the Nursing Home's Medicaid funds. (*Id.* ¶ 65.) Starting in 2007, CHS and the Medical Center began charging the Nursing Home for "medical, administrative, utility and other costs" that the Nursing Home had not incurred or which costs were overinflated. (*Id.* ¶ 66.) The false payments were taken from the Nursing Home's Medicaid and Medicare funds for the Nursing Home's patients. (*Id.* ¶¶ 67, 75–77.)

In 2008, Relator realized that the Medical Center had overcharged the Nursing Home for laboratory costs and brought it to Haight's attention. (*Id.*) Haight informed Relator that the Medical Center charged the Nursing Home a fixed-yearly rate, regardless of the actual laboratory charges incurred. (*Id.*) Relator also discovered that the Medical Center's laboratory rates for the Nursing Home's residents was much greater than the laboratory rates charged for the residents in CHS other nursing homes and much greater than then-current market rate for such services. (*Id.*)

In late 2009 and late 2011, CHS had taken $2 million and $1.1 million, respectively, from the Nursing Home's budget to cover "purported workers['] compensation costs," but Relator alleges that the workers' compensation cases originating from the Nursing Home failed to support such large deductions. (*Id.* ¶ 68.) When Relator questioned the deductions, he was told that they were not only for the workers' compensation costs incurred in those years, but also to cover workers' compensation costs incurred by the Nursing Home in 2005. (*Id.*) In two subsequent emails he received, Relator learned that the Nursing Home's workers' compensation costs were disproportionately higher than those of CHS other nursing homes. (*Id.* ¶¶ 68–70.) When Relator raised the issue of the Nursing Home's workers' compensation costs with officials of CHS and the Medical Center, he was ignored. (*Id.* ¶ 68.)

In March of 2012, Relator attended a meeting with other CHS executives and officials, where he raised his concerns regarding the inflated laboratory costs the Medical Center had charged and was continuing to charge the Nursing Home. (*Id.* ¶ 71.) In response, one executive laughed and told Relator that the Medical Center was "ripping [the Nursing Home] off." (*Id.*) At a follow-up meeting with Haight and other CHS executives, Relator reasserted his concerns pertaining to the Medical Center's rates for the Nursing Home's residents, and was told that the rates would remain the same for the current fiscal year but "could be addressed in next year's budget." (*Id.* ¶ 72.) Relator subsequently received an email confirming CHS position. (*Id.*) Because Haight and other CHS executives refused to address the rate and charging issues, Relator took his concerns to a CHS compliance officer. (*Id.* ¶ 73.) Although the compliance officer said that she would address Relator's concerns, no action was ever taken. (*Id.*)

Shortly thereafter, Relator discovered that the Nursing Home was paying a portion of the salary for various staff members at the Medical Center and other CHS nursing homes who spent

little to no time at the Nursing Home and had little to no involvement in the Nursing Home's operations.  (*Id.* ¶ 74.)  Relator presented the issue to Haight and other CHS executives.  (*Id.*)  Haight and the others acknowledged that the salary charges were improper, but did not take any corrective action.  (*Id.*)  When Relator raised the issue a second time, Haight responded that he was free to charge the Nursing Home for the salaries of any CHS staff regardless of how much of their work pertained to the Nursing Home.  (*Id.* ¶ 75.)

Based on Relator's knowledge of the foregoing activities, he commenced the instant action.  (*Id.* at 2.)

## II.  Discussion

### a.  Standards of review

#### i.  Motion to dismiss for lack of jurisdiction

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)); *see also Chau v. S.E.C.*, --- F. App'x ---, 2016 WL 7036830, at *1–2 (2d Cir. Dec. 2, 2016).  The plaintiff has the burden to prove that subject matter jurisdiction exists, and in evaluating whether the plaintiff has met that burden, "'[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'"  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations omitted), *aff'd*, 561 U.S. 247 (2010).  A court may

consider matters outside of the pleadings when determining whether subject matter jurisdiction exists. *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010).

### ii. Motion to dismiss for failure to state a claim upon which relief may be granted

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Concord Assocs., L.P. v. Entm't Prop. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

Moreover, as discussed in greater detail below, "[i]t is self-evident that the FCA is an anti-fraud statute," and therefore "claims brought under the FCA fall within the express scope of Rule 9(b) [of the Federal Rules of Civil Procedure]." *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (quoting *Gold v. Morrison–Knudsen Co.*, 68

F.3d 1475, 1476–77 (2d Cir. 1995)); *see Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016) *abrogated on other grounds by Bishop v. Wells Fargo & Co.*, 580 U.S. ---, ---, 2017 WL 670171, at *1 (Feb. 21, 2017) (quoting same).  Pleadings subject to Rule 9(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25–26 (2d Cir. 2016) (quoting *Shields v. Citytrust Bank Corp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *Wood*, 328 F. App'x at 747 (quoting same).  "Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading."  *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013); *see Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 383 (S.D.N.Y. 2015) (quoting same); *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014) (quoting same); *U.S. ex rel. Kester v. Novartis Pharma. Corp.* ("*Novartis I*"), 23 F. Supp. 3d 242, 258 (S.D.N.Y. 2014) (quoting same); *see also Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (discussing the purpose of the particularity requirement and emphasizing fair notice to the defendant).

"In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Wilson v. Kellogg Co.*, 628 F. App'x 59, 60 (2d Cir. 2016) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).  In addition, courts may consider "documents that, although not incorporated by reference, are integral to the complaint."  *L-7 Designs, Inc. v. Old Navy, LLC*,

647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

### iii.   Motion for summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id*.  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b.   Federal and New York False Claims Acts

The FCA imposes liability for, among other things, "knowingly" presenting or causing to be presented, a false or fraudulent claim "for payment or approval."  31 U.S.C. § 3729(a).  Although Congress has repeatedly amended the FCA, "its focus remains on those who present or directly induce the submission of false or fraudulent claims."  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. ---, ---, 136 S. Ct. 1989, 1996 (2016).  A "claim" includes direct

requests to the government for payment as well as claims for reimbursement under federal benefits programs. *Id.* The NYFCA "is closely modeled on the federal FCA," *Bilotta*, 50 F. Supp. 3d at 509 (citation and internal quotation marks omitted), and it imposes liability for "knowingly mak[ing] a false statement or knowingly fil[ing] a false record," *People ex rel. Schneiderman v. Sprint Nextel Corp.*, 26 N.Y.3d 98, 112 (2015). Because the NYFCA mirrors the FCA in many respects, "it is appropriate to look toward federal law when interpreting the New York act." *State ex rel. Seiden v. Utica First Ins. Co.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012) (citing *State of N.Y. ex rel. Jamaica Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*, 922 N.Y.S.2d 342, 443 (App. Div. 2011)); *see Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015) ("When interpreting the NYFCA, New York courts rely on federal FCA precedent."); *Bilotta*, 50 F. Supp. 3d at 509 ("New York courts rely on federal FCA precedents when interpreting the NYFCA." (citation omitted)). Pursuant to the private, or *qui tam*, provisions of the FCA and NYFCA, a private person may bring a civil action on behalf of the government, as a "relator," for violations of each act. 31 U.S.C. § 3730(b); N.Y. State Fin. Law § 190(2). If a relator brings such an action under either the FCA or the NYFCA, the government may elect, within a set period of time, to intervene in the action. 31 U.S.C. § 3730(b)–(c); N.Y. State Fin. Law § 190(2)(b).

Here, Relator invokes provisions of the FCA that subject to civil liability any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government, 31 U.S.C § 3729(a)(1)(A); "knowingly makes, uses, or causes to be used, a false record or statement material to [such] a false or fraudulent claim," *id.* § 3729(a)(1)(B); "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)," *id.* § 3729(a)(1)(C); or "knowingly makes . . . a false record or statement material to an

obligation to pay" the government or "conceals or . . . avoids or decreases an obligation to pay" the government, *id.* § 3729(a)(1)(G). (TAC ¶¶ 89, 94, 99, 105.) Relator brings substantially the same claims pursuant to the NYFCA. (TAC ¶¶ 115, 121, 127, 133 (citing N.Y. State Fin. Law §§ 189(1)(a),(b),(c),(g)).)

To prove a false claim under FCA sections 3729(a)(1)(A) and 3729(a)(1)(B) or NYFCA sections 189(1)(a) and 189(1)(b), a relator must show that the defendant "(1) made a claim, (2) to the [] government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Bishop*, 823 F.3d at 43 (quoting *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001)), *abrogated on other grounds by Universal Health Servs., Inc.*, 579 U.S. at ---, 136 S. Ct. at 2001); *U.S. ex rel. Qazi v. Bushwick United Hous. Dev. Fund Corp.*, 977 F. Supp. 2d 235, 239 (E.D.N.Y. 2013) (quoting same). However, neither the FCA nor the NYFCA defines a "false" claim. *See Mikes*, 274 F.3d at 696; *U.S. ex rel. Kester v. Novartis Pharm. Corp.* ("*Novartis V*"), 43 F. Supp. 3d 332, 367–68 (S.D.N.Y. 2014).

Similarly, to prove a "reverse false claim" under FCA section 3729(a)(1)(G) or NYFCA section 189(a)(g), which involves money *owed* to the government rather than money *paid by* the government, a relator must show: "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government — a duty to pay money or property." *Novartis V*, 43 F. Supp. 3d at 367–68 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (internal quotation marks omitted)); *see also Wood*, 328 F. App'x at 748.

Finally, to prove a false claim under FCA section 3729(a)(1)(C) or NYFCA section 189(1)(c), a relator must show that the defendant agreed with another to commit a violation of FCA sections (a)(1)(A), (B) or (G) or NYFCA sections 189(1)(a), (b) or (g), and committed an

overt act in furtherance of the violation. *U.S. ex rel. Scharff v. Camelot Counseling*, No. 12-CV-3791, 2016 WL 5416494, at *9 (S.D.N.Y. Sept. 28, 2016); *Novartis V*, 43 F. Supp. 3d at 360.

### c.  The Court has subject matter jurisdiction over this action

Defendants argue that, based on the version of the FCA that was in effect at the time of the challenged conduct, the Court lacks jurisdiction over Relator's FCA claims because the relevant information underlying the claims was publicly disclosed prior to Relator initiating this action, when the Fraud Unit investigated the Nursing Home's Medicaid and Medicare reimbursement practices in 2005.  (Defs. Mem. of Law in Supp. of Defs. Mot. ("Defs. Mem.") 16-19, Docket Entry No. 29-9.)  Relator argues in response that the Court must apply the version of the FCA statutes in effect at the time he filed this action.  (Pl. Opp'n to Defs. Mot. ("Pl. Opp'n") 3–8, Docket Entry No. 32.)  Relator also argues that CHS never publicly disclosed the essential facts underlying the allegedly fraudulent conduct, and any information CHS provided to the Fraud Unit was not publicly disclosed and therefore does not meet the standard for public disclosure.  (*Id.* at 8–15.)  The Court addresses the arguments below.

### i.  Applicable version of the FCA

The parties dispute which version of the FCA applies to this action for the purpose of determining whether the public disclosure bar is applicable.[8]  (Defs. Mem 16–20; Pl. Opp'n 2–4; Defs. Reply in Further Supp. of Defs. Mot. ("Defs. Reply") 6, Docket Entry No. 36.)  Plaintiff argues that the 2010 version of the FCA applies because it "applies to all cases filed" after its March 2010 enactment.  (Pl. Opp'n 2.)  Defendants argue that the 2006 version of the FCA

---

[8]  The public disclosure bar, 31 U.S.C. § 3730(e)(4)(A), prevents a relator from pursuing an FCA claim where the relevant information underlying the claim was publicly disseminated or publicly available before the relator filed an FCA action.

applies because the alleged conduct occurred between February of 2000, and March of 2009 prior to the FCA amendments. (Defs. Reply 6.)

### 1. The 2006 and 2010 versions of the FCA

In May of 2009, Congress amended the FCA, which it had last amended in 1994. *See* 31 U.S.C. § 3729. The sections and subsections of the FCA were renumbered, as relevant here, from sections 3729(a)(1), (a)(2), (a)(3) and (a)(7), to (a)(1)(A), (a)(1)(B), (a)(1)(C) and (a)(1)(G), respectively. *Compare id.* § 3729 (1994) *with* § 3729 (2009). Although the wording of the sections changed slightly, there was no substantive difference between the 1994 version and the 2009 version of the statute for these sections. *See Bishop*, 823 F.3d at 43 n.1 ("Congress amended the FCA in 2009, but the changes to the statute do not materially alter our analysis . . . .").

In July of 2010, for the first time since 2006, Congress amended the FCA's statutory provisions governing the courts' jurisdiction over section 3729 claims brought by relators pursuant to 31 U.S.C. § 3730. As relevant here, Congress amended "the public disclosure bar" found at section 3730(e)(4)(A), a provision that governs a relator's ability to pursue an FCA claim where the relevant information underlying the claim was publicly disseminated or publicly available before the relator filed an FCA action. The 2006 version of the public disclosure bar read:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily

provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C § 3730(e)(4)(A) (2006). The 2010 version of the public disclosure bar reads:

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

*Id.* § 3730(e)(4)(A) (2010). As relevant here, the 2006 version of the public disclosure bar is a jurisdictional bar. *See id.* § 3730(e)(4)(A) (2006) ("No court shall have jurisdiction over an action under this section . . . ."). In addition, courts interpreted the language of the 2006 version of the statute to encompass disclosures that were made to, among other entities, state governmental bodies because the language of the statute did not specify whether information was publicly disclosed if it was disclosed to state governmental bodies, federal governmental bodies, or both. *See Graham Cty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287 (2010) (holding that, under the 2006 version of the public disclosure bar, "there is no . . . textual basis for excluding the activities of state and local agencies . . . from its ambit"); *Monaghan v.*

*Henry Phipps Plaza W. Inc.*, 531 F. App'x 127, 130–31 (2d Cir. 2013) (holding that a relator's *qui tam* action was barred because "the information underlying [the relator's] suit had already been publicly disclosed in [a] state court proceeding" (citation omitted)); *Novartis V*, 43 F. Supp. 3d at 346–47 ("Accusations of wrongdoing contained in state court complaints qualified as public disclosures under the pre-2010 [version of the] statute . . . ." (citation omitted)); *U.S. ex rel. Rosner v. WB/Stellar IP Owner, LLC*, 739 F. Supp. 2d 396, 403–09 (S.D.N.Y. 2010) (finding that information disclosed through New York state government bodies and databases barred a relator's *qui tam* action).

However, unlike the 2006 version of the public disclosure bar, the 2010 version of the public disclosure bar does not prevent courts from exercising jurisdiction, but rather determines whether a relator has stated a claim. *See New York ex rel. Khurana v. Spherion Corp*, No. 15-cv-6605, 2016 WL 6652735, at *11 (S.D.N.Y. Nov. 10, 2016) (finding that the 2010 version of the public disclosure bar "goes to whether a plaintiff has stated a claim, not whether the Court has jurisdiction" (collecting cases)). In addition, unlike the 2006 version of the public disclosure bar, the 2010 version specifically limits the information that may bar a relator's *qui tam* action to information that was disclosed to, among other places, federal governmental bodies. *See* 31 U.S.C. § 3730(e)(4) (2010) ("The court shall dismiss an action or claim under this section" if the information underlying the claim was publicly disclosed "in a Federal criminal, civil, or administrative hearing [or] in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"); *Novartis V*, 43 F. Supp. 3d at 346–47 ("[T]he post-2010 version of the list of enumerated sources limited the types of hearings in which such disclosures can be made to Federal [proceedings]. Thus, after the 2010 amendment, a court may

consider information disclosed to the federal government — but not to state governments — when it decides whether substantially similar facts were publicly disclosed.").

## 2. The applicable version of the public disclosure bar

While the Second Circuit has not squarely addressed whether a court should apply the version of the FCA in effect on the filing date of the action or the occurrence of the allegedly fraudulent conduct, a district court in this Circuit has held that the time at which the allegedly fraudulent conduct occurred is dispositive in determining what version of the public disclosure bar applies. *See Novartis V*, 43 F. Supp. 3d at 354.

In *Novartis V*, the court examined what version of the public disclosure bar should apply where some of the allegedly fraudulent conduct occurred prior to the 2010 amendment and some occurred after the amendment. *Id.* at 346–54. Quoting the Second Circuit, the court determined that "the 2010 amendment is not retroactive." *Id.* (quoting *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 n.4 (2d Cir. 2011), *overruled on other grounds by Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 417 (2011).[9] The court then determined that the pre-2010 version of the public disclosure bar applied to any conduct that occurred prior to the amendment and that the post-2010 version applied to any conduct that occurred after the effective date of the 2010 amendment. *Id.* at 354 ("Because the 2010 amendment is not retroactive, the pre-2010 definition . . . applies to the [r]elator's allegations concerning [defendant's] conduct from January 2007 to March 2010." (internal quotation marks omitted)).

---

[9] While the *Novartis V* court relied on *Schindler* in finding that the date of the conduct is determinative as to what version of the public disclosure bar applies, *U.S. ex rel. Kester v. Novartis Pharm. Corp.* ("*Novartis V*"), 43 F. Supp. 3d 332, 354 (S.D.N.Y. 2014), *Schindler* does not address the precise issue presented here because the conduct at issue and the date of the filing of the action in *Schindler* both occurred prior to the 2010 amendments. *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 99 (2d Cir. 2011).

In addition, every Court of Appeals that has squarely addressed this issue has similarly held that the date of the challenged conduct, not the date of the filing of the action, determines what version of the statute applies. *See U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 932 n.1 (11th Cir. 2016) (holding that "[defendant's] conduct should be evaluated under the law as it existed at the time [defendant] submitted its allegedly false claims"); *U.S. ex rel. Bloedow v. Planned Parenthood of the Great N.w. Inc.*, 654 F. App'x 335, 335 (9th Cir. 2016) (same); *U.S. ex rel. Gage v. Davis S.R. Aviation, LLC*, 658 F. App'x 194, 197 n.1 (5th Cir. 2016) (same); *U.S. ex rel. Ziebell v. Fox Valley Workforce Devo. Bd., Inc.*, 806 F.3d 946, 951–52 (7th Cir. 2015) (same); *U.S. ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 614–15 (6th Cir. 2015) (same); *U.S. ex rel. Judd v. Quest Diag. Inc.*, 638 F. App'x 162, 165 (3d Cir. 2015) (same); *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 914–16 (4th Cir. 2013) (same). The courts predominantly rely on the premise that the 2010 amendments do not apply retroactively, and therefore cannot be applied to conduct that occurred before they became effective. *See, e.g.*, *Gage*, 658 F. App'x at 197 n.1 (noting that the "public disclosure bar was amended in 2010, but the amendment does not apply retroactively" and holding that the district court properly found that most of the conduct at issue occurred "prior to the [2010] amendment, making the [prior] version of the statute applicable to all but the four allegedly false claims [defendants] presented after the effective date of the amendment" (internal quotation marks omitted)).

Despite the overwhelming persuasive authority, Relator asserts that the reasoning articulated by the Second Circuit in *Monaghan v. Henry Phipps Plaza West Inc.*, 531 F. App'x at 129 n.3, supports his argument that the date of filing of the action, not the date of the conduct, is dispositive as to which version of the statute applies. (Pl. Opp'n 2–4.) The Court is not

persuaded by Relator's argument. In *Monaghan*, the plaintiff-relator filed an FCA claim in July of 2009 based on the defendant's allegedly fraudulent conduct that had occurred years prior. 531 F. App'x at 128–29. In 2012, the district court dismissed the action for lack of subject matter jurisdiction under the public disclosure bar, and the plaintiff-relator appealed. *Id.* at 129. The Second Circuit affirmed the dismissal, *id.* at 129–30, and in a footnote, the Court acknowledged that Congress had amended the public disclosure bar in 2010, but the Court nevertheless applied the 2006 version because "the amendment does not apply retroactively to cases like this one, which were pending prior to the amendment." *Id.* at 129 n.3 (citing *Graham Cty. Soil & Water*, 559 U.S. at 283 n. 1). All of the conduct at issue in *Monaghan* occurred prior to the 2010 amendments. *See Monaghan*, 531 F. App'x at 128–29. Thus, the Court did not have to address the issue presented in this case. *See id.*

In addition, the Second Circuit has made clear that "[i]t is a fundamental canon of statutory construction that retroactive operation is not favored by court and statutes will not be given such construction unless the languages expressly. . . requires it." *1256 Hertrel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 258–59 (2d Cir. 2014); *see also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 87 n.16 (2d Cir. 2006) (holding that "[a] regulation may not be applied to conduct that took place before its enactment in the absence of clear congressional intent"). Moreover, the *Monaghan* Court explained that the 2010 amendments do not "apply retroactively," *Monaghan*, 531 F. App'x at 129 n.3, essentially indicating that the 2010 version of the public disclosure bar may not be applied "to conduct that took place before its enactment," *see Yale-New Haven Hosp.*, 470 F.3d at 87 n.16; *see also Saldivar*, 841 F.3d at 932 n.1 (A"[defendant's] conduct should be evaluated under the law as it existed at the time [defendant]

submitted its allegedly false claims.").  Thus, the Court will apply the version of the public disclosure bar that was in effect at the time of the challenged conduct.

### 3. Dates of the conduct at issue

Because the date of the allegedly fraudulent conduct determines the version of the statute that applies, the Court must identify the basis for each claim, the underlying conduct, and the dates of the relevant conduct in order to determine whether the Court has jurisdiction over Relator's claims.

Relator asserts that Defendants engaged in allegedly fraudulent conduct, including: (1) filing false claims for Medicare and Medicaid reimbursement with the DOH because Defendants used Episcopal Nursing Home's reimbursement rate, (TAC ¶¶ 39–58); (2) unlawfully retaining Medicare and Medicaid funds owed to the DOH due to the overpayments the Nursing Home received from the use of Episcopal Nursing Home's reimbursement rate, (*id.*); (3) unlawfully accepting a substantial mitigation overpayment from the DOH to the Nursing Home because the mitigation payment was calculated based on Defendants' prior use of Episcopal Nursing Home's reimbursement rate, (*id.* ¶ 59–64); (4) unlawfully retaining the mitigation overpayment, which Defendants should have returned to the DOH, (*id.*); (5) unlawfully using the mitigation payment for purposes unrelated to Medicare and Medicaid, (*id.* ¶¶ 52–53); and (6) unlawfully using the Nursing Home's Medicaid funding for improper purposes, specifically, overcharging the Nursing Home for laboratory and other medical costs, operating costs, workers' compensation costs, and CHS staff salary contributions, (*id.* ¶¶ 65–79). Claims one through four, (collectively, the "False Filing and Retention Claims"), are principally based on the same underlying conduct — that Defendants unlawfully used Episcopal Nursing Home's reimbursement rate to secure and retain Medicare and Medicaid overpayments.  Claims

five and six, (collectively, the "Misappropriation Claims"), allege that Defendants engaged in a multifaceted scheme to divert and misappropriate the Nursing Home's Medicare and Medicaid funds.

The False Filing and Retention Claims allege that Defendants submitted false claims for reimbursement from the government between 2000, the year Defendants began operating the Nursing Home, and 2011, the year the DOH changed the methodology for calculating reimbursement rates, because, prior to 2011, Defendants were using Episcopal Nursing Home's reimbursement rate. (TAC ¶¶ 35, 39–58.) Defendants' public-disclosure-bar arguments are based on the investigations by the Fraud Unit in 2005 and the audit by the DOH in 2009 into the Nursing Home's Medicaid and Medicare billing practices, both state governmental entities, during which investigations Defendants disclosed that they were using Episcopal Nursing Home's reimbursement rate for the Nursing Home's reimbursement claims. (Defs. Mem. 17–21.)

As explained above, the date of the challenged conduct determines what version of the public disclosure bar applies. In March of 2010, Congress amended the public disclosure bar so that information disclosed to a state government no longer falls under the public disclosure bar. *See Novartis V*, 43 F. Supp. 3d at 346–47, 354. Thus, any information that Defendants disclosed to the Fraud Unit or the DOH after March of 2010 does not qualify as a public disclosure because the 2010 version of the FCA no longer recognizes disclosures to state governments and agencies as public disclosures. *See id.* at 354 ("Because the 2010 amendment is not retroactive, the pre-2010 definition . . . applies to the [r]elator's allegations concerning [defendant's] conduct from January 2007 to March 2010." (internal quotation marks omitted)). As a result, the Court will not address any of the challenged conduct that occurred after March of 2010 in the public

disclosure bar analysis below.[10] The Court therefore will apply the 2006 version of the public disclosure bar to the conduct that allegedly occurred prior to the 2010 amendment and determine whether it bars Relator's claims that are based on the pre-March 2010 conduct.

---

[10] Defendants also argue that April of 2009 is the end date for the conduct underlying the False Filing and Retention Claims because the DOH recalculated the Nursing Home's reimbursement rate in 2011 and that rate was retroactive to April of 2009. (Defs. Mem. 14–16, 28.) The Court disagrees.

Defendants' argument is based on the following sequence of events. From 1983 to 2009, the DOH used 1983 as the base year to calculate health care providers' reimbursement rates, and accordingly, it used health care providers' costs reports from 1983 to calculate the reimbursement rates. (TAC ¶ 35, 41, 51.) In June of 2011, the DOH selected 2002 as the new base year to calculate reimbursement rates, which selection retroactively applied to health care providers' reimbursement rate calculations for years 2009 to 2011. (*Id.*) Therefore, from 2009 to 2011, the DOH used 2002 as the base year and accordingly, it used health care providers' 2002 cost reports to calculate the reimbursement rates. (*Id.*) In 2002, the Nursing Home submitted a cost report based on its own costs. (*Id.* ¶ 51; DeCerbo Decl. ¶ 52.) In 2011, the DOH recalculated the Nursing Home's reimbursement rate using the Nursing Home's 2002 Medicaid Cost Report, which reimbursement rate was then used for the Nursing Home's reimbursements from 2009 to 2011. (TAC ¶¶ 41, 51, 63; DeCerbo Decl. ¶ 89.) Thus, after the 2011 recalculation, the Nursing Home's reimbursement rate for 2009 through 2011 was based on its own costs, not the costs of Episcopal Nursing Home. (*Id.*)

Defendants argue that, because Relator's claims are premised on the allegation that the Nursing Home submitted false claims for Medicaid and Medicare reimbursement based on its use of Episcopal Nursing Home's reimbursement rate, the 2011 rebasing and recalculation extinguished any allegedly false claims as of 2009 because the rebasing was based on the Nursing Home's costs, not Episcopal Nursing Home's, and the new rates were retroactive to 2009. (Defs. Mem. 14–16, 28.)

However, the DOH's retroactive application of a reimbursement rate based on the Nursing Home's 2002 cost report does not remedy Defendants' submission of allegedly false claims between 2009 and 2011, prior to the rebasing, recalculation and retroactive application of the reimbursement rate. "The FCA prohibits a person from knowingly presenting or causing to be presented, to the Unites States government a false or fraudulent claim for payment[,]" indicating that liability under the FCA is based on whether Defendants actions were false or fraudulent at the time the claims were submitted. *See U.S. ex rel Grupp v. DHL Express (USA), Inc.*, 742 F, 3d 51, 53 (2d Cir. 2014) (alterations, citations and internal quotation marks omitted). Therefore, the Court may consider the reimbursement claims that Defendants submitted between 2009 and 2011 in determining whether they violated the FCA. However, as explained above, the Court will only consider the conduct that occurred prior to March of 2010 in the public-disclosure-bar analysis.

### ii.    The public disclosure bar does not deprive the Court of jurisdiction

Defendants argue that the Court lacks jurisdiction over Relator's FCA claims because the relevant information underlying the claims was publicly disclosed before Relator initiated this action, when the Fraud Unit investigated the Nursing Home's Medicaid and Medicare reimbursement practices in 2005.  (Defs. Mem. 16–19.)  Defendants also argue that Relator was not the original source of the information.  (*Id.* at 20–24.)  Relator argues in response that CHS never publicly disclosed the essential facts underlying the allegedly fraudulent conduct, and also argues that any information CHS provided to the Fraud Unit does not meet the standard for public disclosure.  (Pl. Opp'n 4–15.)  Relator further argues that he is an original source because he exposed the allegedly fraudulent conduct.  (*Id.* at 15–17.)

Under the 2006 version of the public disclosure bar, courts lack jurisdiction over FCA claims if (1) the information underlying the allegedly false claims has been publicly disclosed, (2) the information disclosed contains facts and allegations that are substantially similar to those alleged in the complaint, and (3) the relator was not the original source of the information.[11] 31 U.S.C. § 3730(e)(4) (2006); *see Schindler.*, 437 F. App'x at 17–18; *United States v. Immediate Home Care*, No. 06-CV-1067, 2016 WL 3545699, at *2 (E.D.N.Y. June 24, 2016); *Novartis V*, 43 F. Supp. 3d at 346.

---

[11]  Whether the relator was the original source of the information and whether the disclosed information contains facts and allegations that are substantially similar to those underlying a relator's action only become relevant if the information was publicly disclosed or publicly accessible.  31 U.S.C. § 3730(e)(4); *see U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 437 F. App'x 13, 17–18 (2d Cir. 2011); *United States v. Immediate Home Care*, No. 06-CV-1067, 2016 WL 3545699, at *2 (E.D.N.Y. June 24, 2016).  Because, as explained further below, the Court finds that the information at issue was not publicly disclosed, the Court does not address whether the information was substantially similar or whether Relator was the original source of the information.

The public disclosure bar applies to information that is disclosed in, *inter alia*, a government "hearing, audit, or investigation."  31 U.S.C. § 3730(e)(4)(A) (2006); *Schindler*, 601 F.3d at 104.  Information is publicly disclosed if it has entered the "public domain."  *See Schindler*, 563 U.S. at 414.  To be in the public domain, information does not have to be "broadly disseminated"; rather, information is in the public domain if it is disseminated or available to any member of the public.  *Schindler*, 601 F.3d at 104; *see also U.S. ex rel. Doe v. John Doe Corp.*, 960 F.3d 318, 322 (2d Cir. 1992) (holding that information is in the "public domain" where there is "[p]otential accessibility by those not a party to the fraud" (citation omitted)).

In *Schindler*, the relator, Daniel Kirk, filed an action against his former employer, alleging that the employer submitted false information to the government in its claims for payment under a government contract.  *See Schindler*, 563 U.S. at 405–06.  To support his allegations, Kirk relied on reports the employer had submitted to the government, which he obtained from the Department of Labor through Freedom of Information Act ("FOIA") requests.  *Id.* at 406.  The employer moved to dismiss Kirk's claims, arguing that the public disclosure bar applied because Kirk relied on information he obtained through a FOIA request.  *Id.*  The district court granted the motion, finding that the government's response to the FOIA request constituted a publicly disclosed "administrative report or investigation."  *Id.* (citation and internal quotation marks omitted).  On appeal, the Second Circuit reversed the district court's decision, holding that the government's responses to the FOIA requests were publicly disclosed but were not "reports" or "investigations" under the definition of those terms in the public disclosure bar.  *Id.* (citations omitted).

The Supreme Court reversed, holding that information provided by the government through a FOIA request is a "report" that may fall within the public disclosure bar.  *Id.*  While the

majority of the Court's opinion focused on whether the government's response to a FOIA request qualified as a "report" as defined in the public disclosure bar, the Court also explained why responses to FOIA requests are subject to the public disclosure bar. *Id.* at 407–17. The Court explained that "the sole touchtone in the statutory text *is public disclosure*" and "[t]he FCA's public disclosure bar deprives courts of jurisdiction over *qui tam* suits when the relevant information *has already entered the public domain*." *Id.* at 409, 414 (emphasis added) (alteration and citation omitted).

On remand, the Second Circuit held that the information the government disclosed in response to the FOIA requests "clearly [was] in the public domain" based on the Supreme Court's ruling that responses to FOIA requests were reports as defined under the public disclosure bar. *Kirk*, 437 F. App'x at 17. The bulk of the Second Circuit's analysis therefore focused on whether Kirk's FCA claims were "based upon the allegations or transactions disclosed in the FOIA responses" and whether Kirk was the "original source" of the information. *Id.* The Court held that it lacked jurisdiction over Kirk's claims because the claims were based on the information in the FOIA requests, and Kirk was not the original source of the information; therefore, the claims were non-actionable under the public disclosure bar. *Id.* at 17–18. Regarding whether the information was in the public domain, the Court referenced its earlier opinion, where it held: "information produced in response to a FOIA request becomes public once it is received by the requester" and that information does not have to be "broadly disseminated" to be publicly disclosed; rather, information is publicly disclosed if it is disseminated to any member of the public. *Id.* at 17 (citing *Schindler*, 601 F.3d at 104).

Although neither the Supreme Court nor the Second Circuit has addressed whether information is publicly disclosed when it is provided to the government through an audit or

investigation but remains with the government and is not further disclosed, the Fourth Circuit

recently addressed this precise issue and found that such information is not publicly disclosed.

*See U.S. ex rel. Wilson v. Graham Cty. Soil & Water Conserv. Dist.*, 777 F.3d 691, 696–97 (4th

Cir. 2015).

In *Wilson*, the relator, Karen Wilson, filed a *qui tam* action, alleging that her employer

had violated the provisions of its government contract and falsely reported its compliance. *Id.* at

694. Before Wilson initiated her action, state auditors investigated the employer and discovered

the violations underlying Wilson's suit. *Id.* The state auditors prepared a written report with

their findings and provided copies of the report to the employer and several state and federal

governmental bodies. *Id.* The district court dismissed Wilson's claims, finding, *inter alia*, that

the audit reports were publicly disclosed. *Id.* at 694–95. On appeal, the Fourth Circuit explained

that the audit report "clearly qualif[ied] as eligible sources" under the public disclosure bar, thus,

"the sole question at issue [was] whether the reports were publicly disclosed." *Id.* The Fourth

Circuit held that "[t]he plain meaning of the phrase 'public disclosure' suggests that they were

not." *Id.* The court noted that "[b]y specifying that a disclosure must be public, Congress

indicated that only disclosures made to the public at large or to the public domain had

jurisdictional significance." *Id.* (internal quotation marks omitted). The court explained that the

audit report was not publicly disclosed because it was not "distributed to, or intended to be

distributed to, the public." *Id.* A significant factor in the court's decision was that the state

auditors attached the audit report to "distribution lists, limiting distribution to government

entities." *Id.* The court found support for its holding in precedent from all but one of the Circuit

Courts that had addressed the issue. *Id.* at 697 (citing *United States ex rel. Oliver v. Philip*

*Morris USA, Inc.*, 763 F.3d 36, 42 (D.C. Cir. 2014); *United States ex rel. Meyer v. Horizon*

*Health Corp.*, 565 F.3d 1195, 1200 & n.3 (9th Cir. 2009); *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 730 (1st Cir. 2007), *overruled on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008); *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1043 (10th Cir. 2004); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1499–1500 (11th Cir. 1991)).[12]

In addition, since *Wilson*, 777 F.3d at 696–97, the Sixth Circuit also held, in accordance with a majority of the Circuit Courts, that a "disclosure of information to the government in the administrative audit and investigation did not constitute a public disclosure that would trigger the public-disclosure bar." *United States v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d 260, 269 (6th Cir. 2015) *cert. denied*, 577 U.S. ---, ---, 136 S.Ct. 218, 218 (Oct. 5, 2015).

The Court finds the reasoning of these cases persuasive and holds that the Fraud Unit Investigation and related documentation were not publicly disclosed.  Here, the Fraud Unit

---

[12]  The Seventh Circuit is the only circuit to reach the conclusion that information possessed solely by the government and not publicly available is publicly disclosed.  *See U.S. ex rel. Wilson v. Graham Cty. Soil & Water Conserv. Dist.*, 777 F.3d 691, 696–97 (4th Cir. 2015) (citing *United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999)).  Defendants rely on *Bank of Farmington*, 166 F.3d at 861, to support their argument, (Defs. Mem. 18), but, in view of the fact that the Seventh Circuit has questioned the soundness of that opinion, *see Cause of Action*, 815 F.3d at 276–77, the Court finds Defendants' reliance on the reasoning of *Bank of Farmington* unpersuasive.

The Seventh Circuit, however, recently called into question the holding of *Bank of Farmington*, noting that it is contradictory to the precedent of a majority of the Courts of Appeals:

> Some of our sister circuits have criticized our reading of . . . a public disclosure. . . . There is significant force in the position of other circuits.  If the [government] letter were the only document before us in this case, respect for the position of other circuits would warrant in-depth reconsideration of our precedent.  However, we need not address squarely the correctness of *Bank of Farmington* today because, as [plaintiff] concedes, the [a]udit [r]eport was in the public domain at the time the complaint was filed.

*Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 276–77 (7th Cir. 2016).

investigated the Nursing Home's Medicaid reimbursement claims spanning from 2000 to 2004 and requested that the Nursing Home provide the Fraud Unit with any information regarding overpayment and reserve accounts related to those overpayments, and the Nursing Home complied. (Fraud Unit Letter, annexed to DeCerbo Decl. as Ex. Z; Nursing Home Letter Replying to Fraud Unit, annexed to DeCerbo Decl. as Ex. AA.) In its response, the Nursing Home requested that any information provided to the Fraud Unit be barred from public disclosure under New York's Public Officer's Law. (Nursing Home Letter Replying to Fraud Unit.) There is no information before the Court that the Fraud Unit Letter or Defendants' response was ever "distributed to, or intended to be distributed to, the public." *Wilson*, 777 F.3d at 696; *cf. Schindler*, 94 F.3d at 104 (holding that information is publicly disclosed if the government provides information to members of the public via a FOIA request); *Khurana*, 2016 WL 6652735, at *3, 11 (finding that the information underlying relator's FCA action was publicly disclosed because "the Office of the Comptroller of the City of New York released a [sixteen]-page public audit report"); *United States v. Dialysis Clinic, Inc.*, No. 09-CV-710, 2011 WL 167246, at *1, 6 (N.D.N.Y. Jan. 19, 2011) (finding that the information at issue had been publicly disclosed because "the New York State Office of the Medicaid Inspector General conducted an audit . . . [and] [t]he report was publicly available on the internet"). Accordingly, because the facts underlying the claims were not publicly disclosed through their disclosure to the Fraud Unit, the Court has jurisdiction over Relator's claims.[13]

---

[13] Because the Court finds that the information at issue was not publicly disclosed, it does not address the remaining factors in the public-disclosure-bar analysis. *See U.S. ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 777 F.3d 691, 699–700 (4th Cir. 2015).

### d. Relator fails to establish that Defendants violated the FCA

Defendants move to dismiss the False Filing and Retention Claims and move for summary judgment on the Misappropriation Claims, arguing that Relator fails to show that Defendants submitted a false claim seeking payment from the government or engaged in fraudulent activity during the time period when it was seeking payment from the government. (Defs. Mem. 24–31.)   Relator argues that he has established that Defendants violated the FCA through their use of Episcopal Nursing Home's reimbursement rate and through their use of the Nursing Home's Medicare and Medicaid funds, which funds include the mitigation payment, for non-Medicaid and non-Medicare purposes when they were submitting the Nursing Home's claims for Medicare and Medicaid reimbursement.  (Pl. Opp'n 17–36.)  The Court separately addresses Defendants' motions below.

### i. Particularity requirements for FCA claims

"Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'"  *Ladas*, 823 F.3d at 25–26 (alteration in original) (quoting Fed. R. Civ. P. 9(b)).  "To satisfy this Rule, a complaint alleging fraud must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *Wood*, 328 F. App'x at 747 (quoting same).  "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04–CV–0704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (citation and internal quotation marks omitted).  As the Second Circuit has explained:

> The purpose of Rule 9(b) is threefold — it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing,

and to protect a defendant against the institution of a strike suit. Thus, although Rule 9(b) permits knowledge to be averred generally, we have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent. Essentially, while Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges.

*Wood*, 328 F. App'x at 747 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). "One of the [further] purposes of Rule 9(b) is to discourage the filing of complaints as a pretext for discovery of unknown wrongs. [A relator's] contention, that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage." *Id.* (quoting *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989)).

Courts in this Circuit have held that "allegations as to the existence of an overall fraudulent scheme do not plead fraud with particularity," and that "to satisfy Rule 9(b), an FCA claim must allege the particulars of the false claims themselves." *Bilotta*, 50 F. Supp. 3d at 509; *see also Novartis I*, 23 F. Supp. 3d at 255 ("[A] plaintiff must plead both the particular details of a fraudulent scheme and details that *identify particular false claims for payment* that were submitted to the government." (citation and internal quotation marks omitted)). In other words, FCA pleadings must be "linked to allegations, stated with particularity, of actual false claims submitted to the government." *Bilotta*, 50 F. Supp. 3d at 510 (quoting *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004)).[14] In *Bilotta*, the court noted that:

[I]n this Circuit, courts have held that the complaint must provide details that identify particular false claims for payment that were submitted to the government. . . . [D]etails concerning the dates of

14 Because the Second Circuit has not articulated the requirements of Rule 9(b) in the context of FCA claims, several district courts in the Circuit have relied on the standard articulated by the First Circuit in *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004).

the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a [plaintiff] to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However . . . some[] of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b).

*Id.* (quoting *Polansky*, 2009 WL 1456582, at *5); *see also Novartis I*, 23 F. Supp. 3d at 257–58

("In line with the weight of authority in this Circuit, I adopt the *Karvelas* standard — plaintiffs

asserting subsection (a)(1)(A) and (a)(1)(B) claims must plead the submission of a false claim

with a high enough degree of particularity that defendants can reasonably identify particular false

claims for payment that were submitted to the government." (citation and internal quotation

marks omitted)); *Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 301–02

(S.D.N.Y. 2013) (collecting cases).

Nevertheless, "[i]n cases where the alleged fraudulent scheme is extensive and involves

numerous transactions that occurred over a long period of time," it is "impractical to require the

plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct."

*Bilotta*, 50 F. Supp. 3d at 517 (quoting *Novartis I*, 23 F. Supp. 3d at 258). Rather, "in setting

forth a complex and far-reaching scheme," a relator need allege only "representative samples" of

fraudulent conduct to satisfy Rule 9(b). *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d

438, 481–82 (S.D.N.Y. 2013); *see also United States v. N.Y. Soc'y for the Relief of the Ruptured*

*& Crippled*, No. 07-CV-292, 2014 WL 3905742, at *14 (S.D.N.Y. Aug. 7, 2014) (collecting

cases); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013)

(finding that examples of fraudulent statements were necessary to permit a defendant "to infer

with reasonable accuracy the precise claims at issue").  The pleading standard under Rule 9(b) may be relaxed where "(1) the facts are peculiarly within the possession and control of the defendant or (2) where the belief is based on factual information that makes the inference of culpability plausible."  *Arista Records, LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010); *see also U.S. ex rel. Mooney v. Americare, Inc.*, No. 06-CV-1806, 2013 WL 1346022, at *3 (E.D.N.Y. Apr. 3, 2013) ("The Second Circuit applies a relaxed pleading standard when a plaintiff is not in a position to know specific facts until after discovery and 'when facts are peculiarly within the opposing party's knowledge.'" (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990))).

Further, the Second Circuit has determined that a claim can be false or fraudulent under three theories of liability:

> (1) a factually false theory, under which a claim for payment is made to the government seeking payment for services that were never actually provided or for which the description of the goods or services provided is incorrect; (2) an express false legal certification theory, where a claim for payment of federal funds falsely certifies compliance with a statute or regulation that must be complied with before payment can be made; and (3) an implied false legal certification theory, where, although the claim for payment does not certify compliance with a statute or regulation on its face, compliance is a prerequisite to payment under the express statutory or regulatory terms.

*U.S. v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 255 (N.D.N.Y. 2013) (citing *Mikes*, 274 F.3d at 696–700).  Relators must put forth allegations that connect the alleged fraudulent claims with a viable theory of falsity.  *See Novartis I*, 23 F. Supp. 3d at 260 ("Because the question of whether a complaint satisfies the Rule 9(b) ultimately depends upon the nature of the case, this Court cannot apply the *Karvelas* standard . . . without examining the [relator's] theory of claim falsity . . . ." (citation and internal quotation marks omitted)).

The Court separately addresses below Relator's two categories of claims — the False Filing and Retention Claims and the Misappropriation Claims.

### ii.   The False Filing and Retention Claims

Defendants move to dismiss the False Filing and Retention Claims,[15] arguing that Relator fails to show that Defendants submitted false claims because they complied with the applicable regulations governing the Nursing Home's reimbursement rate.  (Defs. Mem. 24–29.) Relator argues that Defendants' reimbursement claims were false because the DOH never assigned the Nursing Home its own rate and Defendants acted to ensure that the DOH never became aware of that fact.  (Pl. Opp'n 18–34.)

Specifically, Relator alleges that the reimbursement claims were factually false[16] because the Nursing Home used a reimbursement rate that the DOH had not assigned to it.  (Pl. Opp'n 26.)  Relator also alleges that the reimbursement claims were legally false under both an express and an implied certification theory because the Nursing Home certified that its reimbursement

---

[15]   The False Filing and Retention Claims allege that Defendants: (1) filed false claims for Medicare and Medicaid reimbursement with the DOH because Defendants used Episcopal Nursing Home's reimbursement rate, (TAC ¶¶ 39–58); (2) unlawfully retained Medicare and Medicaid funds owed to the DOH due to the overpayments the Nursing Home received from the use of Episcopal Nursing Home's reimbursement rate, (*id.*); (3) unlawfully accepted a substantial mitigation overpayment from the DOH to the Nursing Home because the mitigation payment was calculated based on Defendants' prior use of Episcopal Nursing Home's reimbursement rate, (*id.* ¶ 59–64); and (4) unlawfully retained the mitigation overpayment, which Defendants should have returned to the DOH, (*id.*).

[16]   As noted above, the Second Circuit has established three theories under which a relator may show that defendants submitted false claims to the government — factual falsity, express false certification and implied false certification.  *See U.S. ex rel. Kester v. Novartis Pharma. Corp.* ("*Novartis I*"), 23 F. Supp. 3d 242, 260–61 (S.D.N.Y. 2014) (first citing *Mikes v. Straus*, 274 F.3d 687, 697–98 (2d Cir. 2001); and then citing *Kirk*, 601 F.3d at 113); *New York ex rel. Khurana v. Spherion Corp*, No. 15-cv-6605, 2016 WL 6652735, at *14 (S.D.N.Y. Nov. 10, 2016).

claims were truthful, accurate and in compliance with the DOH's regulations.  (*Id.*)  The Court considers each argument below.

### 1.  Relator fails to present a viable factual falsity argument

Relator's allegations underlying the False Filing and Retention Claims concern Defendants' allegedly fraudulent conduct of using Episcopal Nursing Home's reimbursement rate.  (TAC ¶¶ 39–64).

"A claim is factually false where the party submitting the claim supplies an incorrect description of goods or services provided or a request for reimbursement for good or services never provided."  *Novartis I*, 23 F. Supp. 3d at 260–61 (internal quotation marks omitted) (citing *Mikes* 274 F.3d at 697).  An example of factual falsity is "when a contractor delivers a box of sawdust to the military but bills for a shipment of guns."  *Khurana*, 2016 WL 6652735, at *14 (citing *Bishop*, 823 F.3d at 43–44).

There is no merit to Relator's factual falsity argument, as he does not allege that Defendants billed Medicaid or Medicare for something they did not provide by submitting claims with "an incorrect description of good or services provided or a request for goods and services never provided."  *See Mikes* 274 F.3d at 697 (citation omitted); *Novartis I*, 23 F. Supp. 3d at 262 *see also Khurana*, 2016 WL 6652735, at *14 ("Plaintiff does not allege Spherion actually failed to provide the . . . services for which it claimed reimbursement, or that it provided an incorrect description of those services.  The factually false theory therefore does not apply.").

### 2.  Relator fails to present a viable legal falsity argument

Relator argues that Defendants' reimbursement claims were legally false because "the express and implied certifications of truth and accuracy accompanying each Medicaid claim were false and because the legal entitlement to the rate claim, to which [the Nursing Home]

expressly and impliedly certified in accordance with DOH regulations, was also false." (Pl. Opp'n 26.)

"A legally false claim does not misrepresent the goods or services provided"; instead, "the party submitting the claim falsely represents (or certifies) compliance with a statute, regulation, or contractual provision, where compliance is a precondition to government payment of the claim." *Novartis I*, 23 F. Supp. 3d at 261 (citing *Mikes* 274 F.3d at 697). A relator may premise a legal falsity argument on a theory of express false certification or implied false certification. *See id.* (citing *Mikes* 274 F.3d at 698–99). "[E]xpress false certification occurs when the party submitting the claims expressly and falsely certifies compliance with a particular statute, regulation, or contractual term" that is a precondition to payment. *See id.* (internal quotation marks omitted) (citing *Mikes* 274 F.3d at 698). Implied false certification occurs where "the act of submitting a claim for reimbursement itself implies compliance with governing [state or] federal rules that are a precondition to payment." *Id.* (citing *Mikes*, 274 F.3d at 699).

The Second Circuit fully explained legal falsity in *Mikes*. 274 F.3d at 696–700. In *Mikes*, the relator, Dr. Patricia Mikes, was employed at the defendants' health care practice. *Id.* at 692. Mikes alleged that, during the course of her employment, she discovered that the defendants were using unreliable medical testing procedures and submitting Medicare reimbursement claims for those procedures. *Id.* at 692, 694. Mikes argued that the defendants' reimbursement claims were false because the defendants expressly certified that all the services they performed were "medically necessary." *Id.* at 698. The reimbursement claim form submitted by the defendants contained a certification stating that no Medicare benefits would be paid "unless th[e] form [was] received as required by existing law and regulations." *Id.* (citation omitted). The court held that Mikes had a viable express-false-certification argument because

the form contained a certification that conditioned payment on compliance with the regulations.[17] *Id.* at 698–99.

Mikes also argued that, in the alternative, the reimbursement claims were impliedly false because a separate statute stated that "no payment may be made under the Medicare statute for any expenses incurred for items or services which are not reasonable and necessary." *Id.* at 700 (citation, alteration and internal quotation marks omitted). In addressing the viability of Mikes' implied certification argument, the Court stated that "caution should be exercised not to read this theory expansively." *Id.* at 699. The Court explained that "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Id.* at 700. The Court held that Mikes' implied-false-certification argument failed because, *inter alia*, she did not show that the statutes were preconditions to obtaining reimbursement. *Id.* at 700–02. Instead, the Court noted that the statutes were only conditions that health care providers must comply with to participate in Medicare. *Id.*

While *Mikes* left open the question of how specific a certification must be to support a viable express-false-certification argument, *see Bishop*, 823 F.3d at 44 ("Following *Mikes*, this Court has not addressed how narrow a certification of compliance must be to constitute an express false [certification] claim."), the Second Circuit recently answered that question in *Bishop v. Wells Fargo & Company*, 823 F.3d at 44–47.

---

[17]   The Court nevertheless affirmed dismissal of Mikes' claims because she failed to show that the challenged and reimbursed procedures were "not medically necessary." *Mikes*, 274 F.3d at 699.

The relators in *Bishop* alleged that Wells Fargo had filed false claims under the FCA because it had expressly and impliedly certified compliance with provisions of a lending agreement and the Federal Reserve act, respectively. *Id.* at 44–48. The relators' express-false-certification argument was largely based on a provision in the lending agreement stating that Wells Fargo had to comply with "any laws or regulations in any respect which have any adverse affect whatsoever" on the lending agreement. *Id.* at 45. The Second Circuit held that *Mikes* requires a relator to identify a submitted claim that "falsely certifies compliance with a *particular* statute, regulation or contractual term" that is a precondition to payment. *Id.* at 44 (citing *Mikes*, 274 F.3d at 698). The Court explained that *Mikes* implied that a relator may not base an express-false-certification argument "on anything as broad and vague as certification that there has been compliance with all federal, state, and local statutes, regulations, and policies." *Id.* at 44–45 (alterations, citations and internal quotation marks omitted). The relators' claims failed because they had relied on a vague and broad certification. *Id.* at 45.

### A. Relator fails to present a viable express-false-certification argument

Here, Relator's express-false-certification arguments fail because the certifications on which he relies suffer from the same infirmities as the certifications in *Mikes* and *Bishop*. Relator argues that Defendants submitted Medicare and Medicaid reimbursement claims that were false because the reimbursement forms contained certifications stating that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete[,] [t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts[,]" and "[t]he submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal

or State laws." CMS-1450/UB-04 Form at 15;[18] (TAC ¶¶ 21, 24, 38, 58; Pl. Opp'n 26). Relator

also appears to rely on a certification in the New York State Medicaid Enrollment Form, which

states that "[a]s a Medicaid Provider you agree to comply with the rules, regulations and official

directives of the [DOH]." New York State Medicaid Enrollment Form at 8;[19] (TAC ¶ 24; Pl.

Opp'n 26).[20] The foregoing certifications mirror the types of certifications that the Second

Circuit has held are too vague and broad to support FCA claims based on express-false-

certification arguments. *See Bishop*, 823 F.3d at 45–47; *Mikes*, 274 F.3d at 698.

### B.   Relator fails to present a viable implied-false-certification argument

Relator's implied-false-certification argument also fails because the DOH regulations he

relies on are conditions that are not material to the DOH's decision to issue Medicaid and

Medicare reimbursement funds to health care providers.

In *Bishop*, the Second Circuit held that a viable implied-false-certification argument must

be based on statutes or regulations that "expressly state[] that the provider must comply [with

---

[18] CMS-1450/UB-04 Form, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1104CP.pdf (last visited Mar. 31, 2017).

[19] N.Y. State Medicaid Enrollment Form, https://www.emedny.org/info/ProviderEnrollment/ProviderMaintForms/436601_INST_FORM_InstRateBasedEnrlForm.pdf (last visited Mar. 31, 2017).

[20] Relator did not provide the Court with the CMS 1450/UB-04 Form or the New York Medicaid Enrollment Form, but because Relator explicitly cites to the CMS-1450/UB-04 Form, (TAC ¶ 21), and references the form that providers use to "apply to participate in the New York Medicaid Program and agree as a condition of participation and payment to comply with all the policies and procedures of DOH," (TAC ¶ 24), the Court considers the documents incorporated by reference or integral to the TAC because those documents serve as the basis for Relator's legal falsity arguments. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, (2d Cir. 2016) ("A complaint is deemed to include . . . any statements or documents incorporated in it by reference. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (citations and internal quotation marks omitted)).

those statutes or regulations] in order to be paid." *Bishop*, 823 F.3d at 48. The Court also rejected the relator's argument that an implied-false-certification argument should be viable if the underlying statutes or regulations are "material condition[s] to payment." *Id.* The Supreme Court, however, recently vacated and remanded *Bishop* and the Second Circuit's rule regarding implied-false-certification argument in light of its opinion in *Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2001–02, which adopted the materiality test for implied-false-certification claims. *See Bishop v. Wells Fargo & Co.*, 580 U.S. ---, ---, 2017 WL 670171, at *1 (Feb. 21, 2017).

In *Universal Health*, the Supreme Court "granted certiorari to resolve the disagreement among the Courts of Appeals over the validity and scope of the implied false certification theory of liability." *Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 1998. The alleged false claims before the Supreme Court arose within the Medicaid program and involved a teenage beneficiary of Massachusetts' Medicaid program who received counseling services from Arbour Counseling Services ("Arbour"). *Id.* at 1997. Counselors at Arbour intermittently treated the teenager, Y.R., and prescribed medication to which Y.R. reacted adversely on several occasions. *Id.* Y.R. died from a seizure at the age of seventeen. *Id.* Thereafter, an Arbour counselor revealed to Y.R.'s parents that few Arbour employees were licensed to provide mental health counseling and many performed medical services without required supervision. *Id.* Y.R.'s parents filed a *qui tam* suit under an implied false certification theory of liability. *Id.*

The Supreme Court held that the implied false certification theory can be a basis for liability where two conditions are satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual

requirements makes those representations misleading half-truths." *Id.* at 2001. Regarding the

second condition, the Supreme Court explained that the misrepresentation "must be material to

the Government's payment decision in order to be actionable under the [FCA]," and the

"materiality standard" is "rigorous" and "demanding." *Id.* at 2003. Thus, contrary to the Second

Circuit's decision in *Bishop*, the Supreme Court held that "[w]hether a provision is labeled a

condition of payment is relevant to but not dispositive of the materiality inquiry." *Id.* at 2001.

The Supreme Court further explained:

> when evaluating materiality under the False Claims Act, the
> Government's decision to expressly identify a provision as a
> condition of payment is relevant, but not automatically dispositive.
> Likewise, proof of materiality can include, but is not necessarily
> limited to, evidence that the defendant knows that the Government
> consistently refuses to pay claims in the mine run of cases based on
> noncompliance with the particular statutory, regulatory, or
> contractual requirement. Conversely, if the Government pays a
> particular claim in full despite its actual knowledge that certain
> requirements were violated, that is very strong evidence that those
> requirements are not material. Or, if the government regularly pays
> a particular type of claim in full despite actual knowledge that the
> requirements were violated, and has signaled no change in position,
> that is strong evidence that the requirements are not material.

*Id.* at 2002–03. The Supreme Court vacated the judgment of the First Circuit Court of Appeals

and remanded for a determination of whether the mental health facility requirements were "so

central to the provision of mental health counseling that the Medicaid program would not have

paid the[] claims had it known of the[] violations." *Id.* at 2004.

Here, Relator contends that the reimbursement claims were impliedly false based on the

Nursing Home's use of Episcopal Nursing Home's reimbursement rate, which Relator alleges

was a violation of DOH regulations. The applicable DOH regulations regarding reimbursement

rates provide in pertinent part:

> (k) Receiverships and new operators.

(1) The appointment of a receiver or the establishment of a new operator of an ongoing facility shall require such receiver or operator of file a cost report for the first 12-month period of operation in accordance with section 86-2.2(e) of this Subpart. This report shall be filed and properly certified within 60 days following the end of the 12-month period covered by the report. Failure to comply with this subdivision shall result in application of the provisions of section 86-2.2(c) of this Subpart.

(2) The initial rate for facilities covered under this subdivision shall be the higher of:

(i) the rate in effect on the date of the appointment of a receiver or the date of transfer of ownership as applicable; or

(ii) the rate in effect on the date of appointment of a receiver or the date of transfer of ownership with the direct and indirect component of such rate calculated as follows . . . .

10 N.Y. Comp. Codes R. & Regs. § 86-2.10(k).  The regulations further provide:

(e) Except as identified in sections 86-2.10(k)(6) and 86-2.15(e) of this Part, a cost report shall be filed in accordance with this section by each new facility for the first 12-month period during which the facility has had an overall average utilization of at least 90 percent of bed capacity. This report shall be filed and properly certified within 60 days following the end of the 12-month period covered by the report. Failure to comply with this subdivision shall result in application of subdivision (c) of this section.

*Id.* § 86-2.2(e).  In addition, the regulations impose certain penalties for failure to comply with

the foregoing provisions.  They provide:

(c) In the event a residential health care facility fails to file the required financial and statistical reports on or before the due dates, or as the same may be extended pursuant to subdivision (b) of this section, the State Commissioner of Health shall reduce the current rate paid by State governmental agencies by two percent for a period beginning on the first day of the calendar month following the original due date of the required reports and continuing until the last day of the calendar month in which the required reports are filed.

*Id.* § 86-2.2(c).  Taken together, these provisions provide that a new operator of a facility should

utilize the reimbursement rate of the old operator until the DOH re-bases or recalculates the new

facility's reimbursement rate based on its cost report. *See Mt. Loretto Nursing Home v. Chassin*, 652 N.Y.S.2d 138, 139 (App. Div. 1997); *Queen-Nassau Nursing Home Inc. v. McBarnette*, 627 N.Y.S.2d 848, 849 (App. Div. 1995). Failure to comply with the provisions prevents the DOH from assigning an accurate reimbursement rate, and the DOH will in turn penalize facilities by "reduc[ing] the current rate paid by the State governmental agencies by two percent" until the correct reports are filed. 10 N.Y. Comp. R. & Regs. § 86-2.2(c); *see also Fahey v. Axelrod*, 530 N.Y.S.2d 307, 308 (App. Div. 1988).

Even assuming that Defendants' conduct violated the DOH regulations,[21] Relator's implied-false-certification argument fails, as the reimbursement rate provisions of the DOH regulations could not have been "material" to the DOH's payment decision where the DOH continued to reimburse the Nursing Home despite understanding that the Nursing Home was using an outdated rate. *See Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2002, 2004; *see also U.S. ex rel. Kolchinsky v. Moody's Corp.*, --- F. Supp. 3d ---, ---, 2017 WL 825478, at *5–6 (S.D.N.Y. Mar. 2, 2017) (finding that the relator's implied-certification argument failed because the "claims relate to a time period at which the government . . . was on notice of the facts relied upon to support the alleged fraud here[,] [a]nd . . . continued to pay" the defendants thereafter). When the Fraud Unit investigated the Nursing Home's reimbursement-claims

---

[21] Defendants' conduct does not appear to have been in violation of the DOH regulations, because, in accordance with regulations, Defendants submitted a rate appeal to the DOH for it to assign the Nursing Home a reimbursement rate, but continued to use Episcopal Nursing Home's reimbursement rate while it waited for the DOH to assign the Nursing Home its own reimbursement rate. *See* 10 N.Y. Comp. Codes R. & Regs. § 86-2.10(k) (McKinney 2017) (stating that a new operator of a nursing home must file a cost report to allow the DOH to assign it a reimbursement rate and the new operator must use the previous operator's reimbursement rate until the DOH assigns the new operator its own reimbursement rate). Nevertheless, for the purpose of analyzing the False Filing and Retention Claims, the Court assumes that Defendants' conduct violated the DOH regulations.

practices in 2005 and the DOH audited the Nursing Home's reimbursement-claims practices in 2009, the Nursing Home disclosed that it was using Episcopal Nursing Home's reimbursement rates because it was waiting for the DOH to assign the Nursing Home its own reimbursement rates. (TAC ¶¶ 40, 43–45, 49, 56; Fraud Unit Letter; Nursing Home Letter Replying to Fraud Unit.) Nevertheless, according to Relator, the DOH continued to reimburse the Nursing Home for its Medicaid and Medicare expenses. (TAC ¶¶ 40, 56.) The DOH's decision to continue to reimburse the Nursing Home for its Medicaid and Medicare expenses, even though it knew that the Nursing Home was using Episcopal Nursing Home's reimbursement rate, is "strong evidence" that the DOH did not consider compliance with those regulations as a material condition to reimbursement. *See Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2003–04; *Kolchinsky*, 2017 WL 825478, at *5–6.

In addition, when a health care provider fails to comply with the DOH regulation regarding reimbursement, the DOH does not suspend reimbursement but instead penalizes the health care provider by reducing its reimbursement rate until it complies. *See* 10 N.Y. Comp. R. & Regs. § 86-2.10(k) (explaining that a new operator's failure to file timely cost reports results in two-percent reimbursement rate penalty under section 86-2.2(c)); *id.* at § 2.2(e) (explaining that a facility's failure to file cost report on time results in two-percent reimbursement rate penalty under section 86-2.2(c)); *id.* at § 2.2(c) ("In the event a residential health care facility fails to file the required financial and statistical reports on or before the due dates . . . the State Commissioner of Health shall reduce the current rate paid by State governmental agencies by two percent . . . ."); *Fahey*, 530 N.Y.S.2d at 308 ("Pursuant to 10 NYCRR 86-2.2(c) [the DOH] levied a 2% penalty upon petitioner's current reimbursements" because it "admittedly filed late annual fiscal reports."). The DOH's practice of continuing to pay reimbursement claims where

the health care provider has not complied with the regulations is also "strong evidence" that the DOH does not consider compliance with the regulations material conditions to reimbursement. *See Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. 2003–04; *Kolchinsky*, 2017 WL 825478, at *5–6.

Relator's implied-false-certification argument fails because the DOH had knowledge of the allegedly fraudulent activity and nevertheless continued to reimburse the Nursing Home. Moreover, even when a health care provider fails to comply with the DOH regulations, the DOH still pays the reimbursement claims, albeit at a reduced rate. *See Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. 2003–04; *Kolchinsky*, 2017 WL 825478, at *5–6.

Because Relator fails to establish a viable factual or legal falsity argument, the Court grants Defendants' motion to dismiss the False Filing and Retention claims for failure to state a claim.

### iii. The Misappropriation Claims

Defendants move for summary judgment on the Misappropriation Claims,[22] arguing that Relator fails to put forth any allegations or evidence to prove that Defendants actually overcharged the Nursing Home for medical-services, administrative and operation costs and subsequently submitted reimbursement claims containing the inflated charges. (Defs. Mem. 29–31.) Relator contends that Defendants misunderstand the Misappropriation Claims because they are not based on the submission of false cost reports but on Defendants' fraudulent scheme of unlawfully siphoning the Nursing Home's Medicaid and Medicare funds by overcharging it for

---

[22] The Misappropriation claims allege that Defendants: (1) unlawfully used the mitigation payment for purposes unrelated to Medicare and Medicaid, (*id.* ¶¶ 52–53); and (2) unlawfully used the Nursing Home's Medicaid funding for improper purposes, specifically, overcharging the Nursing Home for laboratory and other medical costs, operating costs, workers' compensation costs, and CHS staff salary contributions, (*id.* ¶¶ 65–79).

services and costs. (Pl. Opp'n 34–35.) Relator argues that any reimbursement claims Defendants submitted while the scheme was occurring were impliedly false because Defendants were violating 42 U.S.C. § 1320a-7b(a)(4) — the statute prohibiting the unlawful conversion of Medicaid and Medicare funds. (*Id.* at 35.) As explained below, Relator alleges a viable implied legal falsity argument based on Defendants' alleged violation of section 1320a-7b(a)(4) and their implied certification of compliance with that statute,[23] but Relator's claims nevertheless fail because he does not show that Defendants submitted any false claims during the course of the alleged scheme.

### 1. Relator's implied-false-certification argument

As discussed above, a relator has a viable implied-false-certification argument where the relator shows that a health care provider submitted a claim that falsely certifies compliance with a statute, regulation or contractual term that is material to the government's payment decision. *Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2002–04. The government's decision "to expressly identify a provision as a condition of payment" remains a relevant consideration in determining materiality. *Id.* at 2003. In addition, the materiality of a provision is bolstered by the fact that a defendant knows that the government "consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory or contractual requirement." *Id.*

---

[23] Although Relator contends that the Misappropriation Claims may proceed on theories of factual falsity, express false certification and implied false certification, (Pl. Opp'n 35), Relator's only viable theory is for implied false certification because Relator does not allege that Defendants filed claims for services they never provided, *see Mikes* 274 F.3d at 697, or expressly certified on the reimbursement or enrollment forms that they were complying with a particular statute, *see Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 44–48 (2d Cir. 2016) *abrogated on other grounds by Bishop v. Wells Fargo & Co.*, 580 U.S. ---, ---, 2017 WL 670171, at *1 (Feb. 21, 2017).

Here, Relator relies on section 1320a-7b(a) to support his implied-false-certification

argument. (Pl. Opp'n 35.) In pertinent part, section 1320a-7b(a) states that:

> Making or causing to be made false statements or representations

> Whoever—

> (1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact *in any application for any benefit or payment under a Federal health care program* (as defined in subsection (f) of this section), . . .

> (4) *having made application to receive any such benefit or payment* for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person . . . .

§ 1320a-7b(a) (emphasis added). In addressing FCA claims where the relator presented implied-

false-certification arguments relying on a different subsection, section 1320a-7b(b), courts within

this Circuit have held that the relators have presented viable implied-false-certification

arguments because section 1320a-7b(b) makes it unlawful for a person or company to receive a

fee for referring someone to a health care provider where "payment" for that health care

provider's services may come from the government.[24] *See, e.g.*, *United States v. TEVA Pharm.*

---

[24] Section 1320a-7b(b), reads, in pertinent part:
> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service *for which payment may be made in whole or in part under a Federal health care program*, or

> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item *for which payment may be made in whole or in part under a Federal health care program* . . . .

§ 1320a-7b(b) (emphasis added).

*USA, Inc.*, No. 13-CV-3702, 2016 WL 750720, at *15–17 (S.D.N.Y. Feb. 22, 2016); *Bilotta*, 50

F. Supp. 3d at 515–16; *Novartis V*, 43 F. Supp. 3d at 361–65; *Mooney*, 2013 WL 1346022, at *4–

8.

Relator alleges that Defendants violated section 1320a-7b(a) by using the mitigation

payment, which contained Medicaid and Medicare funds, for purposes unrelated to Medicare and

Medicaid, (TAC ¶¶ 52–53, 61); and by using the Nursing Home's Medicaid funding for non-

Medicaid and non-Medicare purposes, specifically, overcharging the Nursing Home for

laboratory and other medical costs, operating costs, workers' compensation costs and CHS staff

salary contributions, (*id.*¶¶ 65–79). Relator alleges that Defendants knew that the DOH would

refuse the Nursing Home's reimbursement claims if the DOH was aware that Defendants were

submitting reimbursement claims during the time that they were violating section 1320a-7b(a).

(TAC ¶¶ 65–78.) These allegations support Relator's implied-false-certification argument, as

"proof of materiality" includes allegations showing that "the defendant[s] know[] that the

[g]overnment [] refuses to pay claims" where there is "noncompliance with [a] particular

statut[e]." *See Universal Health Servs.*, 579 U.S. at ---, 136 S. Ct. at 2003.

Therefore, the Court finds that section 1320a-7b(a) is material to the DOH's payment

decisions because: (1) section 1320a-7b(a), like section 1320a-7b(b), contains language that

references "payment" pertaining to a "Federal Health Program," and (2) Defendants allegedly

knew that the DOH would refuse the Nursing Home's reimbursement claims if it was aware of

Defendants' section 1320a-7b(a) violations. *See Universal Health Servs.*, 579 U.S. at ---, 136 S.

Ct. at 2002–2004 (holding that a statute is a material condition to payment from the government

where it has an express condition of payment and a defendant knows that the government would

refuse to pay claims where there is noncompliance with that statute); *TEVA Pharm.*, 2016 WL

750720, at *15–17 (holding that a relator had a viable implied-false-certification argument based on the defendant's alleged violation of section 1320-7b(b)); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1047–49 (S.D. Tex. 1998) (finding that a relator's FCA claims, relying in part on section 1320a-7b(a), particularly and sufficiently pled a claim for relief). Accordingly, the Court finds that Relator has articulated a viable implied-false-certification argument based on his allegations that Defendants violated section 1320a-7b(a) during a time they were submitting false Medicaid and Medicare reimbursement claims.

### 2. Relator fails to show Defendants submitted false claims to the DOH

While Relator has presented a viable implied-false-certification argument, Relator fails to connect Defendants' alleged fraudulent diversion and misappropriation to the submission of claims for payment.

In FCA actions, Relators must allege both an overall fraudulent scheme and "link[] [those] allegations, stated with particularity, [to] actual false claims submitted to the government." *Bilotta*, 50 F. Supp. 3d at 510 (quoting *Karvelas*, 360 F.3d at 232). Relators must provide courts with "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, [and] the individuals involved in the billing." *Id.* (quoting *Polansky*, 2009 WL 1456582, at *5). In addition, relators should set forth "the length of time between the alleged fraudulent practices and the submission of claims based on those practices," *see id.*, and provide "representative samples" of defendants' misconduct as part of that scheme, *see Bank of N.Y. Mellon*, 941 F. Supp. 2d at 481–82. These requirements are necessary to allow defendants to "reasonably identify particular false claims for payment that were submitted to the government." *Novartis I*, 23 F. Supp. 3d at 257–58. "[T]he

submission of a claim is an essential element" of an FCA action. *Id.* at 253 (citations omitted).
Relators may not sustain a cause of action "by alleging a fraudulent scheme in detail, and
concluding that as a result of the fraudulent scheme, false claims must have been submitted." *Id.*
(quoting *Polansky*, 2009 WL 1456582, at *5).

Relator's allegations, affirmations and evidence related to the Misappropriation Claims
set forth numerous details regarding the allegedly fraudulent diversion and misappropriation
scheme but fail to identify any reimbursement claim that Defendants' submitted in furtherance of
the scheme. (TAC ¶¶ 65–79; Pl. Exs. in Supp. of TAC ("Pl. Exs."), Docket Entry No. 16; Decl.
of Michael Quartararo ("Pl. Decl.") ¶¶ 44–58, 80–110, Docket Entry No. 33.) Relator alleges
that the scheme began in 2007 and ended in 2011, explains in great detail how the scheme was
conducted and provides charts and emails evidencing his allegations of overcharging. (TAC
¶¶ 65–79; Pl. Decl. ¶¶ 44–58, 80–110.) To support the allegations in the TAC, Relator submitted
nearly 900 pages of documents related to the Nursing Home's usage of the Episcopal Nursing
Home reimbursement rate. (Pl. Exs.)

However, Relator fails to specify or identify a single reimbursement claim Defendants'
submitted between 2007 and 2011 that is linked to the Medical Center and CHS allegedly
overcharging the Nursing Home for various medical services, administrative costs and operation
costs. (TAC ¶¶ 65–79; Pl. Exs.; Pl. Decl. ¶¶ 44–58, 80–110.) Relator cannot sustain a cause of
action under the FCA by presenting allegations that Defendants engaged in fraudulent activity
but presenting no evidence that Defendants submitted claims for reimbursement during the time
that they engaged in the allegedly fraudulent activity. *See Novartis I*, 23 F. Supp. 3d at 253
(dismissing an FCA claim because relator only "alleg[ed] a fraudulent scheme in detail, and
conclude[ed] that as a result of the fraudulent scheme, false claims must have been submitted").

Relator must show both an overall fraudulent scheme and connect that scheme to Defendants' submission of false claims to the DOH.  *See Bilotta*, 50 F. Supp. 3d at 510 (dismissing a relator's FCA claims because he failed to "link[] [those] allegations, stated with particularity, [to] actual false claims submitted to the government."); *cf Novartis I*, 23 F. Supp. 3d at 264–65 (finding that relators sufficiently established FCA claims because they asserted that "the pharmacies were violating the [law] by receiving kickbacks on every single sale of [the pharmaceutical drugs] in exchange for promoting those drugs[,] . . . [and] [f]or each pharmacy the [c]omplaint states the exact time frame, drug, and government program at issue, and . . . used actual claims data as the basis for its allegations").

Because Relator has failed to link the allegedly fraudulent scheme to a claim Defendants submitted to the DOH for Medicare or Medicaid funds, the Court grants Defendants' motion for summary judgment and dismisses Relator's Misappropriation Claims.  *See Bilotta*, 50 F. Supp. 3d at 510; *see also Khurana*, at 2016 WL 6652735, at *16 (dismissing the relators' claims because "they leave unclear who was involved in submitting the claims, what the claims requested payment for, or when they were submitted"); *N.Y. Soc'y For the Relief of the Ruptured and Crippled*, 2014 WL 3905742, at *15–16 (dismissing the relators' claims because they failed to provide examples of claims submitted during the distinct, allegedly fraudulent schemes).

### 3.  Leave to amend

Relator requested leave to amend the TAC in the event the Court granted Defendants' motions.  (Pl. Opp'n 36–37.)  Defendants argue that the Court should decline to grant Relator leave to amend because amendment would be futile.  (Defs. Reply 10.)

Under Rule 15(a) of the Federal Rules of Civil Procedure, district courts should "liberally grant[] . . . leave to amend" a complaint.  *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir.

2015); *see also Cox v. Blackberry Ltd*., F. App'x 23, 25 (2d Cir. 2016).  As discussed above, the Misappropriation Claims fail only because Relator failed to submit any evidence showing that Defendants submitted false claims in furtherance of their alleged scheme of unlawfully diverting the Nursing Home's Medicaid and Medicare funds to non-Medicaid and non-Medicare purposes. Therefore, the Court grants Relator leave to amend the Complaint as to the Misappropriation Claims to allow Relator to submit allegations and evidence showing that Defendants submitted claims to the DOH for Medicare and Medicaid reimbursement while they were unlawfully diverting the Nursing Home's Medicaid and Medicare funds.  Relator shall file an amendment complaint, if any, within thirty (30) days of this Memorandum and Order.  If Relator elects not to file an amended complaint or fails to file an amended complaint within thirty (30) days of this Memorandum and Order, the Court will dismiss the Misappropriation Claims with prejudice.

### III.  Conclusion

For the foregoing reasons, the Court (1) denies Defendants' motion to dismiss the action for lack of subject matter jurisdiction, (2) grants Defendants' motions to dismiss the action for failure to state a claim as to the False Filing and Retention Claims and dismisses those claims with prejudice, and (3) grants Defendants' motion for summary judgment as to the Misappropriation Claims and dismisses those claims without prejudice.  Relator is granted leave

to amend the Misappropriation Claims and shall file an amended complaint, if any, within (30)

days of the date of this Memorandum and Order.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2017
Brooklyn, New York