UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

UNITED STATES OF AMERICA and THE STATE
OF NEW YORK *ex rel.* MICHAEL
QUARTARARO,

                    Plaintiff,

                v.

CATHOLIC HEALTH SYSTEM OF LONG
ISLAND INC. *d/b/a/* CATHOLIC HEALTH
SERVICES OF LONG ISLAND, ST. CATHERINE
OF SIENA MEDICAL CENTER, ST. CATHERINE
OF SIENA NURSING HOME, GOOD
SAMARITAN HOSPITAL MEDICAL CENTER,
and GOOD SAMARITAN NURSING HOME,

                  Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
12-CV-4425 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff-Relator Michael Quartararo commenced the above-captioned *qui tam* action on September 5, 2012, on behalf of the United States of America and the State of New York, against Defendants Catholic Health System of Long Island Inc., doing business as Catholic Health Services of Long Island ("CHS"), St. Catherine of Siena Medical Center (the "Medical Center"), St. Catherine of Siena Nursing Home (the "Nursing Home"), Good Samaritan Hospital Medical Center, and Good Samaritan Nursing Home. (Compl., ¶ 1, Docket Entry No. 1.) Relator filed a Fourth Amended Complaint ("FAC"), the operative complaint, on May 25, 2017, alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the New York State False Claims Act, N.Y. State Fin. Law § 187 *et seq.* ("NYFCA"), based on the alleged filing of false Medicare and Medicaid reimbursement claims. (FAC, Docket Entry No. 47.) On November 13, 2017, Defendants moved to dismiss the FAC for failure to state a claim, and for

partial summary judgment, pursuant to Rules 12(b)(6) and 56, respectively, of the Federal Rules of Civil Procedure. (Defs. Second Mot. to Dismiss and for Partial Summ J. ("Second Mot."), Docket Entry No. 61; Defs. Second Mem. in Supp of Second Mot. ("Second Mem."), Docket Entry No. 61-6.) For the reasons discussed below, the Court denies Defendants' motion to dismiss and for partial summary judgment.

I. **Background**

The Court assumes familiarity with the facts as detailed in its prior March 31, 2017 Memorandum and Order ("March 2017 Decision") and provides a summary of only the pertinent facts.[1] *See United States v. Catholic Health Sys. of Long Island Inc.*, No. 12-CV-4425, 2017 WL 1239589, at *1–6 (E.D.N.Y. Mar. 31, 2017).

a. **Medicare and Medicaid reimbursement programs**

Medicare and Medicaid are taxpayer-funded health insurance programs offered to individuals based on age or disability. (FAC ¶¶ 20, 22.) Medicare is provided by the federal government and Medicaid is provided by federal, state, and local governments and administered through the states. (*Id.*) The United States Department of Health and Human Services, through its Centers for Medicare and Medicaid Services, runs both programs in conjunction with the state agencies that oversee Medicaid. (*Id.*) Individuals may be covered under Medicare, Medicaid, or both. (*Id.*) New York State maintains a Medicaid program for its citizens. (*Id.* ¶ 23.) If health care providers[2] choose to provide state-based Medicaid services, they must enroll with the New

---

[1] For the purposes of deciding Defendants' motion to dismiss, the Court assumes the truth of the allegations in the FAC.

[2] Under Medicare and Medicaid, health care providers are "patient care institutions such as hospitals, critical access hospitals, hospices, nursing homes, and home health agencies." Centers for Medicaid and Medicare Services, Publication 100-07, State Operations Manual §

2

York State Department of Health ("DOH"), which requires health care providers to certify that they will comply with DOH rules and regulations.[3] (*Id.* ¶ 24.) Health care providers that treat patients covered by Medicare or Medicaid may submit claims for reimbursement of the costs expended to treat the covered patients. (*Id.* ¶¶ 21, 38.) Reimbursement claims are submitted to the DOH on CMS-1450/UB-04 Forms.[4] (*Id.* ¶ 21.) The reimbursement claim forms contain general compliance certifications specifying that false, misleading, incomplete or inaccurate claims may subject the claimant to civil and criminal penalties. (*Id.* ¶¶ 21, 24, 25.) The reimbursement claim forms also require a health care provider to include its reimbursement rate. (*Id.*) In states that provide Medicaid coverage, the reimbursement rate for Medicaid and Medicare claims is calculated and assigned by the state agency that oversees the Medicaid program, (*id.* at ¶ 26); in New York State, the DOH, (*id.* ¶ 38).

As health care providers, nursing homes are reimbursed for every day they provide care to a Medicaid or Medicare beneficiary.[5] (*Id.* ¶ 26 (first citing N.Y. Pub. Health Law § 2808; and then citing N.Y. Codes R. & Regs. § 86-2 *et seq.*).) The reimbursement rates are calculated by a

---

1000A, (Oct. 3, 2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c01.pdf

[3] *See* New York State Medicaid Enrollment Form, at 8, https://www.emedny.org/info/ProviderEnrollment/ProviderMaintForms/436601_INST_FORM_InstRateBasedEnrlForm.pdf (last visited July 9, 2018).

[4] CMS-1450/UB-04 Form- https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1104CP.pdf (last visited July 9, 2018).

[5] While the Court focuses on how the reimbursement procedures operate with respect to nursing homes, the reimbursement procedures are similar for any health care provider seeking Medicaid and Medicare reimbursement in New York State. *See, e.g.*, 10 N.Y. Codes R. & Regs. § 86-1 *et seq.* (governing reimbursement for "medical facilities"); *id.* § 86-3 *et seq.* (government reimbursement for "health maintenance organizations"); *id.* § 86-4 *et seq.* (governing reimbursement for "free-standing ambulatory care facilities"); *id.* § 86-5 *et seq.* (governing reimbursement for "long-term health care programs").

complex formula that considers four components related to a nursing home's costs and expenditures: (1) direct costs; (2) indirect costs; (3) non-comparable costs; and (4) capital expenditures. (*Id.* ¶ 27 citing 10 N.Y. Codes R. & Regs. 86-2.10.) The first three components are known as the "operating portion" of the reimbursement rate. (*Id.*) The operating portion is calculated based on a nursing home's costs from a particular fiscal year selected by the DOH ("base year"). (*Id.* ¶ 34.) After the DOH selects a base year, it continues to use that base year to calculate a health care provider's operating costs until it decides to select a new base year. (*Id.*) The DOH obtains the base-year operating costs through annual cost reports that must be submitted by any nursing home intending to seek Medicaid reimbursement. (*Id.* ¶¶ 34–35.) From 1983 to 2009, the DOH used a base year of 1983, and cost reports from 1983, to calculate the operating-costs portion of the reimbursement rates. (*Id.* ¶ 35.) In 2009, the DOH selected a new base year of 2002. (*Id.*) From 2009 to 2011, the DOH used 2002 as the base year and used 2002 cost reports to calculate the operating-costs portion of the reimbursement rates. (*Id.*) In 2012, the DOH selected a new base year of 2007 and changed its reimbursement rate calculation methodology. (*Id.*)

      b.   **Factual background**

CHS is a healthcare consortium that operates hospitals and nursing homes. (*Id.* ¶ 8.) In or about November of 1999, CHS purchased the Nursing Home and the Medical Center from Episcopal Health Services, who had operated the facilities under the names Bishop Jonathan G. Sherman Episcopal Nursing Home ("Episcopal Nursing Home") and St. John's Episcopal Hospital. (*Id.* ¶ 39.) CHS officially assumed ownership and control of Episcopal Nursing Home in early 2000. (*Id.* ¶ 41.)

In April of 2007, Relator, who had been working for CHS for about thirty-eight years, was elevated to the position of Licensed Administrator of the Nursing Home. (*Id.* ¶ 7.) As the

Licensed Administrator, Relator was responsible for the general administration of the nursing home, which included "managing, supervising, and coordinating" the various departments at the Nursing Home, as well as "maintaining and developing legally compliant operating protocols, developing and managing budgets, developing financial policies[,] . . . monitoring financial performance . . . , supervising all human resource issues and reporting to the [N]ursing [H]ome's governing body as needed." (*Id.*)

        **i. The DOH retroactively re-based the reimbursement rates in 2011 and the Nursing Home received a mitigation payment as a result**

In June of 2011, the DOH retroactively changed the base year used to calculate Medicaid reimbursement rates for health care providers from 1983 to 2002 for the reimbursement period covering 2009 through 2011. (*Id.* ¶¶ 35, 51.) The re-basing caused the Nursing Home's reimbursement rate to drop from "approximately $270 per Medicaid patient day to . . . $250 per Medicaid [patient] day." (*Id.* ¶ 51.) The DOH sought to minimize the impact of the re-basing by providing one-time mitigation payments to affected health care providers that could be used to off-set any potential losses caused by the retroactive application of the lower reimbursement rates. (*Id.* ¶ 59.) Under this program, the Nursing Home received a $4.5 million mitigation payment.[6] (*Id.*) CHS accepted the mitigation payment and subsequently "misappropriated" approximately $1.7 million of the mitigation payment by charging the Nursing Home for "workers['] compensation" and "excess Medicaid" costs. (*Id.* ¶ 61.)

---

      [6] The Nursing Home's accounting firm had anticipated that the re-basing may occur and that a mitigation payment would be issued as a result of the re-basing. (FAC ¶¶ 50, 62.) Therefore, the accounting firm estimated that because the mitigation payment would be based on the difference between the Episcopal Nursing Home rate used by the Nursing Home and the newly issued rate, the Nursing Home may have had to repay approximately $3 million.

### ii. CHS's alleged use of the Nursing Home's Medicaid and Medicare funds for non-Medicaid and non-Medicare purposes

During the course of Relator's employment as the Nursing Home's Licensed Administrator, Relator also discovered that CHS had been improperly diverting the Nursing Home's Medicaid funds. (*Id.* ¶ 65.) Starting in 2007, CHS and the Medical Center began charging the Nursing Home for "medical, administrative, utility and other costs" that the Nursing Home had not incurred or which costs were overinflated. (*Id.* ¶ 66.) Relator contends that these false payments include charges for a non-existent inhalation therapy department. (*Id.* ¶ 79.) CHS took the false payments from the Nursing Home's Medicaid and Medicare funds for the Nursing Home's patients. (*Id.* ¶¶ 67, 75–77.)

In 2008, Relator realized that the Medical Center had overcharged the Nursing Home for laboratory costs and brought it to the attention of John Haight, a CHS executive. (*Id.* ¶¶ 54, 67.) Haight informed Relator that the Medical Center charged the Nursing Home a fixed-yearly rate, regardless of the actual laboratory charges incurred. (*Id.*) Relator also discovered that the Medical Center's laboratory rates for the Nursing Home's residents was much greater than the laboratory rates charged for the residents in CHS's other nursing homes and much greater than then-current market rate for such services. (*Id.*)

In late 2009 and late 2011, CHS had taken $2 million and $1.1 million, respectively, from the Nursing Home's budget to cover "purported workers['] compensation costs," but Relator alleges that the workers' compensation cases originating from the Nursing Home failed to support such large deductions. (*Id.* ¶¶ 68–69.) When Relator questioned the deductions, he was told that they were not only for the workers' compensation costs incurred in those years, but also to cover workers' compensation costs incurred by the Nursing Home in 2005. (*Id.*) In two subsequent emails he received, Relator learned that the Nursing Home's workers' compensation

costs were disproportionately higher than those of CHS's other nursing homes. (*Id.* ¶¶ 68–70.) When Relator raised the issue of the Nursing Home's workers' compensation costs with officials of CHS and the Medical Center, he was ignored. (*Id.* ¶ 68.)

In March of 2012, Relator attended a meeting with other CHS executives and officials, where he raised his concerns regarding the inflated laboratory costs the Medical Center had charged and was continuing to charge the Nursing Home. (*Id.* ¶ 72.) In response, one executive laughed and told Relator that the Medical Center was "ripping [the Nursing Home] off." (*Id.*) At a follow-up meeting with Haight and other CHS executives, Relator reasserted his concerns pertaining to the Medical Center's rates for the Nursing Home's residents, and was told that the rates would remain the same for the current fiscal year but "could be addressed in next year's budget." (*Id.* ¶ 73.) Relator subsequently received an email confirming CHS's position. (*Id.*) Because Haight and other CHS executives refused to address the rate and charging issues, Relator raised his concerns to a CHS compliance officer. (*Id.* ¶ 74.) Although the compliance officer said that she would address Relator's concerns, she never took any action. (*Id.*)

Shortly thereafter, Relator discovered that the Nursing Home was paying a portion of the salary for various staff members at the Medical Center and other CHS nursing homes who spent little to no time at the Nursing Home and had little to no involvement in the Nursing Home's operations. (*Id.* ¶ 80.) Haight and others acknowledged that the salary charges were improper, but did not take any corrective action. (*Id.*) When Relator raised the issue a second time, Haight responded that he was free to charge the Nursing Home for the salaries of any CHS staff regardless of how much of their work pertained to the Nursing Home. (*Id.* ¶ 81.)

Based on Relator's knowledge of the foregoing activities, he commenced the instant action. (*Id.* at 1–2.)

### c. Procedural history

Relator commenced the action on September 5, 2012, and subsequently amended the complaint three times prior to filing the FAC.[7] (TAC ¶¶ 1–6, Docket Entry No. 15.) On June 15, 2016, Defendants moved to dismiss the TAC for lack of subject matter jurisdiction, failure to state a claim, and for partial summary judgment, pursuant to Rules 12(b)(1), 12(b)(6), and 56, respectively, of the Federal Rules of Civil Procedure. (Defs. First Mot. to Dismiss and for Partial Summ J. ("First Mot."), Docket Entry No. 29.)

In the March 2017 Decision, the Court dismissed all claims with prejudice except for the implied-false certification misappropriation claims.[8] *See Catholic Health Sys.*, 2017 WL 1239589, at *27. Despite finding the implied-false certification misappropriation claims otherwise viable, the Court granted summary judgment because Relator had failed to "show that Defendants submitted any . . . claims during the course of the alleged scheme." *Id.* at *24. The Court therefore granted Relator leave to amend the TAC to identify and provide evidence of Defendants' requests for reimbursement between 2007 and 2011, the period of operation of the alleged scheme. *Id.* at *27.

On April 13, 2017, Relator moved for reconsideration of the dismissal of the false filing and false retention claims. (Pl. Mot. for Recons. ("Pl. Recons. Mot."), Docket Entry No. 41.)

---

[7] While the United States and New York State investigated the allegations to determine whether to intervene, Relator filed an Amended Complaint on September 10, 2012, (Docket Entry No. 3), a Second Amended Complaint on August 2, 2013, (Docket Entry No. 6), and a Third Amended Complaint ("TAC") with attachments on February 21, 2015, (Docket Entry Nos. 15, 16). The United States and the State of New York declined to intervene on January 27, 2016, (Docket Entry Nos. 18, 19), and the Court unsealed the TAC the same day. (Order dated Jan. 27, 2016, Docket Entry No. 20); *see also* 31 U.S.C. §§ 3730(b),(c) (2006) (requiring *qui tam* actions to be sealed until the government parties decide or decline to intervene).

[8] The Court based its decision on Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure. *See United States v. Catholic Health Sys. of Long Island Inc.*, No. 12-CV-4425, 2017 WL 1239589, at *27 (E.D.N.Y. Mar. 31, 2017).

On September 12, 2017, the Court denied Relator's motion for reconsideration on the record. (Minute Order dated September 12, 2017.) The Court determined that it had not overlooked any controlling decisions or factual matters, and rejected Relator's five separate grounds for reconsideration. (*Id.*) Defendants did not move for reconsideration.

## II. Discussion

### a. The law of the case doctrine bars Defendants' arguments

Defendants move to dismiss the FAC and for partial summary judgment, and restate the same arguments previously advanced in their motion to dismiss the TAC. Defendants assert three arguments in support of their motion to dismiss the remaining misappropriation claims: (1) that there is no legal obligation on how to spend Medicaid and Medicare funds other than providing the "prescribed levels of care" as defined by the Public Health Law and DOH regulations; (2) that no "siphon[ing]" of funds could occur from the Nursing Home because all the entities are part of the same legal entity; and (3) that the alleged misappropriation could not have impacted the per diem rates or calculation of the remediation payment. (Second Mem. 1–2.) In support of their motion for partial summary judgment, Defendants argue that the alleged improper misappropriation expenses identified by Plaintiff were legitimate expenses. (*Id.* at 15–22.) Defendants do not deny that all of these arguments were raised previously. Rather, they contend that the Court can reconsider these arguments because the March 2017 Decision "*did not reject* [or] . . . address[]" them.[9] (Defs. Reply in Supp. of Second Mot. ("Defs. Reply") 6–7 & 6 n.1, Docket Entry No. 63.) Defendants also argue that "the defense of failure to state a claim is

---

[9] Defendants also appear to argue that the law of the case doctrine only applies where an appellate court has previously decided the issue. (*See* Defs. Mem. 7 (citing *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002).) However, the "mandate rule" is merely one "branch" of the law of the case doctrine. *See Quintieri*, 306 F.3d at 1225 ("The 'mandate rule' ordinarily forecloses relitigation of all issues previously waived by the defendant or decided by the appellate court.").

9

not waivable," (*id.* at 8), in particular where an amended complaint has been filed, (Second Mem. 3 n.1). Defendants contend that they did not move for reconsideration of the March 2017 Decision because they had obtained all of the relief requested, "albeit without prejudice." (Defs. Reply 8.)

Plaintiff contends that the law of the case doctrine bars reconsideration of Defendants' previously raised arguments. (Pl. Opp'n to Defs. Second Mot. ("Pl. Opp'n"), Docket Entry No. 62; Pl. Mem. in Supp. of Pl. Opp'n ("Pl. Mem.") 5, Docket Entry No. 62-13.) Plaintiff argues that there are no exceptional circumstances requiring reconsideration of the previously denied arguments, (*id.* at 9), and that Defendants fail to even address the reasoning of the March 2017 Decision, (*id.* at 1). Moreover, Plaintiff argues that Defendants misled the Court as to the scope of the now pending motion at the pre-motion conference, and have failed to even "address[] . . . the specific pleading concerns raised in the . . . prior decision." (*Id.* at 2.) Plaintiff also argues that Defendants had "a full and fair opportunity to move for reconsideration" of the March 2017 Decision but failed to do so. (*Id.* at 10.)

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Arizona Premium Fin. Co. v. Employers Ins. of Wausau, of Wausau Am Mut. Co.*, 586 F. App'x 713, 716 (2d Cir. 2014) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). To prevent the parties from re-litigating previously decided issues, the doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Jackson v. New York State*, 523 F. App'x 67, 69 (2d Cir. 2013) (quoting *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008)). A court

should therefore be "'loathe' to revisit an earlier decision 'in the absence of extraordinary circumstances . . . .'" *N. River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995); *see also Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999) ("[T]he decision whether or not to apply law-of-the-case is . . . informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." (citations omitted)). Although prudential and discretionary, the doctrine may be raised by a court *sua sponte*. *See United States v. Lacouture*, 721 F. App'x 1, 4 (1st Cir. 2018) (citing *United States v. Wallace*, 573 F.3d 82, 90 n.6 (1st Cir. 2009)); *United States v. Anderson*, 772 F.3d 662, 669 (11th Cir. 2014); *F.T.C. v. Consumer Health Benefits Ass'n*, No. 10-CV-3551, 2012 WL 1890242, at *4 (E.D.N.Y. May 23, 2012).

The Court has already considered Defendants' arguments in the March 2017 Decision and declines to do so again. Although the March 2017 Decision did not expressly address Defendants' current arguments,[10] the Court did so *implicitly* by finding potentially viable misappropriation claims. *See Ragbir v. Lynch*, 640 F. App'x 105, 108 (2d Cir. 2016) ("The law of the case doctrine commands that 'when a court has [explicitly or implicitly] ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case.'" (quoting *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009))). The Court's denial of Defendants' arguments was a "necessary part of [the] holding" of the March 2017 Decision. *Cf. White v. Dingle*, 616 F.3d 844, 848 n.1 (8th Cir. 2010) (holding law of case doctrine did not apply where issue "was not a necessary part of . . . holding"); *see also Catholic Health Sys.*, 2017 WL 1239589, at *26 ("Relator's allegations, affirmations and evidence related to the

---

[10] The Court determined that 42 U.S.C. § 1320a-7b(a)(4) may serve as the basis for Plaintiff's misappropriation claims by precluding the use of funds for purposes unrelated to Medicare and Medicaid. *Catholic Health Sys.*, 2017 WL 1239589, at *26.

[m]isappropriation [c]laims set forth numerous details regarding the allegedly fraudulent diversion and misappropriation scheme but fail to identify any reimbursement claim that Defendants' submitted in furtherance of the scheme."). As Defendants contend, the Court could not have previously found potentially viable misappropriation claims if it had accepted any of Defendants' arguments. Nor is the filing of a materially similar amended complaint an "exceptional circumstance" sufficient to preclude the application of the law of the case doctrine.[11] *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316–17 (S.D.N.Y. 2015) ("The mere

---

[11] Defendants' argument that the application of the law of the case doctrine would effectively force them to waive their right to assert a defense for failure to state a claim is meritless. (*See* Defs. Reply 8, Docket Entry No. 63.) The Court has already addressed Defendants' arguments as to the TAC, a materially similar complaint to the FAC. Because the TAC and FAC are similar in all material respects, Defendants essentially request multiple bites at the same apple. Under these circumstances, the law of the case doctrine precludes consideration of previously rejected arguments to later amended complaints with materially similar allegations. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995); *Batson v. RIM San Antonio Acquisition, LLC*, No. 15-CV-07576, 2018 WL 1581675, at *5 (S.D.N.Y. Mar. 27, 2018); *Bayer Healthcare Pharm. Inc. v. RJ Health Sys. Int'l LLC*, No. 15-CV-6952, 2017 WL 253954, at *1 (D.N.J. Jan. 20, 2017); *Magnotti v. Crossroads Healthcare Mgmt. LLC*, No. 14-CV-6679, 2016 WL 3080801, at *2 (E.D.N.Y. May 27, 2016); *Guttilla v. City of New York*, No. 14-CV-156, 2016 WL 1255737, at *3 (S.D.N.Y. Mar. 29, 2016); *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316–17 (S.D.N.Y. 2015), *aff'd*, 626 F. App'x 20 (2d Cir. 2015); *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 11-CV-1755, 2013 WL 8336267, at *5 (N.D. Ohio Sept. 28, 2013), *report and recommendation adopted*, No. 11-CV-1755, 2014 WL 1493158 (N.D. Ohio Apr. 15, 2014); *F.T.C. v. Consumer Health Benefits Ass'n*, No. 10-CV-3551, 2012 WL 1890242, at *8 (E.D.N.Y. May 23, 2012); *Gutman v. Klein*, No. 03-CV-1570, 2010 WL 4975593, at *4 (E.D.N.Y. Aug. 19, 2010), *report and recommendation adopted*, No. 03-CV-1570, 2010 WL 4916722 (E.D.N.Y. Nov. 24, 2010), *aff'd*, 515 F. App'x 8 (2d Cir. 2013); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, No. 00-CV-3613, 2004 WL 1943099, at *16 (S.D.N.Y. Aug. 27, 2004); *cf. Hamlen v. Gateway Energy Servs. Corp.*, No. 16-CV-3526, 2017 WL 6398729, at *5 (S.D.N.Y. Dec. 8, 2017) ("The law-of-the-case doctrine does not control here because the Amended Complaint is based on new evidence and 'alleges *materially different* and more detailed claims' than the Complaint." (emphasis added and citation omitted)); *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at *3 (S.D.N.Y. July 12, 2011) ("The law of the case doctrine does not control here, however, as the [a]mended [c]omplaint alleges *materially different* and more detailed claims than the original [c]omplaint." (emphasis added)).

filing of an [a]mended [c]omplaint does not entitle Plaintiff to relitigate his claims absent new factual allegations."),[12] *aff'd*, 626 F. App'x 20 (2d Cir. 2015); *see also Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995) (holding that law of the case doctrine could be applied as to sufficiency of amended complaints if they were sufficiently similar to the original complaint). Defendants should have moved for reconsideration to the extent they believed the Court overlooked any facts, law, or arguments in the March 2017 Decision. *See U.S. ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998 (2d Cir. 1995) ("Defendants sought reconsideration of the dismissal without prejudice, contending that 'dismissal *with prejudice* is the only remedy that properly preserves the congressional objectives embodied in the *qui tam* statutory scheme.'" (citation omitted)); *see also Estrada–Rodriguez v. Lynch*, 825 F.3d 397, 402 (8th Cir. 2016) ("'Law of the case' doctrine, as described in *Arizona*, embodies principles that work alongside Rule 54(b) of the Federal Rules of Civil Procedure in guiding a court's discretion when reconsidering issues decided in the same case."). The Court

---

[12] In filing the FAC, Plaintiff cured the defects described in the March 2017 Decision by providing evidence of Defendants' requests for reimbursement between 2007 and 2011, the period of operation of the alleged scheme. Plaintiff also provided new allegations and evidence regarding the alleged fabrication of inhalation therapy costs as another example of how Defendants used the funds for non-Medicare and non-Medicaid services. (FAC ¶¶ 65–84.) Plaintiff's additional allegations as to the inhalation therapy costs do not provide a basis for Defendants to relitigate the sufficiency of the implied-false certification misappropriation claims. Even without these additional allegations, Plaintiff had previously provided detailed allegations as to the potential misappropriation of funds for illegitimate purposes. *See Catholic Health Sys.*, 2017 WL 1239589, at *26 (explaining relatedly provide "allegations, affirmations and evidence related to the [m]isappropriation [c]laims set[ting] forth numerous details regarding the allegedly fraudulent diversion and misappropriation scheme but fail to identify any reimbursement claim that Defendants' submitted in furtherance of the scheme"); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001) (holding genuine issue of fact could raised even by uncorroborated accounts). The prior dismissal of the misappropriations claim was based on the lack of allegations and evidence as to the submission of reimbursement requests, and not on a finding that there were no disputed issues of fact as to the legitimacy of the uses of the funds. *See Catholic Health Sys.*, 2017 WL 1239589, at *26.

therefore declines to consider Defendants' previously raised arguments a second time.

### b. Plaintiff has sufficiently cured the TAC as directed by the Court in the March 2017 Decision

The Court finds that Plaintiff has provided sufficient allegations and evidence for viable implied-false certification misappropriation claims. Defendants have not argued that the new allegations and evidence fail to meet the Court's directions in the March 2017 Decision. Defendants instead reiterate their prior arguments, and conclusorily argue that "[t]he fact that the [R]elator has supplied evidence that authentic and proper reimbursement claims were submitted to the government cannot cure the defect of the [m]isappropriation [c]laims." (Second Mem. 7.) Because Plaintiff has cured the previously identified defects, and Defendants only offer the same previously rejected arguments, the Court finds that the FAC and the attached submissions sufficiently state implied-false certification misappropriation claims.

## III. Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss and for partial summary judgment as to the misappropriation claims.

SO ORDERED:

　　　s/ MKB　　　　
MARGO K. BRODIE
United States District Judge

Dated: August 10, 2018
　　　　Brooklyn, New York