UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA and NEW YORK
STATE *ex rel.* MICHAEL QUARTARARO,

                              Plaintiffs,

              v.

CATHOLIC HEALTH SYSTEM OF LONG
ISLAND INC. *d/b/a/* CATHOLIC HEALTH
SERVICES OF LONG ISLAND, ST. CATHERINE
OF SIENA MEDICAL CENTER, and ST.
CATHERINE OF SIENA NURSING HOME,

                              Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
12-CV-4425 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff-Relator Michael Quartararo ("Relator"), a former nursing home administrator,

commenced the above-captioned *qui tam* action on September 5, 2012.  (Compl., Docket Entry

No. 1.)  Relator asserts claims against Defendants Catholic Health System of Long Island, Inc.,

doing business as Catholic Health Services of Long Island ("CHS"), St. Catherine of Siena

Medical Center (the "Medical Center"), and St. Catherine of Siena Nursing Home (the "Nursing

Home") under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the New

York False Claims Act, N.Y. Finance Law § 187 *et seq.* ("NYCFCA").  (*See* Fourth Am. Compl.

("FAC"), Docket Entry No. 47.)  On August 10, 2018, the Court denied Defendants' motion to

dismiss the FAC and motion for partial summary judgment, (*see* Mem. & Order dated Aug. 10,

2018, Docket Entry No. 75), and by Order dated March 31, 2019, the Court agreed to reconsider

Defendant's underlying motion to dismiss the FAC and motion for partial summary judgment on

the merits, (Order dated Mar. 31, 2019).  (*See* Defs. Mot. to Dismiss & for Partial Summ. J.

("Defs. Mot."), Docket Entry No. 61; Defs Mem. in Supp of Defs. Mot ("Defs. Mem."); Docket

Entry No. 61-6; Decl. of David DeCerbo in Supp. of Defs. Mot. ("DeCerbo Decl."), Docket

Entry No. 61-1.)  On reconsideration, and for the reasons explained below, the Court denies

Defendants' motion to dismiss and denies the motion for summary judgment without prejudice to

renewal.

**I.    Background**

The Court assumes familiarity with the facts as detailed in its prior March 31, 2017

Memorandum and Order (the "March 2017 Decision") and August 10, 2018 Memorandum and

Order (the "August 2018 Decision") and provides a summary of only the pertinent facts.[1]  *See*

*United States v. Catholic Health Sys. of Long Island Inc. ("Catholic Health II")*, No. 12-CV-

4425, 2018 WL 3825906, at *1–4 (E.D.N.Y. Aug. 10, 2018); *United States v. Catholic Health*

*Sys. of Long Island Inc. ("Catholic Health I")*, No. 12-CV-4425, 2017 WL 1239589, at *1–6

(E.D.N.Y. Mar. 31, 2017).

**a.    Overview of Medicare and Medicaid reimbursement programs**

Medicare and Medicaid are taxpayer-funded health insurance programs offered to

individuals based on age or disability.  (FAC ¶¶ 20, 22.)  Medicare is provided by the federal

government and Medicaid is provided by federal, state, and local governments and administered

through the states.  (*Id.*)  The United States Department of Health and Human Services, through

its Centers for Medicare and Medicaid Services, runs both programs in conjunction with the state

agencies that oversee Medicaid.  (*Id.*)  Individuals may be covered under Medicare, Medicaid, or

both.  (*Id.*)  New York State maintains a Medicaid program for its citizens.  (*Id.* ¶ 23.)  If health

---

[1]  For the purposes of deciding Defendants' motion to dismiss, the Court assumes the truth of the factual allegations in the FAC.

care providers[2] choose to provide state-based Medicaid services, they must enroll with the New

York State Department of Health (the "DOH"), which requires health care providers to certify

that they will comply with DOH rules and regulations.[3]  (*Id.* ¶ 24.)  Health care providers that

treat patients covered by Medicare or Medicaid may submit claims for reimbursement of the

costs expended to treat the covered patients.  (*Id.* ¶¶ 21, 38.)  Reimbursement claims are

submitted to the DOH on CMS-1450/UB-04 Forms.[4]  (*Id.* ¶ 21.)  The reimbursement claim

forms contain general compliance certifications specifying that false, misleading, incomplete or

inaccurate claims may subject the claimant to civil and criminal penalties.  (*Id.* ¶¶ 21, 24–25.)

The reimbursement claim forms also require a health care provider to include its reimbursement

rate.  (*Id.*)  In states that provide Medicaid coverage, the reimbursement rate for Medicaid and

Medicare claims is calculated and assigned by the state agency that oversees the Medicaid

program, (*id.* ¶ 26); in New York State, that agency is the DOH, (*id.* ¶ 38).

     As health care providers, nursing homes are reimbursed for every day they provide care

to a Medicaid or Medicare beneficiary.[5]  (*Id.* ¶ 26 (first citing N.Y. Pub. Health Law § 2808; and

---

[2]  Under Medicare and Medicaid, health care providers are "patient care institutions such as hospitals, critical access hospitals, hospices, nursing homes, and home health agencies." Centers for Medicaid and Medicare Services, Publication 100-07, State Operations Manual § 1000A (Oct. 3, 2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c01.pdf.

[3]  *See* New York State Medicaid Enrollment Form, at 8, https://www.emedny.org/info/ProviderEnrollment/ProviderMaintForms/436601_INST_FORM_InstRateBasedEnrlForm.pdf (last visited June 10, 2020).

[4]  CMS-1450/UB-04 Form, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1104CP.pdf (last visited June 10, 2020).

[5]  While the Court focuses on how the reimbursement procedures operate with respect to nursing homes, the reimbursement procedures are similar for any health care provider seeking Medicaid and Medicare reimbursement in New York State.  *See, e.g.*, 10 N.Y. Codes R. & Regs.

then citing N.Y. Codes R. & Regs. § 86-2 *et seq*.).) The reimbursement rates are calculated by a complex formula that considers four components related to a nursing home's costs and expenditures: (1) direct costs; (2) indirect costs; (3) non-comparable costs; and (4) capital expenditures. (*Id.* ¶ 27 (citing 10 N.Y. Codes R. & Regs. 86-2.10).) The first three components are known as the "operating portion" of the reimbursement rate. (*Id.*) The operating portion is calculated based on a nursing home's costs from a particular fiscal year selected by the DOH or "base year." (*Id.* ¶ 34.) After the DOH selects a base year, it continues to use that base year to calculate a health care provider's operating costs until it decides to select a new base year. (*Id.*) The DOH obtains the base-year operating costs through annual cost reports that must be submitted by any nursing home intending to seek Medicaid reimbursement. (*Id.* ¶¶ 34–35.) From 1983 to 2009, the DOH used a base year of 1983, and cost reports from 1983, to calculate the operating-costs portion of the reimbursement rates. (*Id.* ¶ 35.) In 2009, the DOH selected a new base year of 2002. (*Id.*) From 2009 to 2011, the DOH used 2002 as the base year and used 2002 cost reports to calculate the operating-costs portion of the reimbursement rates. (*Id.*) In 2012, the DOH selected a new base year of 2007 and changed its reimbursement rate calculation methodology. (*Id.*)

### b. Factual background

CHS is a healthcare consortium that operates hospitals and nursing homes. (*Id.* ¶ 8.) In or about November of 1999, CHS purchased the Nursing Home and the Medical Center from Episcopal Health Services, who had operated the facilities under the names Bishop Jonathan G. Sherman Episcopal Nursing Home ("Episcopal Nursing Home") and St. John's Episcopal

---

§ 86-1 *et seq.* (governing reimbursement for "medical facilities"); *id.* § 86-3 *et seq.* (governing reimbursement for "health maintenance organizations"); *id.* § 86-4 *et seq.* (governing reimbursement for "free-standing ambulatory care facilities"); *id.* § 86-5 *et seq.* (governing reimbursement for "long-term health care programs").

Hospital.  (*Id.* ¶ 39.)  CHS officially assumed ownership and control of Episcopal Nursing Home in early 2000.  (*Id.* ¶ 41.)

In April of 2007, Relator, who had been working for CHS for about thirty-eight years, was elevated to the position of Licensed Administrator of the Nursing Home.  (*Id.* ¶ 7.)  As the Licensed Administrator, Relator was responsible for the general administration of the Nursing Home, which included "managing, supervising, and coordinating" the various departments at the Nursing Home, as well as "maintaining and developing legally compliant operating protocols, developing and managing budgets, developing financial policies[,] . . . monitoring financial performance . . . , supervising all human resource issues and reporting to the [N]ursing [H]ome's governing body as needed."  (*Id.*)

### i. The DOH retroactively re-based the reimbursement rates in 2011 and the Nursing Home received a mitigation payment as a result

In June of 2011, the DOH retroactively changed the base year used to calculate Medicaid reimbursement rates for health care providers from 1983 to 2002 for the reimbursement period covering 2009 through 2011.  (*Id.* ¶¶ 35, 51.)  The re-basing caused the Nursing Home's reimbursement rate to drop from "approximately $270 per Medicaid patient day to . . . $250 per Medicaid [patient] day."  (*Id.* ¶ 51.)  The DOH sought to minimize the impact of the re-basing by providing one-time mitigation payments to affected health care providers that could be used to off-set any potential losses caused by the retroactive application of the lower reimbursement rates.  (*Id.* ¶ 59.)  Under this program, the Nursing Home received a $4.5 million mitigation payment.[6]  (*Id.*)  Relator alleges that CHS subsequently "misappropriated" approximately $1.7

---

[6] The Nursing Home's accounting firm had anticipated that the re-basing may occur and that a mitigation payment would be issued as a result of the re-basing.  (FAC ¶¶ 50, 62.) Therefore, the accounting firm estimated that because the mitigation payment would be based on the difference between the Episcopal Nursing Home rate used by the Nursing Home and the newly issued rate, the Nursing Home may have had to repay approximately $3 million.

million of the mitigation payment by charging the Nursing Home for "workers['] compensation" and "excess Medicaid" costs.  (*Id.* ¶ 61.)

### ii.  CHS's alleged use of the Nursing Home's Medicaid and Medicare funds for non-Medicaid and non-Medicare purposes

During the course of Relator's employment as the Nursing Home's Licensed Administrator, Relator also discovered that CHS had been improperly diverting the Nursing Home's Medicaid funds.  (*Id.* ¶ 65.)  Starting in 2007, CHS and the Medical Center began charging the Nursing Home for "medical, administrative, utility and other costs" that the Nursing Home had not incurred or which costs were overinflated.  (*Id.* ¶ 66.)  Relator contends that these false payments include charges for a non-existent inhalation therapy department, (*id.* ¶ 79), and that CHS took the false payments from the Nursing Home's Medicaid and Medicare funds for the Nursing Home's patients, (*id.* ¶¶ 67, 75–77).

In 2008, Relator realized that the Medical Center had overcharged the Nursing Home for laboratory costs and brought it to the attention of John Haight, a CHS executive.  (*Id.* ¶¶ 54, 67.)  Haight informed Relator that the Medical Center charged the Nursing Home a fixed yearly rate, regardless of the actual laboratory charges incurred.  (*Id.*)  Relator also discovered that the Medical Center's laboratory rates for the Nursing Home's residents were much greater than the laboratory rates charged for the residents in CHS's other nursing homes and much greater than the then-current market rate for such services.  (*Id.*)

In late 2009 and late 2011, CHS took $2 million and $1.1 million, respectively, from the Nursing Home's budget to cover "purported workers['] compensation costs," but Relator alleges that the workers' compensation cases originating from the Nursing Home failed to support such large deductions.  (*Id.* ¶¶ 68–69.)  When Relator questioned the deductions, he was told that they were not only for the workers' compensation costs incurred in those years, but also to cover

workers' compensation costs incurred by the Nursing Home in 2005. (*Id.*)  In two subsequent emails he received, Relator learned that the Nursing Home's workers' compensation costs were disproportionately higher than those of CHS's other nursing homes. (*Id.* ¶¶ 68–70.)  When Relator raised the issue of the Nursing Home's workers' compensation costs with officials of CHS and the Medical Center, they ignored him. (*Id.* ¶ 68.)

In March of 2012, Relator attended a meeting with other CHS executives and officials, where he raised his concerns regarding the inflated laboratory costs the Medical Center had charged and was continuing to charge the Nursing Home. (*Id.* ¶ 72.)  In response, one executive laughed and told Relator that the Medical Center was "ripping [the Nursing Home] off." (*Id.*)  At a follow-up meeting with Haight and other CHS executives, Relator reasserted his concerns pertaining to the Medical Center's rates for the Nursing Home's residents, and was told that the rates would remain the same for the current fiscal year but "could be addressed in next year's budget." (*Id.* ¶ 73.)  Relator subsequently received an email confirming CHS's position. (*Id.*) Because Haight and other CHS executives refused to address the rate and charging issues, Relator raised his concerns to a CHS compliance officer. (*Id.* ¶ 74.)  Although the compliance officer said that she would address Relator's concerns, she never took any action. (*Id.*)

Shortly thereafter, Relator discovered that the Nursing Home was paying a portion of the salary for various staff members at the Medical Center and other CHS nursing homes who spent little to no time at the Nursing Home and had little to no involvement in the Nursing Home's operations. (*Id.* ¶ 80.)  Haight and others acknowledged that the salary charges were improper, but did not take any corrective action. (*Id.*)  When Relator raised the issue a second time, Haight responded that he was free to charge the Nursing Home for the salaries of any CHS staff regardless of how much of their work pertained to the Nursing Home. (*Id.* ¶ 81.)

Based on Relator's knowledge of the foregoing activities, he commenced the instant

action.  (*Id.* at 1–2.)

### c.  Procedural history

Relator commenced the action on September 5, 2012, and subsequently amended the

complaint three times prior to filing the FAC.[7]  (FAC ¶¶ 1–6.)  On June 15, 2016, Defendants

moved to dismiss the TAC for lack of subject matter jurisdiction and failure to state a claim, and

for partial summary judgment, pursuant to Rules 12(b)(1), 12(b)(6), and 56, respectively, of the

Federal Rules of Civil Procedure.  (Defs. First Mot. to Dismiss & for Partial Summ. J., Docket

Entry No. 29.)

In the March 2017 Decision, the Court dismissed all claims with prejudice except for the

implied-false-certification misappropriation claims.[8]  *See Catholic Health I*, 2017 WL 1239589,

at *27.  The Court held that "Relator ha[d] articulated a viable implied-false-certification

argument based on his allegations that Defendants violated section 1320a-7b(a) during a time

they were submitting false Medicaid and Medicare reimbursement claims," but dismissed the

claims because Relator had failed to "show that Defendants submitted any . . . claims during the

course of the alleged scheme."  *Id.* at *26, 24.  The Court therefore granted Relator leave to

---

[7]  While the United States and the State of New York investigated the allegations to determine whether to intervene, Relator filed an Amended Complaint on September 10, 2012, (Am. Compl., Docket Entry No. 3), a Second Amended Complaint on August 2, 2013, (Second Am. Compl., Docket Entry No. 6), and a Third Amended Complaint ("TAC") with attachments on December 21, 2015, (TAC, Docket Entry Nos. 15, 16).  The United States and the New York State of New York declined to intervene on January 27, 2016, (Notice of Election to Decline to Intervene, Docket Entry Nos. 18, 19), and the Court unsealed the TAC the same day, (Order dated Jan. 27, 2016, Docket Entry No. 20); *see also* 31 U.S.C. §§ 3730(b),(c) (2006) (requiring *qui tam* actions to be sealed until the government parties decide or decline to intervene).

[8]  The Court based its decision on Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.  *See United States v. Catholic Health Sys. of Long Island Inc.*, No. 12-CV-4425, 2017 WL 1239589, at *27 (E.D.N.Y. Mar. 31, 2017).

amend the TAC to identify and provide evidence of Defendants' requests for reimbursement between 2007 and 2011, the period of operation of the alleged scheme. *Id.* at *27.

On April 14, 2017, Relator moved for reconsideration of the dismissal of the false filing and false retention claims. (Pl. Mot. for Recons. ("Pl. Recons. Mot."), Docket Entry No. 41.) On September 12, 2017, the Court denied Relator's motion for reconsideration on the record. (Min. Order dated Sept. 12, 2017.) The Court determined that it had not overlooked any controlling decisions or factual matters, and rejected Relator's five separate grounds for reconsideration. (*Id.*) Defendants did not move for reconsideration.

On May 25, 2017, Relator filed the FAC. (FAC.) On November 13, 2017, Defendants moved to dismiss the FAC and for partial summary judgment. (Defs. Mot.; Defs. Mem.) Relator opposed the motion, (Pl. Opp'n to Defs. Mot. ("Pl. Opp'n"), Docket Entry No. 62; Pl. Mem. in Supp. of Pl. Opp'n ("Pl. Mem."), Docket Entry No. 62-13),[9] and in the August 2018 Decision, the Court denied Defendants' motion, *Catholic Health II*, 2018 WL 3825906, at *6.

On August 24, 2018, Defendants filed a motion for reconsideration of the August 2018 Decision, (Defs. Mot. for Recons. ("Defs. Recons. Mot."), Docket Entry No. 76), which Relator opposed, (Pl. Opp'n to Defs. Recons. Mot. ("Pl. Recons. Opp'n"), Docket Entry No. 78).

By Order dated March 31, 2019, the Court granted Defendants' motion for reconsideration and decided that it would reconsider Defendant's underlying motion to dismiss the FAC and for partial summary judgment on the merits. (Order dated Mar. 31, 2019.) The Court addresses Defendants' motions below.

---

[9] In support of his opposition brief, Relator filed a thirty-nine-page sworn declaration responding to the DeCerbo Declaration. (Pl. Decl. in Supp. of Pl. Opp'n ("Pl. Decl."), Docket Entry No. 62-11.) In addition, Relator asserts in his supporting declaration that he will be able to identify the full "extent of . . . diversion and conspiracy" "only through discovery." (Pl. Decl. ¶ 65.)

## II.   Discussion

### a.   Standards of review

#### i.   Motion to dismiss

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the

complaint as true, and drawing all reasonable inferences in the plaintiff's favor."   *Kim v. Kimm*,

884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d

Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v.

N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)).   A complaint must plead "enough

facts to state a claim to relief that is plausible on its face."   *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).   A claim is plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009)).   Although all allegations contained in the complaint are assumed to be true, this

tenet is "inapplicable to legal conclusions."   *Iqbal*, 556 U.S. at 678.

#### ii.   Motion for summary judgment

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Wandering

Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA N.Y.C. Transit*, 802

F.3d 226, 230 (2d Cir. 2015). The court must "'constru[e] the evidence in the light most

favorable to the non-moving party'" and "'resolve all ambiguities and draw all permissible

factual inferences in favor of the party against whom summary judgment is sought.'"   *Lenzi v.

Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football

League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532,

534 (2d Cir. 2006)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### iii.   Federal and New York False Claims Acts

The FCA imposes liability for, among other things, "knowingly" presenting or causing to be presented a false or fraudulent claim "for payment or approval."  31 U.S.C. § 3729(a). Although Congress has repeatedly amended the FCA, "its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. ---, ---, 136 S. Ct. 1989, 1996 (2016).  A "claim" includes direct requests to the government for payment as well as claims for reimbursement under federal benefits programs. *Id.*  The NYFCA "is closely modeled on the federal FCA," *United States ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014) (citation and internal quotation marks omitted), and it imposes liability for "knowingly mak[ing] a false statement or knowingly fil[ing] a false record," *People ex rel. Schneiderman v. Sprint Nextel Corp.*, 26 N.Y.3d 98, 112 (2015).  Because the NYFCA mirrors the FCA in many respects, "it is appropriate to look toward federal law when interpreting the New York act." *State ex rel. Seiden v. Utica First Ins. Co.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012) (citing *State of N.Y. ex rel.*

*Jamaica Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*, 922 N.Y.S.2d 342, 443 (App. Div. 2011)); *see Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015) ("When interpreting the NYFCA, New York courts rely on federal FCA precedent."); *Bilotta*, 50 F. Supp. 3d at 509 ("New York courts rely on federal FCA precedents when interpreting the NYFCA." (citation omitted)).  Pursuant to the private, or *qui tam*, provisions of the FCA and NYFCA, a private person may bring a civil action on behalf of the government, as a "relator," for violations of each act.  31 U.S.C. § 3730(b); N.Y. State Fin. Law § 190(2).  If a relator brings such an action under either the FCA or the NYFCA, the government may elect, within a set period of time, to intervene in the action.  31 U.S.C. § 3730(b)-(c); N.Y. State Fin. Law § 190(2)(b).

Relator invokes provisions of the FCA that subject to civil liability any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government, 31 U.S.C § 3729(a)(1)(A); "knowingly makes, uses, or causes to be used, a false record or statement material to [such] a false or fraudulent claim," *id.* § 3729(a)(1)(B); "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)," *id.* § 3729(a)(1)(C); or "knowingly makes . . . a false record or statement material to an obligation to pay" the government or "conceals or . . . avoids or decreases an obligation to pay" the government, *id.* § 3729(a)(1)(G).  (FAC ¶¶ 107, 112, 117, 123.)  Relator brings substantially the same claims pursuant to the NYFCA.  (*See* FAC ¶¶ 133, 139, 145, 151 (citing N.Y. State Fin. Law §§ 189(1)(a),(b),(c),(g)).)

To prove a false claim under FCA sections 3729(a)(1)(A) and 3729(a)(1)(B) or NYFCA sections 189(1)(a) and 189(1)(b), a relator must show that the defendant "(1) made a claim, (2) to the [] government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking

payment from the federal treasury." *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016) (quoting *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001)), *abrogated on other grounds by Universal Health Servs., Inc.*, 579 U.S. at ---, 136 S. Ct. at 2001); *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) ("To state a claim under 31 U.S.C. § 3729(a)(1), the plaintiff must show "the defendants (1) made a claim, (2) to the United States Government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." (quoting *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011))); *U.S. ex rel. Qazi v. Bushwick United Hous. Dev. Fund Corp.*, 977 F. Supp. 2d 235, 239 (E.D.N.Y. 2013) (quoting same).  However, neither the FCA nor the NYFCA defines a "false" claim. *See Mikes*, 274 F.3d at 696; *U.S. ex rel. Kester v. Novartis Pharm. Corp.* ("*Novartis V*"), 43 F. Supp. 3d 332, 367–68 (S.D.N.Y. 2014).

Similarly, to prove a "reverse false claim" under FCA section 3729(a)(1)(G) or NYFCA section 189(a)(g), which involves money *owed to* the government rather than money *paid by* the government, a relator must show: "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government — a duty to pay money or property." *Novartis V*, 43 F. Supp. 3d at 367–68 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (internal quotation marks omitted)); *see also Wood ex rel. United States v. Applied Research Assoc., Inc.*, 328 F. App'x 744, 748 (2d Cir. 2009).

Finally, to prove a false claim under FCA section 3729(a)(1)(C) or NYFCA section 189(1)(c), a relator must show that the defendant agreed with another to commit a violation of FCA sections (a)(1)(A), (B) or (G) or NYFCA sections 189(1)(a), (b) or (g), and committed an

overt act in furtherance of the violation.  *U.S. ex rel. Scharff v. Camelot Counseling*, No. 12-CV-3791, 2016 WL 5416494, at *9 (S.D.N.Y. Sept. 28, 2016); *Novartis V*, 43 F. Supp. 3d at 360.

### b.   Relator states a claim under the FCA

Defendants assert three main arguments in support of their motion to dismiss the FAC for failure to state an FCA claim based on an implied-false-certification theory: (1) "the manner in which the per diem payments and the Remediation Payment were used cannot support an implied-false-certification claim" because the Nursing Home is not required to earmark or otherwise tie specific Medicare and Medicaid funds to specific patients, (Defs. Mem. 2, 7); (2) "the Nursing Home is not a distinct legal entity from [CHS] and [the Medical Center], and, therefore, those entities could not 'siphon' money from the Nursing Home, as . . . [R]elator contends," (*id.* at 13); and (3) "[R]elator still has not plausibly alleged that any actual payment received was used for non-Medicaid or Medicare purposes," (*id.* at 12).

Relator opposes Defendants' motion to dismiss the FAC for procedural and substantive reasons.  As to the procedural reasons, Relator argues that: (1) in the March 2017 Decision, the Court previously "rejected the identical arguments now raised by Defendants" when it "concluded that Relator adequately pleaded a viable claim under the FCA based on a theory of implied false certification" based on his allegations that "Defendants had submitted claims to Medicare and Medicaid without disclosing that the funding received for the benefit of [N]ursing [H]ome residents was being converted for uses unrelated to the care of those residents,"[10] (Pl.

---

[10]   Relator contends that "Defendants advance three essential arguments now that were raised in their prior motion [to dismiss the TAC]:" (1) that "Defendants cannot 'siphon' or 'divert' monies away from the [N]ursing [H]ome because the [N]ursing [H]ome is part of a larger unified health care system controlled by [D]efendants," (2) "[t]he alleged 'inflated costs' did not impact the cost reports submitted by Defendants to the government and thus did not impact the amount of federal funding received by Defendants," and (3) "[a]s a factual matter, costs were not inflated."  (Pl. Opp'n 7–8.)  However, in light of the Court's prior Order granting

Opp'n 5–6); (2) "exceptional circumstances would be required not to fully honor the Court's earlier decision" and such circumstances "are not present here," (*id.* at 9); and (3) "Defendants had a full and fair opportunity to move for reconsideration of the [March 2017 Decision] and did not do so" and "the time for challenging the Court's decision has long passed," (*id.* at 10).

As to the substantive reasons, Relator argues that: (1) "Defendants are barred by statute from converting Medicare and Medicaid benefits obtained for the use and benefit of Nursing Home residents to other uses which are unrelated to the care of such residents," (*id.* at 13); (2) "Defendants fail in attempting to distinguish their conduct from the criminal behavior outlawed by 42 U.S.C. § 1320a-7b(a)(4)," (*id.* at 16); and (3) Defendants' insistence that "the alleged fraud did not impact the cost reports continues to miss the point[,] since misrepresentations within the cost reports is not the legal basis of the misappropriation claim," (*id.* at 21).

For the reasons discussed below, the Court finds that Relator has articulated a viable implied-false-certification argument based on alleged violations of section 1320a-7b(a)(4) and states a claim under the FCA.

### i.   Implied-false-certification claims

As set forth in the March 2017 Decision, "[a] legally false claim does not misrepresent the goods or services provided"; instead, "the party submitting the claim falsely represents (or certifies) compliance with a statute, regulation, or contractual provision, where compliance is a precondition to government payment of the claim." *United States ex rel. Kester v. Novartis Pharm. Corp. ("Novartis I")*, 23 F. Supp. 3d 242, 261 (S.D.N.Y. 2014) (citing *Mikes*, 274 F.3d at 697). A relator may premise a legal falsity argument on a theory of express false certification

---

Defendants' motion for reconsideration of the instant motion on the merits, the Court addresses each of Defendants' arguments in this Memorandum and Order.  (Order dated Mar. 31, 2019.)

or implied false certification.[11]  *See id.* (citing *Mikes*, 274 F.3d at 698–99).  Implied false

certification occurs where "the act of submitting a claim for reimbursement itself implies

compliance with governing [state or] federal rules that are a precondition to payment."  *Id.*

(citing *Mikes*, 274 F.3d at 699).

The Second Circuit fully explained legal falsity in *Mikes*.  274 F.3d at 696–700.  In

*Mikes*, the relator, Dr. Patricia Mikes, was employed at the defendants' health care practice.  *Id.*

at 692.  Mikes alleged that, during the course of her employment, she discovered that the

defendants were using unreliable medical testing procedures and submitting Medicare

reimbursement claims for those procedures.  *Id.* at 692, 694.  Mikes argued that the defendants'

reimbursement claims were false because the defendants expressly certified that all the services

they performed were "medically necessary."  *Id.* at 698.  The reimbursement claim form

submitted by the defendants contained a certification stating that no Medicare benefits would be

paid "unless th[e] form [was] received as required by existing law and regulations."  *Id.* (citation

omitted).  The Second Circuit held that Mikes had a viable express-false-certification argument

because the form contained a certification that conditioned payment on compliance with the

regulations.  *Id.* at 698–99.

Mikes also argued that, in the alternative, the reimbursement claims were impliedly false

because a separate statute stated that "no payment may be made under the Medicare statute for

any expenses incurred for items or services which are not reasonable and necessary."  *Id.* at 700

---

[11]  "[E]xpress false certification occurs when the party submitting the claims expressly and falsely certifies compliance with a particular statute, regulation, or contractual term" that is a precondition to payment.  *See Novartis I*, 23 F. Supp. 3d at 261 (internal quotation marks omitted) (citing *Mikes*, 274 F.3d at 698).  Because the claim the Court reconsiders is based on implied false certification, the Court addresses express false certification only to the extent relevant to explain implied false certification.

(citation, alteration, and internal quotation marks omitted).  In addressing the viability of Mikes'
implied certification argument, the Court stated that "caution should be exercised not to read this
theory expansively." *Id.* at 699.  The Court explained that "implied false certification is
appropriately applied only when the underlying statute or regulation upon which the plaintiff
relies *expressly* states the provider must comply in order to be paid." *Id.* at 700.  The Court held
that Mikes' implied-false-certification argument failed because, *inter alia*, she did not show that
the statutes were preconditions to obtaining reimbursement. *Id.* at 700–02.  Instead, the court
noted that the statutes were only conditions that health care providers must comply with to
participate in Medicare. *Id.*

  The Second Circuit subsequently clarified in *Bishop*, the level of certification necessary
to constitute an express false certification claim.  The relators in *Bishop* alleged that Wells Fargo
had filed false claims under the FCA because it had expressly and impliedly certified compliance
with provisions of a lending agreement and the Federal Reserve Act, respectively.  823 F.3d at
44–48.  The relators' express-false-certification argument was largely based on a provision in the
lending agreement stating that Wells Fargo had to comply with "any laws or regulations in any
respect which have any adverse effect whatsoever" on the lending agreement. *Id.* at 45.  The
Second Circuit held that *Mikes* requires a relator to identify a submitted claim that "falsely
certifies compliance with a *particular* statute, regulation or contractual term" that is a
precondition to payment. *Bishop*, 823 F.3d at 44 (citing *Mikes*, 274 F.3d at 698).  The court
explained that *Mikes* implied that a relator may not base an express-false-certification argument
"on anything as broad and vague as certification that there has been compliance with all federal,
state, and local statutes, regulations, and policies." *Bishop*, 823 F.3d at 44–45 (alterations,

citations and internal quotation marks omitted).  The *Bishop* relators' claims failed because they

had relied on a vague and broad certification.  *Id.* at 45.

### ii.   Particularity requirements for FCA claims

"*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to

Rule 9(b)."  *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Resp., Inc.*,

865 F.3d 71, 81 (2d Cir. 2017) (citing *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26

(2d Cir. 2016)).  "Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.'"  *Ladas*, 824 F.3d at 25 (alteration

in original) (quoting Fed. R. Civ. P. 9(b)).  "To satisfy this Rule, a complaint alleging fraud must

'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements were

fraudulent.'"  *Chorches*, 865 F.3d at 80 (quoting *Ladas*, 824 F.3d at 25)).  In other words, Rule

9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."

*HDtracks.com, LLC v. 7digital Grp. PLC*, No. 18-CV-5823, 2019 WL 6170838, at *10

(S.D.N.Y. Nov. 19, 2019) (quoting *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 511 (S.D.N.Y.

2016)).  As the Second Circuit has explained:

> The purpose of Rule 9(b) is threefold — it is designed to provide a
> defendant with fair notice of a plaintiff's claim, to safeguard a
> defendant's reputation from improvident charges of wrongdoing,
> and to protect a defendant against the institution of a strike suit.

*Wood*, 328 F. App'x at 747 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674,

676 (2d Cir. 1991)).

Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally," Fed. R. Civ. P. 9(b), a plaintiff must "plead circumstances that provide at

least a minimal factual basis for their conclusory allegations of scienter."  *In re Express Scripts*

18

*Holdings Co. Sec. Litig.*, 773 F. App'x 9, 12 (2d Cir. 2019) (quoting *San Leandro Emergency*

*Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)); *see also*

*Brookhaven Town Conservative Comm. v. Walsh*, 258 F. Supp. 3d 277, 286 (E.D.N.Y. 2017)

("[A]lthough a plaintiff may 'allege fraudulent intent generally' under Rule 9(b), he still 'must

provide some minimal factual basis for conclusory allegations of scienter that give rise to a

strong inference of fraudulent intent.'" (quoting *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184

(2d Cir. 1995))).

In applying Rule 9(b) to the submission of false claims under subsections 3729(b)(2)(A)

and (B) of the FCA, the Second Circuit has "decline[d] to require that every *qui tam* complaint

allege on personal knowledge specific identified false invoices submitted to the government."

*Chorches*, 865 F.3d at 86; *see also United States ex rel. Gelbman v. City of New York*, 790 F.

App'x 244, 248 (2d Cir. 2019) ("[A] *qui tam* complaint need not always allege, based on

personal knowledge, the actual submission of false claims to the federal government."), *cert.*

*denied*, --- U.S. ---, 140 S. Ct. 1296 (2020).

"[T]o survive dismissal under Rule 9(b) when the complaint pleads only on information

and belief that fraudulent claims were actually submitted to the United States, a plaintiff must (1)

'make plausible allegations that the bills or invoices actually submitted to the government were

uniquely within [the defendant's] knowledge and control,' and (2) 'adduce specific facts

supporting a strong inference of fraud.'" *Gelbman*, 790 F. App'x at 248 (quoting *Chorches*, 865

F.3d at 83 (internal quotation marks omitted)); *see also Chorches*, 865 F.3d at 86 ("[A]

complaint can satisfy Rule 9(b)'s particularity requirement by making plausible allegations

creating a strong inference that specific false claims were submitted to the government and that

the information that would permit further identification of those claims is peculiarly within the

opposing party's knowledge.").

### iii. Section 1320a-7(b)(a)(4) may serve as the basis for Relator's misappropriation claims

Relator argues that the Medicaid and Medicare funding for the Nursing Home was "paid

for the benefit of specific program beneficiaries in whose names that funding was billed on a

weekly (Medicaid) and monthly (Medicare) basis" and that "the benefits were awarded for the

benefit of individual Medicare and Medicaid beneficiaries as eligible participants in those two

federal entitlement programs."  (Pl. Opp'n 14.)

Defendants argue that Relator fails to state a claim under the FCA based on an implied-

false-certification theory because the Nursing Home is not required to earmark or otherwise tie

specific Medicare and Medicaid funds to specific patients and Relator "does not cite a statute or

regulation requiring such behavior, because there is none."  (Defs. Mem. 7.)  In support,

Defendants argue that "the Misappropriation Claims hinge entirely on the premise that . . . the

per diem reimbursement payments and the Remediation Payment were to be tied specifically to

care associated with Medicare and Medicaid recipients" and "this premise cannot support the

Misappropriation Claims" because it lacks "any basis in law to impose such an obligation, let

alone one that would be material to the government's decision to pay."  (*Id.* at 9–10.)

The Court finds unpersuasive Defendants' arguments that section 1320a-7b(a)(4) may not

support Relator's misappropriation claims because there is "no statutory or regulatory

requirement" that the "reimbursement payment and Remediation Payment were to be tied

specifically to care associated with Medicare and Medicaid recipients."  (*Id.* at 9–10.)

Section 1320a-7b(a) states, in pertinent part:

> Making or causing to be made false statements or representations

> Whoever— (1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f) of this section), . . . (4) having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person . . . ."

42 U.S.C. § 1320a-7b(a).

Defendants rely on the language of New York Public Health Law § 2808-2(d), which authorizes the DOH to make supplemental payments to residential health care facilities, to demonstrate the absence of any requirement that the remediation payment be used in a specific manner.  (Defs. Mem. 9 (citing N.Y. Pub. Health Law § 2808).)  However, because section 2808-2(d) only addresses supplemental payments and does not address individual reimbursements for services provided to patients in the care of the Nursing Home, it does not undermine Relator's allegations as to submitted claims for reimbursement of services at falsely inflated prices.[12]

Relator cites to *United States v. Wright*, 160 F.3d 905 (2d Cir. 1998), which lends some limited support to Relator's position that Medicaid and Medicare funds are, to some extent, tied to the provision of services for the intended beneficiaries in whose name the funds were awarded.  In *Wright*, the main issue examined by the Second Circuit was whether the defendants' sentences were appropriately increased by an abuse-of-trust enhancement for their roles in embezzling public funds from an assisted living facility for intellectually disabled adults, thus it

---

[12]  Contrary to Defendants' argument, New York Public Health Law § 2808 21(h) does appear to require some direct connection between intended beneficiaries and funds disbursed for their medical assistance.  *See* N.Y. Pub. Health Law § 2808 21(h)(i) ("This subdivision shall be effective if, and as long as, federal financial participation is available for expenditures made for beneficiaries eligible for medical assistance under title XIX of the federal social security act for the rate adjustments determined in accordance with this subdivision.").

is factually distinguishable from the case before the Court.  160 F.3d at 907–08.  However, in

discussing public Medicaid funds provided by the federal government and administered by the

DOH for day-to-day operations of the assisted living facility, the Second Circuit described the

Medicaid funds as "to be used for the benefit of its [intellectually disabled] residents" and the

chairperson of the facility as having "unsupervised discretion over the disbursement of the . . .

funds" and a "duty to exercise that discretion for the benefit of [the facility's] residents and to

put public funds to their intended use."  *Id.* at 911.  In addition, the Second Circuit implicitly

reiterated this framing of the intended use of Medicare and Medicaid benefits when citing to

*Wright* in a recent decision.  *See United States v. Cabot*, 755 F. App'x 75, 79 (2d Cir. 2018)

(describing the holding in *Wright* as "finding abuse of trust when the chairperson and sole

director of a caretaking facility enjoyed unsupervised discretion over the disbursement of

Medicaid funds intended for the benefit of its mentally disabled residents, but used those funds

for lavish personal expenditures"), *cert. denied*, --- U.S. ---, 140 S. Ct. 283 (2019).  Because the

Second Circuit has previously specified that Medicare and Medicaid funding must be used for

the benefit of the intended beneficiaries, Relator is not precluded from bringing an FCA claim

based on a violation of section 1320a-7b(a).

Accordingly, the Court finds that Relator has articulated a viable implied-false-

certification argument based on his allegations that Defendants violated section 1320a-7b(a)

during a time they were submitting false Medicaid and Medicare reimbursement claims.

### iv.   Relator alleges a viable theory of conversion pursuant to section 1320a-7b(a)(4)

Defendants argue that in enacting Title 42 of the United States Code, Congress intended

to address the scenario in which "an entity makes an application for payment for care rendered to

a beneficiary, but on receipt of that payment from the government, does not provide the care or

service underlying the request" and contend that Relator's theory of conversion under section 1320a-7(b)(a)(4) "does not fit that mold." (Defs. Mem. 11.) Defendants also assert that the prohibition in section 1320a-7b(a)(4) "tracks the common-law definition of conversion in New York," and that "since there is no obligation under any applicable federal or state statue or regulation for the Nursing Home to trace any money received to the care of any particular resident, there can be no conversion." (*Id.* at 10, 11.) In addition, Defendants argue that "[e]ven if there were a credible argument tying receipt of any per diem amount or the Remediation Payment to a duty to a resident," (1) "the relator still has not plausibly alleged that any actual payment received was used for non-Medicaid or Medicare purposes," (*id.* at 12), and (2), "the Nursing Home is not a distinct legal entity from [CHS] and [the Medical Center] and, therefore, those entities could not 'siphon' money from the Nursing Home, as . . . [R]elator contends," (*id.* at 13).

Relator argues that Defendants misstate the legislative history of section 1320a-7b(a)(4), which "reflects the clear intent of Congress to protect the integrity of the Medicare and Medicaid programs against 'unlawful' and 'unethical' practices, including the misappropriation and misuse of payments intended for the use of beneficiaries." (Pl. Opp'n 17.) In support, Relator argues that "merely because [section] 1320a-7b(a)(4) includes the word 'convert' in its text does not mean that one applies New York's common law definition of conversion in order to understand how the statute applies to Defendants' conduct in this case," and contends that "'federal common law rather than state law defines conversion and governs the elements to be pled.'" (*Id.* at 17–18 (quoting *Perlman v. Zell*, 938 F. Supp. 1327, 1347 (N.D. Ill. 1996).) Relator also argues that "[w]hether or not [the Nursing Home] is viewed as a 'component' of CHS for tax or cost reporting purposes, or is otherwise subject to the operational authority of CHS or [the Medical

Center], is entirely irrelevant to whether Defendants may steal money intended for Medicare and Medicaid beneficiaries and use it for their own purposes," because "[t]hat is a question governed exclusively by . . . [section] 1320a-7b(a)(4)." (*Id.* at 13.)

"'Statutory analysis begins with the plain meaning of a statute.'" *United States v. Haverkamp*, --- F.3d ---, 2020 WL 2110970, at *3 (2d Cir. May 4, 2020) (quoting *Nat. Res. Def. Council v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001)). The court "derive[s] meaning from context, thus, 'a statute is to be considered in all its parts when construing any one of them.'" *Id.* (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998)). "In conducting such an analysis, [a court] review[s] the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme." *United States v. Balde*, 943 F.3d 73, 81 (2d Cir. 2019) (quoting *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010)); *see also Moskal v. United States*, 498 U.S. 103, 108 (1990) ("In determining the scope of a statute, we look first to its language, giving the words used their ordinary meaning." (citations and internal quotation marks omitted)); *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010) (stating that an undefined statutory term is viewed in accordance with its ordinary meaning). Where Congress has provided no definition of statutory terms, the court next considers the ordinary, common-sense meaning of the words. *See United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000) (citing *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992)). However, where a statute is ambiguous, the court "may look to legislative history to discern the legislature's intent." *Chen v. Major League Baseball Props., Inc.*, 798 F.3d 72, 76 (2d Cir. 2015) (citing *Gordon v. Softech Intern., Inc.*, 726 F.3d 42, 48 (2d Cir. 2013)).

The Social Security Act § 1320a-7b provides in pertinent part, "[w]hoever . . . having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person," shall face certain penalties, 42 U.S.C. §1320a-7b(a)(4), but the act does not define convert. *See, e.g.*, 42 U.S.C. § 1301 (providing definitions for terms used for Subchapter XI of the Social Security Act § 1301 *et seq.*, regarding general provisions, peer review, and administrative simplification). In the specific context of tort and criminal law, Black's Law Dictionary defines "conversion," the noun form of "convert" as:

> The wrongful possession or disposition of another's property as if it were one's own; an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property.

Black's Law Dictionary 406 (10th ed. 2014).

Contrary to Defendants' argument[13] that there is no violation because they are permitted by their corporate structure to move money among the various entities, this definition does not necessarily require that funds be transferred from the possession of one legal entity to another, but instead requires only that an item or property be "used in a manner inconsistent with another's right," and that, as a result of that use, "that other person is deprived of the use" of that item or property. *Id.* at 406. As such, the definition of conversion suggests that even where Defendants may have the legal authority to effectuate a transfer of funds between distinct entities

---

[13]   Defendants urge the Court to find that they could not have violated section 1320a-7b(a)(4) because "[CHS] and [the Medical Center] moved money amongst themselves, which they are permitted to do by their corporate structure and by the regulatory structure governing hospitals and nursing homes licensed under New York law." (Defs. Mem. 14.)

within a single corporate structure, they may nevertheless engage in conversion if those funds are used in a manner inconsistent with the rights of the beneficiaries of those funds. *See Balde*, 943 F.3d at 81 (relying on dictionary definitions to aid in interpreting statutory text and determine the plain meaning of the statute). The plain language of section 1320a-7b(a)(4) also supports this interpretation as it specifically addresses the scenario in which one "converts" a "benefit or payment or any part thereof *to a use other than for the use and benefit of such other person*." 42 U.S.C. § 1320a-7b(a)(4) (emphasis added).

Accordingly, Relator is not precluded from alleging a viable theory of conversion pursuant to section 1320a-7b(a)(4) based on Defendants' alleged misappropriation of Medicaid and Medicare funding for inappropriate uses.

> **v.   The FAC sufficiently cures the defects in the TAC identified in the March 2017 Decision**

Defendants argue that "[e]ven if there were a credible argument tying receipt of any per diem amount or the Remediation Payment to a duty to a resident (and there is not), the [R]elator still has not plausibly alleged that any actual payment received was used for non-Medicaid or Medicare purposes." (Defs. Mem. 12.) In support, Defendants assert that "[i]t is insufficient to argue (as the [R]elator does here) that merely because there were non-Medicaid-or-Medicare-related expenses charged to the Nursing Home, 'some portion' of the per diem reimbursement or the Remediation Payment must have been used," and further argue that Relator fails to state a claim based on an alleged conversion pursuant to section 1320a-7(b)(a)(4) because he cannot demonstrate that any of the money received through the alleged false or inflated reimbursements was used to pay for non-Medicare or non-Medicaid expenses. (*Id.*)

Relator argues "[t]here is simply no requirement that Relator tie a specific beneficiary dollar in a deliberately comingled operating account to a specific non-Medicare or non-Medicaid

expense in order to trigger [section] 1320a-7b(a)(4) or state a valid implied false certification

claim."  (Pl. Opp'n 19–20.)

Notwithstanding that "a complaint can satisfy Rule 9(b)'s particularity requirement by

making plausible allegations creating a strong inference that specific false claims were submitted

to the government and that the information that would permit further identification of those

claims is peculiarly within the opposing party's knowledge," *Chorches*, 865 F.3d at 86, "the

Second Circuit has yet to provide clear guidance as to what information plaintiffs must provide

in order to plead false claims with particularity," *United States ex rel. O'Toole v. Cmty. Living

Corp.*, No. 17-CV-4007, 2020 WL 2512099, at *9 (S.D.N.Y. May 14, 2020).

> [S]ister courts have required: 'Details concerning the dates of the
> claims, the content of the forms or bills submitted, their
> identification numbers, the amount of money charged to the
> government, the particular goods or services for which the
> government was billed, the individuals involved in the billing, and
> the length of time between the alleged fraudulent practices and the
> submission of claims based on those practices . . . . These details do
> not constitute a checklist of mandatory requirements that must be
> satisfied by each allegation included in a complaint.' However,  . . .
> some[] of this information for at least some of the claims must be
> pleaded in order to satisfy Rule 9(b).

*Id.* at *9 (quoting *Bilotta*, 50 F. Supp. 3d at 510 (alteration in original)).

"General assertions about an alleged scheme, unsupported by examples and details,

typically are insufficient to satisfy Rule 9(b)."  *United States v. Novartis Pharm. Corp.*, No. 13-

CV-3700, 2020 WL 1436706, at *3 (S.D.N.Y. Mar. 24, 2020) (citing *United States ex rel. Smith

v. N.Y. Presbyterian Hosp.*, No. 06-CV-4056, 2007 WL 2142312, at * 6 & n.43 (S.D.N.Y. July

18, 2017)).  However, "'in setting forth a complex and far-reaching scheme, the [plaintiff] need

allege only representative samples of fraudulent conduct to satisfy Rule 9(b).'"  *Id.* at *3

(quoting *Bilotta*, 50 F. Supp. 497 at 517–18).

Relator cured the defects described in the March 2017 Decision by not only alleging relevant facts in the FAC, but by providing evidence of claims submitted by Defendants and paid by the DOH for three representative months within the period of operation of the alleged scheme. *See Catholic Health I*, 2017 WL 1239589, at *26 (explaining that in the TAC, Relator provided "allegations, affirmations and evidence related to the [m]isappropriation [c]laims set[ting] forth numerous details regarding the allegedly fraudulent diversion and misappropriation scheme but fail[ed] to identify any reimbursement claim that Defendants' submitted in furtherance of the scheme"); (FAC ¶ 91; First Spreadsheet of Paid Claims, annexed to FAC as Ex. 3, Docket Entry No. 47-4; Second Spreadsheet of Paid Claims, annexed to FAC as Ex. 4, Docket Entry No. 47-5; Third Spreadsheet of Paid Claims, annexed to FAC as Ex. 5, Docket Entry No. 47-6).  In addition, Relator provided new allegations and evidence regarding the alleged fabrication of inhalation therapy costs as another example of how Defendants used the funds for non-Medicare and non-Medicaid services.  (FAC ¶¶ 65–84.)

Defendants cite to *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432 (3d Cir. 2004), to argue that "when a claimant offers goods or services that are paid for with government benefit dollars and other sources of income, a *qui tam* plaintiff must show that accused conduct actually involved government funds to be actionable" and if "the conduct cannot be tied to government funds, no claim will lie."  (Defs. Reply Mem. in Supp. of Defs. Mot. ("Defs. Reply") 4, Docket Entry No. 63.)  However, Relator correctly distinguishes *Quinn* based on the summary judgment procedural posture in that case.  (*See* Pl. Opp'n 20 n.2.)  In *Quinn*, the relator brought a *qui tam* action alleging that a Medicaid-provider pharmacy submitted false claims by, *inter alia*, returning credits to Medicaid for medications that had been returned by customers "for less than 100% of the amount initially claimed for returned medications."  382 F.3d at 436.  In holding

28

that the district court properly found that the relator "ha[d] not pointed to sales inconsistent with

the certification," the Third Circuit noted that:

> In the present case, however, [the relator] cannot demonstrate either
> that an improperly recycled medication was paid for by Medicaid or
> that it was paid for by one of the other sources of payment for the
> medications that [the defendant Medicaid-provider pharmacy]
> dispensed.   Although we might hypothesize that 60% of the
> improperly recycled medications were paid for by Medicaid, it is
> impossible to rule out the chance that they were paid for by non-
> Medicaid sources . . . . As with our discussion on successive claims,
> [the relator] did not provide the District Court with a single instance
> where [the defendant Medicaid-provider pharmacy] submitted a
> claim for payment for medications recycled in violation of [the New
> Jersey Administrative Code, Board of Pharmacy Regulations].   For
> that reason, [the relator's] false certification claim fails.

*Id.* at 443 (citation omitted).

Although Relator's claims may ultimately fail at the summary judgment stage if, after

discovery, he cannot provide proof of a single instance in which Defendants submitted a claim

for reimbursement within the period of operation of the alleged scheme, Relator has produced

evidence of representative claims submitted by Defendants to the DOH within the relevant

period, which satisfies Relator's burden at the motion to dismiss stage.  *State v. MedImmune,*

*Inc.*, 342 F. Supp. 3d 544, 555 (S.D.N.Y. 2018) ("Additionally, the Complaint-in-Intervention

satisfies Rule 9(b) because 'where numerous false claims are involved, the plaintiff may satisfy

Rule 9(b) by providing sufficient identifying information about those false claims, or by

providing example false claims that enable the defendant to identify similar claims.'"); *United*

*States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 292 (E.D.N.Y. 2016) ("[The]

[r]elators have satisfied Rule 9(b) by alleging 'a complex and far-reaching scheme' and

providing 'representative samples' of [the] [d]efendants' misconduct as part of that scheme.");

*United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 481–82 (S.D.N.Y. 2013) (noting that

"courts have held that in setting forth a 'complex and far-reaching scheme'" a relator need allege only "'representative samples' of fraudulent conduct to satisfy Rule 9(b)").

Because Relator has cured the previously identified defects in the governing pleading, the Court finds that the FAC and the attached submissions sufficiently state implied-false-certification misappropriation claims.

### c. Defendants' motion for summary judgment lacks evidentiary support and is premature

Defendants move for summary judgment as to the misappropriation claims on the grounds that all of the specific cost categories that Relator challenges as inflated or fabricated were in fact legitimate.[14]  (Defs. Mem. 15.)  In support, Defendants argue that, while Relator identifies the Cost Categories as evidence of "siphoning," the Cost Categories are legitimate charges, "neither inflated nor fabricated," and, as a result, Relator has "failed to demonstrate that those funds were used for an illegitimate purpose" and therefore they cannot support an FCA claim.  (*Id.* at 15, 16.)

In further support of their argument that the Cost Categories are not inflated or fabricated, Defendants assert that the alleged "'inflated' or 'fabricated' costs occurred after the base year used to set the Nursing Home's per diem rates, and *years before* it received the Remediation Payment in May 2011."  (*Id.* at 16.)  Therefore, "there is no allegation in the FAC that any of the costs targeted by . . . [R]elator were presented to the government for payment" and "none of the costs targeted by . . . [R]elator had any bearing on either the per diem payment rate effective from 2007 to 2011, or the amount of the Remediation payment."  (*Id.*)  Accordingly, Defendants

---

[14]  The cost categories identified by Relator are workers' compensation reserve, (Defs. Mem. 17), laboratory, radiology, and pharmacy costs, (*id.* at 18–19), natural gas allocations, (*id.* at 21–22), salary expenses, (*id.* at 19–20), and inhalation therapy, (*id.* at 20–21) (the "Cost Categories").

argue, Relator fails to demonstrate a genuine dispute of fact as to his allegations regarding the Cost Categories.

Relator argues that "Defendants are forced to concede that [he] has alleged an abundance of evidence in the FAC that [the Nursing Home] submitted claims to Medicare and Medicaid during the period that Defendants are alleged to have violated 42 U.S.C. § 1320a-7b(a)(4)," and that "[c]haracterizing those claims as 'authentic and proper' . . . is a blatant falsehood." (Pl. Opp'n 15.) Relator also argues that because of the procedural stage of the proceedings, there is "no legal basis" for the Court to credit Defendants' "self-serving claims that [they] did not massively overcharge the [N]ursing [H]ome for medical services and . . . to reject . . . Relator's sworn testimony," (*id.* at 10), and Defendants' "empty denials" of wrongdoing are not "sufficient to supplant Relator's entitlement to discovery in support of his claims," (*id.* at 11–12). As to his personal knowledge, Relator argues that he "possesses first-hand knowledge of the massive overcharges and fictitious costs experienced by the [N]ursing [H]ome" and personally witnessed the diversion of federal health care program benefits toward other corporate purposes unrelated to the care of the [N]ursing [H]ome residents for whom those benefits were intended and who he, as the [the Nursing Home] Administrator was responsible for managing." (*Id.* at 11.) Relator also argues that "Defendants do not deny some of the categories of overcharges testified to by . . . Relator." (*Id.* at 12.)

In response, Defendants argue that "[u]nder Rule 56(d), [R]elator bears the burden of demonstrating why determination of the summary judgment motion should be postponed," (Defs. Reply 9), and that "[g]iven his apparent inability to articulate what discovery he needs, [R]elator is obligated to demonstrate a genuine issue of material fact to avoid summary judgment," (*id.* at 10).

"'Since summary judgment is a "drastic device," it should not be granted when there are major factual contentions in dispute.  This is particularly so when, as here, one party has yet to exercise its opportunities for pretrial discovery.'"  *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018) (quoting *Nat'l Life Ins. Co. v. Solomon*, 529 F.2d 59, 61 (2d Cir. 1975)); *Hellstrom v. United States Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."); *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 139 n.21 (S.D.N.Y. 2015) (noting that "courts disfavor summary judgment motions made prior to the completion of discovery").  A district court should only grant summary judgment "'if *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.'"  *Hellstrom*, 201 F.3d at 97 (quoting *Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996)); *Berger*, 87 F.3d at 65 (concluding "'the grant of summary judgment here was premature'" because the court could not "conclude that the parties had already had 'a fully adequate opportunity for discovery' when the district court granted summary judgment" (quoting *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995))); *see also Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995) (reversing summary judgment entered before any discovery had taken place); *Trebor Sportswear Co., Inc., v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) (holding that the non-moving party "should not be 'railroaded' into his offer of proof in opposition to summary judgment" and "must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment" (first citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); and then citing *Anderson*, 477 U.S. at 250 n.5)).

"Rule 56(d) of the Federal Rules of Civil Procedure authorizes district courts to defer ruling on a motion for summary judgment — or to deny the motion altogether — '[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" *Ass'n of Car Wash Owners Inc.*, 911 F.3d at 83–84 (quoting Fed. R. Civ. P. 56(d)(1)); *see also Sura v. Zimmer, Inc.*, 768 F. App'x 58, 59 (2d Cir. 2019) ("Rule 56(d) permits the district court to defer summary judgment or permit additional discovery when the nonmovant files an affidavit or declaration stating that, 'for specified reasons, it cannot present facts essential to justify its opposition.'" (quoting Fed. R. Civ. P. 56(d))); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303–04 (2d Cir. 2003). "Rule 56 also authorizes district courts to 'allow time to obtain affidavits or declarations or to take discovery' or to 'issue any other appropriate order.'" *Ass'n of Car Wash Owners Inc.*, 911 F.3d at 83–84 (quoting Fed. R. Civ. P. 56(d)(2)–(3)). The Second Circuit has "held that when a party advises the court that it needs discovery to defend against a motion for summary judgment, 'the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion.'" *Halebian v. Berv*, 548 F. App'x 641, 646 (2d Cir. 2013) (first citing Fed. R. Civ. P. 56(d); and then quoting *Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 386 (2d Cir. 2001)).

In his supporting declaration, Relator indicates discovery is necessary to determine the full extent of the alleged fraudulent scheme to misappropriate Medicare and Medicaid funding. First, Relator asserts that Defendants commissioned an actuarial firm to come up with a new "formula of misleading Unit/Facility percentages and manipulated statistics" in order to make an upward adjustment of the Nursing Home's Workers' Compensation Reserves to create a pre-text for the "1.8 million dollar profit" the Nursing Home had otherwise generated through falsely

inflated charges, and also conspired to fraudulently claim "$1.655 million" in losses, but that "[o]nly through discovery can [he] identify and prove this total of $3,455 MILLION . . . of fraudulent diversions of Medicare and Medicaid Funding from the Nursing Home [r]esidents." (Pl. Decl. ¶ 42.)  Relator also asserts that Defendants "routinely and secretly overcharged and inflated millions of dollars' worth of inappropriate charges for required services and care of the elderly residents in their scheme to illegally divert Medicaid funding," but that "only through discovery will we know the extent of this actual diversion and conspiracy."  (*Id.* ¶¶ 64–65.) Although these two paragraphs in Relator's declaration do indicate that he believes additional discovery is necessary as to these two allegations, Relator's general assertion that he cannot identify the full extent of Defendants' alleged misappropriation without discovery does not provide any "specified reasons" for the need for discovery in order to defend against Defendants' motion for summary judgment.

However, even assuming Relator has failed to adequately articulate a request for additional discovery under Rule 56(d), the Court nevertheless finds the summary judgment motion premature because at the time Defendants filed their motion, the parties had not yet engaged in any discovery.  *Marom v. Pierot*, No. 18-CV-12094, 2020 WL 1862974, at *15 (S.D.N.Y. Jan. 16, 2020) (finding the plaintiff's summary judgment motion "premature" and recommending that the district court deny the motion without prejudice "in light of the fact that no discovery ha[d] been conducted" and because "*no discovery* has been conducted to date," notwithstanding that the defendants "failed to provide an affidavit pursuant to Fed R. Civ. P. 56(f), or state with specificity the evidence they need[ed] to oppose summary judgment"), *report and recommendation adopted*, No. 18-CV-12094, 2020 WL 1444938 (S.D.N.Y. Mar. 25, 2020); *see also Syrup Assocs., Inc. v. Coastal Dev. Mass., LLC*, No. 18-CV-8133, 2019 WL 2121878, at

*4 (S.D.N.Y. May 15, 2019) (denying motion for summary judgment and finding that the court could not conclude on the basis of the plaintiff's affidavit alone that there could be no genuine dispute of material fact where the defendants "had no opportunity to obtain evidence that could rebut [the plaintiff's] representation").

In arguing that Relator has failed to properly request discovery, Defendants cite to cases in which, after some initial discovery had taken place, the court considered whether to grant a request for additional discovery made pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  *See Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) (analyzing whether the district court erred in denying request for additional discovery on jurisdictional issue); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1139 (2d Cir. 1994) (affirming district court's denial of a request for additional discovery under Rule 56(f)).  However, those cases are distinguishable because, unlike in those cases, the parties here had not yet engaged in any discovery at the time Defendants filed their motion.[15]  *See, e.g.*, *Crystalline H2O, Inc. v. Orminski*, 105 F. Supp. 2d 3, 7–8 (N.D.N.Y. 2000) (comparing cases where the nonmoving party is requesting further discovery with those where the party had no opportunity to take discovery).

Accordingly, the Court denies Defendants' motion for partial summary judgment as premature.  *See Stora v. Don't Ask Why Outfitters*, No. 15-CV-7106, 2017 WL 1034637, at *2 (E.D.N.Y. Mar. 17, 2017) (denying motions for summary judgment on the grounds they were "premature because the parties have yet to begin discovery in these cases").

---

[15]  The parties have since engaged in ongoing discovery, however, none of the information either party learned through discovery is before the Court in deciding this motion.

## III.  Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss and denies the

motion for partial summary judgment without prejudice.

Dated: July 13, 2020
        Brooklyn, New York

                                        SO ORDERED:


                                        _____s/ MKB_____
                                        MARGO K. BRODIE
                                        United States District Judge