UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNITED STATES OF AMERICA and NEW YORK
STATE *ex rel.* MICHAEL QUARTARARO,

                            Plaintiffs,

                    v.

CATHOLIC HEALTH SYSTEM OF LONG
ISLAND INC. *d/b/a/* CATHOLIC HEALTH
SERVICES OF LONG ISLAND, ST. CATHERINE
OF SIENA MEDICAL CENTER, and ST.
CATHERINE OF SIENA NURSING HOME,

                            Defendants.

------------------------------------------------------------

**MEMORANDUM & ORDER**
12-CV-4425 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff-Relator Michael Quartararo ("Relator"), a former nursing home administrator,

commenced the above-captioned *qui tam* action on September 5, 2012.  (Compl., Docket Entry

No. 1.)  Relator asserts claims against Defendants Catholic Health System of Long Island, Inc.,

doing business as Catholic Health Services of Long Island ("CHS"), St. Catherine of Siena

Medical Center (the "Medical Center"), and St. Catherine of Siena Nursing Home (the "Nursing

Home") under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), and the New

York False Claims Act, N.Y. Finance Law § 187 *et seq.* (the "NYFCA")*.  (See* Fourth Am.

Compl. ("FAC"), Docket Entry No. 47.)  On August 10, 2018, the Court denied Defendants'

motion to dismiss the FAC and motion for partial summary judgment, (*see* Mem. & Order dated

Aug. 10, 2018, Docket Entry No. 75), and by Order dated March 31, 2019, the Court agreed to

reconsider Defendants' underlying motion to dismiss the FAC and motion for partial summary

judgment on the merits, (Order dated Mar. 31, 2019).  On reconsideration, the Court denied

Defendants' motion to dismiss and denied the motion for summary judgment,[1] and on July 24,

2020, Defendants filed a further motion to reconsider and certify the issues for appellate review,

pursuant to 28 U.S.C. § 1292(b).[2]  Relator opposes the motion.  (Pl.'s Opp'n to Defs.' Mot. for

Further Recon. ("Pl.'s Opp'n"), Docket Entry No. 93.)

      For the reasons stated below, the Court grants certification to the Second Circuit for

interlocutory appeal.

**I.**    **Background**

      The Court assumes familiarity with the facts as detailed in its prior July 13, 2020

Memorandum and Order (the "July 2020 Decision"), August 10, 2018 Memorandum and Order

(the "August 2018 Decision"), and March 31, 2017 Memorandum and Order (the "March 2017

Decision") and provides a summary of only the pertinent facts.[3]  *See United States ex. rel.*

*Quartararo v. Catholic Health Sys. of Long Island Inc. ("Catholic Health III")*, No. 12-CV-4425,

2020 WL 3960514, at *8 (E.D.N.Y. July 13, 2020); *United States v. Catholic Health Sys. of Long*

*Island Inc. ("Catholic Health II")*, No. 12-CV-4425, 2018 WL 3825906, at *1–4 (E.D.N.Y. Aug.

10, 2018); *United States v. Catholic Health Sys. of Long Island Inc. ("Catholic Health I")*, No.

12-CV-4425, 2017 WL 1239589, at *1–6 (E.D.N.Y. Mar. 31, 2017).

---

[1]  (Mem. & Order dated July 13, 2020, Docket Entry No. 90); *United States ex rel. Quartararo v. Catholic Health Sys. of Long Island Inc. ("Catholic Health III")*, No. 12-CV-4425, 2020 WL 3960514, at *8 (E.D.N.Y. July 13, 2020).

[2]  (Defs.' Mem. in Supp. of Mot. for Further Recon. ("Defs.' Mem."), Docket Entry No. 92-1; Defs.' Reply in Supp. of Mot. for Further Recon. ("Defs.' Reply."), Docket Entry No. 94.)

[3]  For the purposes of deciding Defendants' motion to dismiss, the Court assumes the truth of the factual allegations in the FAC.

### a.   Overview of Medicare and Medicaid reimbursement programs

Medicare and Medicaid are taxpayer-funded health insurance programs offered to individuals based on age or disability.  (FAC ¶¶ 20, 22.)  Medicare is provided by the federal government and Medicaid is provided by federal, state, and local governments and administered through the states.  (*Id.*)  The United States Department of Health and Human Services, through its Centers for Medicare and Medicaid Services, runs both programs in conjunction with the state agencies that oversee Medicaid.  (*Id.*)  Individuals may be covered under Medicare, Medicaid, or both.  (*Id.*)  New York State maintains a Medicaid program for its citizens.  (*Id.* ¶ 23.)  If health care providers[4] choose to provide state-based Medicaid services, they must enroll with the New York State Department of Health (the "DOH"), which requires health care providers to certify that they will comply with DOH rules and regulations.[5]  (*Id.* ¶ 24.)  Health care providers that treat patients covered by Medicare or Medicaid may submit claims for reimbursement of the costs expended to treat the covered patients.  (*Id.* ¶¶ 21, 38.)  Reimbursement claims are submitted to the DOH on CMS-1450/UB-04 Forms.[6]  (*Id.* ¶ 21.)  The reimbursement claim forms contain general compliance certifications specifying that false, misleading, incomplete or inaccurate claims may subject the claimant to civil and criminal penalties.  (*Id.* ¶¶ 21, 24–25.)

---

[4]  Under Medicare and Medicaid, health care providers are "patient care institutions such as hospitals, critical access hospitals, hospices, nursing homes, and home health agencies."  Ctrs. for Medicaid and Medicare Servs., Publication 100-07, State Operations Manual § 1000A (Oct. 3, 2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c01.pdf.

[5]  *See* New York State Medicaid Enrollment Form, at 8, https://www.emedny.org/info/ProviderEnrollment/ProviderMaintForms/436601_INST_FORM_InstRateBasedEnrlForm.pdf (last visited Jan. 22, 2021).

[6]  CMS-1450/UB-04 Form, https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-1450 (last visited Jan. 22, 2021).

The reimbursement claim forms also require a health care provider to include its reimbursement rate. (*Id.*) In states that provide Medicaid coverage, the reimbursement rate for Medicaid and Medicare claims is calculated and assigned by the state agency that oversees the Medicaid program, (*id.* ¶ 26); in New York State, that agency is the DOH, (*id.* ¶ 38).

As health care providers, nursing homes are reimbursed for every day they provide care to a Medicaid or Medicare beneficiary.[7] (*Id.* ¶ 26 (first citing N.Y. Pub. Health Law § 2808; and then citing N.Y. Codes R. & Regs. § 86-2 *et seq.*).) The reimbursement rates are calculated by a complex formula that considers four components related to a nursing home's costs and expenditures: (1) direct costs; (2) indirect costs; (3) non-comparable costs; and (4) capital expenditures. (*Id.* ¶ 27 (citing 10 N.Y. Codes R. & Regs. 86-2.10).)

### b.   Factual background

CHS is a healthcare consortium that operates hospitals and nursing homes. (*Id.* ¶ 8.) In or about November of 1999, CHS purchased the Nursing Home and the Medical Center from Episcopal Health Services, who had operated the facilities under the names Bishop Jonathan G. Sherman Episcopal Nursing Home ("Episcopal Nursing Home") and St. John's Episcopal Hospital. (*Id.* ¶ 39.) CHS officially assumed ownership and control of Episcopal Nursing Home in 2000. (*Id.* ¶ 41.)

In April of 2007, Relator, who had been working for CHS for about thirty-eight years, was elevated to the position of Licensed Administrator of the Nursing Home. (*Id.* ¶ 7.) As the

---

[7] While the Court focuses on how the reimbursement procedures operate with respect to nursing homes, the reimbursement procedures are similar for any health care provider seeking Medicaid and Medicare reimbursement in New York State. *See, e.g.*, 10 N.Y. Codes R. & Regs. § 86-1 *et seq.* (governing reimbursement for "medical facilities"); *id.* § 86-3 *et seq.* (governing reimbursement for "health maintenance organizations"); *id.* § 86-4 *et seq.* (governing reimbursement for "free-standing ambulatory care facilities"); *id.* § 86-5 *et seq.* (governing reimbursement for "long-term health care programs").

Licensed Administrator, Relator was responsible for the general administration of the Nursing Home, which included "managing, supervising, and coordinating" the various departments at the Nursing Home, as well as "maintaining and developing legally compliant operating protocols, developing and managing budgets, developing financial policies[,] . . . monitoring financial performance . . . , supervising all human resource issues and reporting to the [N]ursing [H]ome's governing body as needed."  (*Id.*)

> ### i.   The DOH retroactively re-based the reimbursement rates in 2011 and the Nursing Home received a mitigation payment as a result

In June of 2011, the DOH retroactively changed the base year used to calculate Medicaid reimbursement rates for health care providers from 1983 to 2002 for the reimbursement period covering 2009 through 2011.  (*Id.* ¶¶ 35, 51.)  The re-basing caused the Nursing Home's reimbursement rate to drop from "approximately $270 per Medicaid patient day to . . . below $250 per Medicaid [patient] day."  (*Id.* ¶ 54.)  The DOH sought to minimize the impact of the re-basing by providing one-time mitigation payments to affected health care providers that could be used to off-set any potential losses caused by the retroactive application of the lower reimbursement rates.  (*Id.* ¶ 59.)  Under this program, the Nursing Home received a $4.5 million remediation payment.[8]  (*Id.*)  Relator alleges that CHS subsequently "misappropriated" approximately $1.7 million of the mitigation payment by charging the Nursing Home for "workers['] compensation" and "excess Medicaid" costs.  (*Id.* ¶ 61.)

---

[8]  The Nursing Home's accounting firm had anticipated that the re-basing may occur and that a mitigation payment would be issued as a result of the re-basing.  (FAC ¶¶ 50, 62.) Therefore, the accounting firm estimated that because the mitigation payment would be based on the difference between the Episcopal Nursing Home rate used by the Nursing Home and the newly issued rate, the Nursing Home may have had to repay approximately $3 million.

### ii. CHS's alleged use of the Nursing Home's Medicaid and Medicare funds for non-Medicaid and non-Medicare purposes

During the course of Relator's employment as the Nursing Home's Licensed Administrator, Relator also discovered that CHS had been improperly diverting the Nursing Home's Medicaid funds. (*Id.* ¶¶ 65, 68.) Starting in 2007, CHS and the Medical Center began charging the Nursing Home for "medical, administrative, utility and other costs" that the Nursing Home had not incurred or which were overinflated. (*Id.* ¶ 66.) Relator contends that these false payments include charges for a non-existent inhalation therapy department, (*id.* ¶ 79), and that CHS took the false payments from the Nursing Home's Medicaid and Medicare funds for the Nursing Home's patients, (*id.* ¶¶ 67, 75–77).

In 2008, Relator realized that the Medical Center had overcharged the Nursing Home for laboratory costs and brought it to the attention of John Haight, a CHS executive. (*Id.* ¶¶ 54, 67.) Haight informed Relator that the Medical Center charged the Nursing Home a fixed yearly rate, regardless of the actual laboratory charges incurred. (*Id.* ¶ 67.) Relator also discovered that the Medical Center's laboratory rates for the Nursing Home's residents were much greater than the laboratory rates charged for the residents in CHS's other nursing homes and much greater than the then-current market rate for such services. (*Id.*)

In late 2009 and late 2011, CHS took $2 million and $1.1 million, respectively, from the Nursing Home's budget to cover "purported workers['] compensation costs," but Relator alleges that the workers' compensation cases originating from the Nursing Home failed to support such large deductions. (*Id.* ¶¶ 68–69.) When Relator questioned the deductions, he was told that they were not only for the workers' compensation costs incurred in those years, but also to cover workers' compensation costs incurred by the Nursing Home in 2005. (*Id.* ¶ 69.) In two subsequent emails he received, Relator learned that the Nursing Home's workers' compensation

6

costs were disproportionately higher than those of CHS's other nursing homes.  (*Id.* ¶¶ 68–70.)
When Relator raised the issue of the Nursing Home's workers' compensation costs with officials
of CHS and the Medical Center, they ignored him.  (*Id.* ¶ 68.)

In March of 2012, Relator attended a meeting with other CHS executives and officials,
where he raised his concerns regarding the inflated laboratory costs the Medical Center had
charged and was continuing to charge the Nursing Home.  (*Id.* ¶ 72.)  In response, one executive
laughed and told Relator that the Medical Center was "ripping [the Nursing Home] off."  (*Id.*)  At
a follow-up meeting with Haight and other CHS executives, Relator reasserted his concerns
pertaining to the Medical Center's rates for the Nursing Home's residents, and was told that the
rates would remain the same for the current fiscal year but "could be addressed in next year's
budget."  (*Id.* ¶ 73.)  Relator subsequently received an email confirming CHS's position.  (*Id.*)
Because Haight and other CHS executives refused to address the rate and charging issues,
Relator raised his concerns to a CHS compliance officer.  (*Id.* ¶ 74.)  Although the compliance
officer said that she would address Relator's concerns, she never took any action.  (*Id.*)

Shortly thereafter, Relator discovered that the Nursing Home was paying a portion of the
salary for various staff members at the Medical Center and other CHS nursing homes who spent
little to no time at the Nursing Home and had little to no involvement in the Nursing Home's
operations.  (*Id.* ¶ 80.)  Haight and others acknowledged that the salary charges were improper,
but did not take any corrective action.  (*Id.*)  When Relator raised the issue a second time, Haight
responded that he was free to charge the Nursing Home for the salaries of any CHS staff
regardless of how much of their work pertained to the Nursing Home.  (*Id.* ¶ 81.)

Based on Relator's knowledge of the foregoing activities, he commenced the instant
action.  (*Id.* at 1–2.)

### c.   Procedural history

Relator commenced the action on September 5, 2012, and subsequently amended the complaint three times prior to filing the FAC.[9]  (*Id.* ¶¶ 1–6.)  On June 15, 2016, Defendants moved to dismiss the TAC for lack of subject matter jurisdiction and failure to state a claim, and for partial summary judgment, pursuant to Rules 12(b)(1), 12(b)(6), and 56, respectively, of the Federal Rules of Civil Procedure.  (Defs.' First Mot. to Dismiss & for Partial Summ. J., Docket Entry No. 29.)

In the March 2017 Decision, the Court dismissed all claims with prejudice except for the implied-false-certification misappropriation claims and granted Relator leave to amend the TAC to identify and provide evidence of Defendants' requests for reimbursement between 2007 and 2011, the period of operation of the alleged scheme.[10]  *See Catholic Health I*, 2017 WL 1239589, at *27.  On April 14, 2017, Relator moved for reconsideration of the dismissal of the false filing and false retention claims.  (Pl.'s 2017 Mot. for Recons., Docket Entry No. 41.)  On September 12, 2017, the Court denied Relator's motion for reconsideration on the record.  (Min. Order dated Sept. 12, 2017.)  Defendants did not move for reconsideration.

---

[9]  While the United States and the State of New York investigated the allegations to determine whether to intervene, Relator filed an Amended Complaint on September 10, 2012, (Am. Compl., Docket Entry No. 3), a Second Amended Complaint on August 2, 2013, (Second Am. Compl., Docket Entry No. 6), and a Third Amended Complaint ("TAC") with attachments on December 21, 2015, (TAC, Docket Entry Nos. 15, 16).  The United States and the New York State of New York declined to intervene on January 27, 2016, (Notice of Election to Decline to Intervene, Docket Entry Nos. 18, 19), and the Court unsealed the TAC the same day, (Order dated Jan. 27, 2016, Docket Entry No. 20); *see also* 31 U.S.C. §§ 3730(b)–(c) (2006) (requiring *qui tam* actions to be sealed until the government parties decide or decline to intervene).

[10]  The Court based its decision on Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.  *See United States v. Catholic Health Sys. of Long Island Inc. ("Catholic Health I")*, No. 12-CV-4425, 2017 WL 1239589, at *27 (E.D.N.Y. Mar. 31, 2017).

On May 25, 2017, Relator filed the FAC.  (FAC.)  On November 13, 2017, Defendants moved to dismiss the FAC and for partial summary judgment.  (Defs.' Mot. to Dismiss FAC & for Partial Summ. J, Docket Entry No. 61.)  Relator opposed the motion,[11] and in the August 2018 Decision, the Court denied Defendants' motion, *Catholic Health II*, 2018 WL 3825906, at *6.

On August 24, 2018, Defendants filed a motion for reconsideration of the August 2018 Decision, (Defs.' First Mot. for Recons., Docket Entry No. 76-1), which Relator opposed, (Pl.'s Opp'n to Defs.' First Mot. for Recons., Docket Entry No. 78).  By Order dated March 31, 2019, the Court granted Defendants' motion for reconsideration and decided that it would reconsider Defendants' underlying motion to dismiss the FAC and for partial summary judgment on the merits.  (Order dated Mar. 31, 2019.)  In the July 2020 Decision, the Court denied Defendants' motion to dismiss and the motion for partial summary judgment and found that "Relator ha[d] articulated a viable implied-false-certification argument based on his allegations that Defendants violated section 1320a-7b(a) during a time they were submitting false Medicaid and Medicare reimbursement claims."  *Catholic Health III*, 2020 WL 3960514, at *8.  The Court concluded that "Relator is not precluded from alleging a viable theory of conversion pursuant to section 1320a-7b(a)(4) based on Defendants' alleged misappropriation of Medicaid and Medicare funding for inappropriate uses."  *Id.* at *11.

---

[11]  (Pl.'s Opp'n to Defs.' Mot. to Dismiss FAC, Docket Entry No. 62.)  In support of his opposition brief, Relator filed a thirty-nine-page sworn declaration responding to the DeCerbo Declaration.  (Pl.'s Decl. in Supp. of Pl. Opp'n to Defs.' Mot. to Dismiss FAC ("Pl.'s Decl."), Docket Entry No. 62-11.)  In addition, Relator asserts in his supporting declaration that he will be able to identify the full "extent of . . . diversion and conspiracy" "only through discovery." (*Id.* ¶ 65.)

On July 24, 2020, Defendants filed a motion for further consideration and amendment of the Court's July 2020 Decision, requesting that the Court certify the issues to the Circuit for appellate review pursuant to 28 U.S.C. § 1292(b), (Defs.' Mem.), and Relator opposed, (Pl.'s Opp'n).

**II.  Discussion**

    **a.  Standard of review**

Pursuant to 28 U.S.C. § 1292(b), a district court may certify an interlocutory appeal of an order if the court determines that (1) "such order involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion" and (3) "that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  "'Inherent in the requirements of section 1292(b) is that the issue' in the certified order 'be ripe for judicial determination,' because the 'purpose of section 1292(b) is not to offer advisory opinions rendered on hypotheses which [evaporate] in the light of full factual development.'"  *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 508 (2d Cir. 2020) (alteration in original) (quoting *Oneida Indian Nation of New York State v. County of Oneida*, 622 F.2d 624, 628 (2d Cir. 1980)).  The party seeking interlocutory appeal has the burden to establish all three section 1292(b) factors.  *See In re Great Atl. & Pac. Tea Co., Inc.*, 615 B.R. 717, 722 (S.D.N.Y. 2020) ("A court certifying a decision for interlocutory appeal must be of the opinion that all three of these statutory conditions are met.").  Because "[i]nterlocutory appeals are 'presumptively disfavored,'" *McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*, 293 F. Supp. 3d 394, 399 (S.D.N.Y. 2018) (quoting *Youngers v. Virtus Inv. Partners Inc.*, 228 F. Supp. 3d 295, 298 (S.D.N.Y. 2017)), district courts "have broad discretion to deny certification even where the statutory criteria are met," *In re Liddle & Robinson, L.L.P.*, No. 20-CV-865, 2020 WL 4194542, at *4 (S.D.N.Y. July 21, 2020) (quoting *SPL Shipping Ltd. v. Gujarat Cheminex*

*Ltd.*, No. 06-CV-15375, 2007 WL 1119753, at *1 (S.D.N.Y. Apr. 12, 2007)). *See Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996) (noting that "[i]t is a basic tenet of federal law to delay appellate review until a final judgment has been entered" and that 28 U.S.C. § 1292(b) "is a rare exception to the final judgment rule that generally prohibits piecemeal appeals"); *Adar Bays, LLC v. Aim Expl., Inc.*, 310 F. Supp. 3d 454, 456 (S.D.N.Y. 2018) ("Certification of an interlocutory appeal 'is not intended as a vehicle to provide early review of difficult rulings in hard cases.'" (quoting *In re Levine*, No. 94-CV-44257, 2004 WL 764709, at *2 (S.D.N.Y. Apr. 9, 2004))).

### b.   Defendants' request is timely and appropriate

Defendants argue that the request for certification of interlocutory appeal is timely. (Defs.' Reply 1.)  In support, Defendants assert that Court agreed to reconsider its prior ruling and that because "[r]econsideration motions are subject to a stricter deadline than certification motions[,] if Defendants' reconsideration motion was adjudged to be timely, then by definition its companion request for certification was timely as well." (*Id.*)  Defendants also argue that the request for certification is appropriate because the "pending motion does not . . . seek different relief from what was previously sought, or make new arguments that were not made before," and because "the Court did not grant dismissal, Defendants' request for certification in the alternative remains animate." (*Id.* at 2–3.)

Relator argues that Defendants' motion is untimely because in the March 2017 Decision, the Court decided that "42 U.S.C. § 1320a-7b(a)(4) may support . . . a viable implied false certification claim under the FCA" and "[t]he time to seek of certification of [the] narrow legal question for appeal was . . . in March [of] 2017, or shortly thereafter, and not now." (Pl.'s Opp'n 3–4.)  Relator also argues that Defendants' request is inappropriate because "[b]y presenting their request for certification of an appeal as being 'in the alternative' to the Court granting

reconsideration of its prior ruling, Defendants arguably waived their right to seek certification of an appeal at this time." (*Id.* at 4.)

Rule 5(a) of the Federal Rules of Appellate Procedure does not specify a time limit for seeking certification of interlocutory appeal under section 1292(b). However, "reasonable simultaneity of the certification with the order certified is required." *Kaye v. Amicus Mediation & Arb. Grp., Inc.*, No. 13-CV-347, 2014 WL 12755000, at *1 (D. Conn. Oct. 29, 2014) (quoting *Weir v. Propst*, 915 F.2d 283, 286 (7th Cir. 1990) (denying request for certification of appealability due to nearly five-month delay))); *see also In re Bank of Am. Corp. Sec., Derivative, & Empl. Ret. Income Sec. Act (ERISA) Litig.*, No. 09-MD-2058, 2012 WL 1308993, at *1 (S.D.N.Y. Apr. 16, 2012) (concluding that the nearly six-month delay in requesting certification of appealability weighed against granting certification under section 1292(b)); *Kogut v. County of Nassau*, No. 06-CV-6695, 2010 WL 844745, at *2 (E.D.N.Y. Mar. 8, 2010) (noting that the defendant's request for certification of appealability filed two months after a court's reconsideration decision was "likely untimely").

Contrary to Relator's assertion, courts routinely address motions for reconsideration and interlocutory appeal in the alternative. *See Culwick v. Wood*, No. 15-CV-5868, 2019 WL 9663013, at *8 (E.D.N.Y. Aug. 14, 2019) (addressing both request for reconsideration and alternative request for interlocutory appeal); *Harris v. TD Ameritrade Inc.*, No. 17-CV-6033, 2019 WL 10945228, at *2 (S.D.N.Y. July 9, 2019) (same); *United States v. McKesson Corp.*, No. 12-CV-6440, 2019 WL 2717104, at *2 (E.D.N.Y. June 28, 2019); *Smith v. New York State*, No. 17-CV-558, 2019 WL 2097816, at *3 (N.D.N.Y. May 14, 2019) (same). Although Defendants alternatively sought interlocutory appeal when they filed the motion for reconsideration, (Defs.' First Mot. for Recons. 3), the Court failed to address Defendants' request

in the July 2020 Decision, *Catholic Health III.*, 2020 WL 3960514, at *8.  Defendants therefore

properly request a decision on whether the issue can be appealed to the Second Circuit.  *See In re*

*Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374, 391 (S.D.N.Y. 2019) (finding that

the plaintiff's arguments for reconsideration unpersuasive but granting certification for

interlocutory appeal).[12]

Because the Court failed to address Defendants' request for certification of interlocutory

appeal in the July 2020 Decision and Defendants filed the instant motion requesting that the

Court decide the issue and grant certification on July 24, 2020, only eleven days after the July

2020 Decision, (Defs.' Mem. 1), the Court finds that Defendants' request for certification of

interlocutory appeal is timely.

### c.   Defendants satisfy the substantive requirements for certification of an interlocutory appeal

Defendants assert that "[t]he Court's denial on reconsideration of [its] motion to dismiss

— on the grounds that 42 U.S.C. § 1320a-7b(a)(4) may serve as the basis for [Relator's]

[m]isappropriation [c]laims — is a ruling of substantial import."  (Defs.' Mem. 3.)  In support,

Defendants argue that the outcome is relevant to the present action as well as "any others where

a court may be called upon in the future, given the precedent articulated in this case, to apply that

statutory subsection to any medical facility that houses and treats Medicare and Medicaid

recipients."  (*Id.*)

Relator argues that "[s]ince 'no controlling issue of law is presented,' no 'substantial

difference of opinion' regarding the legal issue identified by [D]efendants exists and 'an

---

[12]  Moreover, 28 U.S.C. § 1292 permits the district court to certify an interlocutory
appeal to a circuit court even when the request is not raised by either party.  *See also Baker v.*
*Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 256 (N.D.N.Y. 2017) (certifying
interlocutory appeal where neither party requested one where the motion raised "several complex
and novel issues"), *aff'd in part, appeal dismissed in part*, 959 F.3d 70 (2d Cir. 2020).

immediate appeal' would not advance the ultimate termination of the litigation, Defendants'

request for an interlocutory appeal is unwarranted." (Pl.'s Opp'n 5 (quoting *Storms v. United States,* 2015 WL 7429999, at *10–12 (E.D.N.Y. 2015)).)

For the reasons discussed below, the Court finds that Defendants have established all

three section 1292(b) factors.

### i.   There is a controlling question of law

Defendants argue that whether the misappropriation claims "may properly be pursued

under [s]ection 1320a-7b(a)(4) is a controlling question of law that can, without question, be

decided 'quickly and cleanly without having to study the record.'" (Defs.' Mem. 3 (quoting

*Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013)).) Defendants

contend that the guiding question in the Court's determination is "whether, assuming the truth of

Relator's allegations, [the alleged] conduct violates the [FCA]." (Defs.' Reply 4.) In support,

Defendants argue that the issue "involves the interpretation and application of a criminal statute

in a context that no other court, in any reported decision, has considered, and is a 'pure' question

of law" and that "modification or reversal of the Court's decision in this instance would

'terminate' the Relator's final surviving [FCA] claim, and thus would 'significantly affect the

conduct of the action' going forward." (Defs.' Mem. 3 (quoting *Batalla Vidal v. Nielsen*, No.

16-CV-4756, 2018 WL 333515, at *2 (E.D.N.Y. Jan. 8, 2018)).)

Relator argues that "[w]hether Defendants misappropriated funding that the government

provided to CHS for nursing home residents' care and utilized it for other unrelated corporate

purposes is fact-driven, as demonstrated by CHS's need to develop a factual record in support of

its dismissal motion" and that the "Court's holding denying Defendants' dismissal motions

rested upon it finding that factual issues existed that required the development of record

evidence." (Pl.'s Opp'n 6.) Relator further asserts that whether Defendants violated 42 U.S.C. §

1320a-7b(a)(4) "is dependent upon the details surrounding the charges against the Nursing Home's budget that are alleged by Relator to have been fabricated and inflated for the illegal purpose of diverting Medicare and Medicaid proceeds away from the care of Nursing Home residents to unrelated purposes." (*Id.*)  Finally, Relator asserts that the claims do not involve a controlling issue of law because "[t]he Relator maintains a separate retaliation claim that would continue irrespective of the outcome of an appeal." (*Id.*)

To be ripe for interlocutory appeal, the controlling question of law "must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record." *Fairbank Recons. Corp. v. Greater Omaha Packing Co., Inc.*, No. 13-CV-907S, 2020 WL 7427025, at *4 (W.D.N.Y. Dec. 18, 2020) (quoting *Retail Pipeline, LLC v. JDA Software Grp., Inc.*, No. 17-CV-67, 2018 WL 2298355, at *2 (D. Vt. May 21, 2018)).  Where reversal of the district court's order "would terminate the action," it involves a "controlling" question of law.  *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990).  Short of a reversal necessitating dismissal, at a minimum, the resolution of the issue should "materially affect the litigation's outcome." *In re Great Atl. & Pac. Tea Co., Inc.*, 615 B.R. at 722 (quoting *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 658 (S.D.N.Y. 2005)).  The issue "'need not affect a wide range of pending cases' as long as it is controlling in the instant litigation." *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 141 (E.D.N.Y. 2015) (quoting *Klinghoffer*, 921 F.2d at 24).

Although the issue of whether Defendants misappropriated funds is fact-driven, the Court finds that the issue of whether the misappropriation claims may properly be *pursued* under section 1320a-7b(a)(4) is a pure question of law.  Even if Relator shows facts that support the

15

misappropriation of funds, the misappropriation claims would be nonviable if the alleged conduct does not violate the FCA. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. ---, ---, 140 S. Ct. 2183, 2208 (2020) (finding that severability was a pure question of law because "[i]f the removal restriction is not severable, then [the court] must grant the relief requested, promptly rejecting the demand outright" but if "the removal restriction is severable, [the court] must instead remand"); *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 282 (2d Cir. 2020) (noting that notwithstanding the number of unsolicited texts the defendant sent, whether the Telephone Consumer Protection Act applied to the defendant was a "pure question of statutory interpretation"); *United States v. Williams*, 733 F.3d 448, 452 (2d Cir. 2013) ("Interpretations of statutes are pure questions of law . . . ."); *Tantaros v. Fox News Network, LLC.*, 465 F. Supp. 3d 385, 390 (S.D.N.Y. 2020) ("The question of subject matter jurisdiction in this case is also a 'pure' question of law that turns on the statutory interpretation of [section 7515 of the New York Civil Practice Law and Rules].").  Indeed, the Second Circuit can review whether section 1320a-7b(a)(4) may support Relator's misappropriation claims without referring to the record.

If the Second Circuit holds that section 1320a-7(b)(a)(4) may not serve as a basis for Relator's misappropriation claims, the FCA claims would be terminated.  *See In re Actos End-Payor Antitrust Litig.*, No. 13-CV-9244, 2020 WL 433710, at *2 (S.D.N.Y. Jan. 28, 2020) (finding that the "controlling question of law" factor was met because "if the Court of Appeals were to interpret [the statute] in accordance with the construction advanced by [the defendants], that conclusion would put an end to the instant litigation"); *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 256 (N.D.N.Y. 2017) (granting interlocutory appeal where the viability of claims "could significantly impact the . . .  scope and focus of discovery, any

subsequent motion for summary judgment, and the issues to be presented at trial"), *aff'd in part, appeal dismissed in part*, 959 F.3d 70 (2d Cir. 2020).

Accordingly, whether Plaintiff may be afforded FCA relief under section 1320a-7b(a)(4) is a controlling question of law.

### ii. There is substantial ground for difference of opinion

Defendants argue that "[n]o other federal court in the nation (other than this one) has addressed whether a facility that receives Medicare or Medicaid funding violates 42 U.S.C. § 1320a-7b(a)(4) if it fails to specifically earmark and segregate those government funds for the sole and exclusive benefit of the program beneficiaries." (Defs.' Mem. 4.) Defendants assert that the Court's "holding [in this case] has broad-reaching implications for medical facilities in [the Second] Circuit, and indeed, nationwide." (*Id.*)

Relator argues that there is no substantial difference of opinion as to the plain language interpretation of 42 U.S.C. § 1320a-7b(a)(4) and that there is no case law that supports Defendants' assertion that the statute would not apply to Defendants. (Pl.'s Opp'n 7–8.) Relator states that consistent with Second Circuit precedent, "when the government gives money for a particular purpose, one cannot secretly use it for an alternative agenda." (*Id.* at 8.)

A substantial ground for a difference of opinion may exist when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *Pen Am. Ctr., Inc. v. Trump*, No. 18-CV-9433, 2020 WL 5836419, at *2 (S.D.N.Y. Oct. 1, 2020) (quoting *Whyte v. Wework Companies, Inc.*, No. 20-CV-1800, 2020 WL 4383506, at *1 (S.D.N.Y. July 31, 2020)). "There must be more than 'simple disagreement' on the issue." *Danaher Corp. v. Travelers Indem. Co.*, No. 10-CV-121, 2020 WL 6712193, at *1 (S.D.N.Y. Nov. 16, 2020) (quoting *Garber v. Office of the Comm'r of Baseball*, 120 F. Supp. 3d

17

334, 337 (S.D.N.Y. 2014)).  However, "when a question meets the standards set forth in [section] 1292(b) and 'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'"  *Tantaros*, 465 F. Supp. 3d at 391 (quoting *Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013)); *see also Benoit*, 959 F.3d at 508 ("[T]here is ample ground for difference of opinion as to whether New York law recognizes the availability of medical monitoring for a claim based solely on property damage."); *Mei Xing Yu v. Hasaki Rest., Inc.*, 874 F.3d 94, 98 (2d Cir. 2017) (concluding that there was substantial ground for difference of opinion demonstrated by "the differing rulings within this Circuit"); *Zakrzewska v. New Sch.*, 574 F.3d 24, 27 (2d Cir. 2009) (granting a motion for interlocutory appeal based on the district court's statement that its "conclusion is not free from doubt" (quoting *Zakrzewska v. The New Sch.*, 598 F. Supp. 2d 426, 437 (S.D.N.Y. 2009))); *Weber v. United States*, 484 F.3d 154, 159 (2d Cir. 2007) (stating that part of Congress' intent in passing section 1292(b) was "to assure the prompt resolution of knotty legal problems"); *Seneca Nation v. Cuomo*, No. 18-CV-429, 2020 WL 5248467, at *10 (W.D.N.Y. Sept. 3, 2020) (noting a substantial ground for opinion where the case law was "less than crystal clear").

"[I]t is the duty of the district judge to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute."  *Pen Am. Ctr., Inc.*, 2020 WL 5836419, at *3 (quoting *Flor v. Bot Fin. Corp. (In re Flor)*, 79 F.3d 281, 284 (2d Cir. 1996)); *see also Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 200 (2d Cir. 2010) (affirming district court's conclusion that there was substantial ground for difference of opinion as to the status of a public employee who reports on an issue of public concern in his workplace).

While the July 2020 Decision stated that "[s]ection 1320a-7(b)(a)(4) may serve as the basis for Relator's misappropriation claims," this is a novel issue in the Second Circuit. *Catholic Health III*, 2020 WL 3960514, at *10; *see also Pen Am. Ctr., Inc.*, 2020 WL 5836419, at *3 (granting certification of interlocutory appeal although "the [c]ourt disagree[d] with [the defendant's] position that there is no constitutionally permissible declaration available to redress [the plaintiff's] alleged injuries," because the "issue is a matter of first impression in the Circuit"). The Court acknowledges that the only cases on this issue in the Second Circuit involve the instant action and that substantial difference of opinion may exist as to the statute's interpretation. *See Tantaros*, 465 F. Supp. 3d at 392 (finding that the second factor was met where only one other case had interpreted the statutory provision); *Capitol Records, LLC*, 972 F. Supp. 2d at 552 ("This issue is a question of first impression in the Second Circuit, and aside from these two decisions[,] no other federal court appears to have addressed the issue. In view of the paucity of case law . . . , the [c]ourt finds that the second statutory factor has been satisfied."); *Republic of Colombia v. Diageo N. Am. Inc.*, 619 F. Supp. 2d 7, 11 (E.D.N.Y. 2007) (granting certification of appealability where there were "so few decisions" on the relevant doctrine).

In addition, the outcome of this case has broad-reaching ramifications for healthcare facilities. *See In re Actos End-Payor Antitrust Litig.*, 2020 WL 433710, at *2 (finding that there was a substantial difference in opinion where "both parties made strong arguments in support of their differing [statutory] interpretations," there was an "absence of controlling authority," and the issue "may have important ramifications for other companies in the pharmaceutical industry"); *Capitol Records, LLC*, 972 F. Supp. 2d at 553 (granting certification of appealability and recognizing "that determining whether a defendant has 'red flag' knowledge of infringement

is a difficult question that has important ramifications for service providers such as [the defendant]").

Accordingly, the Court finds that there is substantial ground for a difference of opinion as to whether section 1320a-7b(a)(4) may support Relator's misappropriation claims.

### iii.   An immediate appeal may materially advance the ultimate termination of the litigation

Defendants argue that an immediate appeal may materially advance the ultimate termination of the litigation because "if allowed to proceed to discovery and trial, the [m]isappropriation [c]laims will involve substantial factual discovery" as exemplified by "the recently adopted discovery schedule [which] establishes that discovery will not conclude until, at the earliest, late 2021."  (Defs.' Mem. 5; Min. Entry dated July 24, 2020.)  Defendants assert that "if the Second Circuit were to determine that there is no legal basis for those [s]ection 1320a-7b(a)(4) claims, there would be no need to engage in such extensive efforts."  (Defs.' Mem. 5.)

Relator argues that (1) "[it] maintains a retaliation claim that would be litigated irrespective of an appeal's outcome," and (2) that "a reversal would not . . . materially change the nature of discovery . . . because the Relator must prove that he reasonably and in good faith objected to conduct he believed to be an FCA violation," and there is "substantial overlap between discovery that supports . . . Relator's retaliation and FCA claims."  (Pl.'s Opp'n 8–9.)

A party may show that an interlocutory appeal would "materially advance" the litigation by demonstrating that the "appeal promises to advance the time for trial or to shorten the time required for trial."  *Tantaros*, 465 F. Supp. 3d at 389 (quoting *Florio v. City of N.Y.*, No. 06-CV-6473, 2008 WL 3068247, at *1 (S.D.N.Y. Aug. 5, 2008)).  This factor carries particular weight, and is "'closely connected' to the first factor."  *Capitol Records, LLC*, 972 F. Supp. 2d at 551

(quoting *In re 650 Fifth Ave.*, No. 08-CV-10934, 2012 WL 363118, at *2 (S.D.N.Y. Feb. 2,

2012)).

 While there may be some overlap between the discovery for both the retaliation and FCA

claims, a dismissal of the FCA claims will streamline discovery.  Relator need not prove an FCA

violation to succeed on the retaliation claim.  *See Graham Cnty. Soil & Water Conservation Dist.*

*v. United States ex rel. Wilson*, 545 U.S. 409, 416 & n.1 (2005) (noting that "a well-

pleaded retaliation complaint need not allege that the defendant submitted a false claim" and that

many courts have "properly recognized that proving a violation of [the false claims statute] is not

an element of a [retaliation] cause of action"); *New York ex rel. Khurana v. Spherion Corp.*, No.

15-CV-6605, 2021 WL 50890, at *11 (S.D.N.Y. Jan. 6, 2021) (noting that an FCA claim is

distinct from a retaliation claim under the FCA); *Hayes v. Dep't of Educ.*, 20 F. Supp. 3d 438,

443 (S.D.N.Y. 2014) (noting that the plaintiff's FCA retaliation claim could proceed

"irrespective of the fate of her FCA *qui tam* claim").  Unlike *qui tam* complaints filed under the

FCA, which are subject to the particularity requirements of Rule 9(b) of the Federal Rules of

Civil Procedure, retaliation claims under the FCA are evaluated under the plausibility

standard.  *See United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Resp.,*

*Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) ("*Qui tam* complaints filed under the FCA, because they are

claims of fraud, are subject to Rule 9(b)." (citing *United States ex rel. Ladas v. Exelis, Inc.*, 824

F.3d 16, 26 (2d Cir. 2016))); *id.* at 81 ("The particularity requirement of Rule 9(b) does not apply

to retaliation claims under the FCA." (citing *Weslowski v. Zugibe*, 626 F. App'x 20, 20 (2d Cir.

2015))); *Shi v. Moog, Inc.*, No. 19-CV-339, 2020 WL 5668979, at *1 n.2 (W.D.N.Y. Sept. 24,

2020) (noting the difference in pleading requirements between FCA claims and retaliation claims

under the FCA).  Thus, the scope of discovery necessary to prove the retaliation claim would be narrower.

Furthermore, if the Second Circuit ruled in Defendants' favor, the action would be dismissed at least in substantial part.  *See Capitol Records, LLC*, 972 F. Supp. 2d at 554 (granting certification of interlocutory appeal where the Second Circuit's decision may narrow the number of instances of infringement alleged in an amended complaint); *Republic of Colombia*, 619 F. Supp. 2d at 11 ("If [the defendants] were to prevail on even one of these defenses, the action would be dismissed in whole or in part, thus eliminating or significantly reducing the costs of discovery.  As a result, permitting an interlocutory appeal will expedite this litigation.").  Indeed, such a dismissal would advance the trial schedule and expedite the litigation.  *See United States ex rel. Chorches for Bankr. Estate of Fabula*, 865 F.3d at 87–88 ("[The plaintiff's] plausible and particularized allegations are amenable to a targeted discovery process that could lead to a swift resolution of the lawsuit, especially if [the defendant] has not committed the fraud alleged."); *Veeraswamy v. Jones as Tr. of Estate of Veeraswamy*, No. 19-CV-2137, 2019 WL 1876788, at *2 (E.D.N.Y. Apr. 26, 2019) ("An immediate appeal may materially advance the ultimate termination of the litigation when the 'appeal promises to advance the time for trial or to shorten the time required for trial.'" (quoting *Osuji v. U.S. Bank, Nat'l Ass'n*, 285 F. Supp. 3d 554, 558 (E.D.N.Y. 2018))); *Batalla Vidal*, 2018 WL 333515, at *3 (E.D.N.Y. Jan. 8, 2018) (granting certificate of appealability and noting that if the Second Circuit concluded that the decision to rescind the Deferred Action for Childhood Arrivals Program was nonreviewable, then at least one of the plaintiff's challenges would be dismissed, which "would not only simplify [the] court's task but might also reduce the scope of discovery").

Thus, an interlocutory appeal would materially advance the litigation.  Because

Defendants have established all three section 1292(b) factors, the Court grants Defendants'

motion to certify interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

**III.  Conclusion**

For the reasons set forth above, the Court grants Defendants' motion for certification of

interlocutory appeal and issues a certificate of appealability.

Dated: February 22, 2021
       Brooklyn, New York

                              SO ORDERED:


                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge